UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VINCENT A. SHEPERIS, | : | CIVIL ACTION NO.: |
| | : | 3:17CV011318(JCH) |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SIG SAUER, INC. | : | JURY TRIAL DEMANDED |
| | : | |
| | : | |
| Defendant. | : | AUGUST 31, 2017 |

**AMENDED COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), plaintiff Vincent Sheperis amends his Complaint against defendant Sig Sauer, Inc. as follows.

**NATURE OF ACTION**

This action seeks recovery of compensatory and punitive damages, and equitable relief, caused by defendant Sig Sauer, Inc.'s negligent manufacture and/or design of a semi-automatic firearm. Specifically, a semi-automatic pistol model known as the "P320."

On January 5, 2017 the plaintiff, a member of the Stamford Police Department's Special Response Team (SRT), accidentally dropped his Department-issued P320 while loading SRT equipment into the rear of his vehicle. Upon impact with the ground, the pistol discharged, without the trigger being pulled,[1] shooting him in his left leg, causing substantial physical harm,

---

[1] In the weapons industry, this type of discharge is typically referred to as an inadvertent or unintended discharge, or "drop fire," in which the weapon fires without a trigger pull. *See, e.g., O'Neal v. Remington Arms Co., LLC*, 817 F.3d 1055, 1060 (8th Cir. 2015) (referring to "inadvertent discharge" of weapon "without the trigger being pulled").

emotional distress, sleeplessness, and mental trauma.  At the time of its descent to the ground and the discharge, Sheperis's pistol was, further, fully holstered.  The trigger was therefore incapable of being touched or of any manual movement by Officer Sheperis.  SIG was made aware of this incident in January 2017, days after it happened, yet issued no press release, recall or "voluntary upgrade" until after it was sued in this court eight months later.

The weapon should never have discharged upon mere impact with the ground, holstered or un-holstered.  In its own "Safety Without Compromise" marketing materials for the P320, SIG SAUER states:

> "We've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to."

SIG further expressly represented in the marketing materials that the P320 was in fact drop safe:  "[a]nd, while available as an option, you won't need a tabbed trigger safety for your gun to be **drop safe**." (emphasis added).

Under these circumstances, SIG SAUER is liable for this incident under the Connecticut Product Liability Act, Conn. Gen. Stat. §§ 52-572m and 52-572n, which includes, on a unified basis, claims for strict liability, negligence, misrepresentation, punitive damages and breach of implied and express warranty.  Plaintiff Sheperis also brings a separate cause of action seeking compensatory and punitive damages under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), for unfair and deceptive trade practices in their marketing of the weapon, as further described below.

He also brings causes of action under Connecticut common law for negligent and intentional infliction of emotional distress in view of Sig's misleading representations about the safety of the weapon, as well as the company's knowledge, months before and after January

2017, that there was a defect in the trigger that could cause an unintentional discharge if the weapon were dropped on the rear of the weapon's slide and frame.

Upon information and belief, defendant recklessly failed to recall and fix this defect in the commercial model of this weapon, used by law enforcement agencies all over the country, as well as any civilian purchasers of the weapon, until after this suit was originally brought eight months later on August 4, 2017, in the calculated and reckless hope that no one would be shot due to an accidental discharge. It did so to avoid incurring a cost in excess of approximately $75 million in parts, labor, and shipping to fix the problem, thereby placing thousands of lives unnecessarily at risk.

## JURISDICTION

1. Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff Vincent Sheperis is a citizen of the United States and the State of Connecticut. Defendant Sig Sauer, Inc. has a principal place of business in New Hampshire. The amount in controversy exceeds, exclusive of interest and costs, $75,000.

## VENUE

2. Venue is proper in this judicial district under 28 U.S.C. § 1391(a)(2). A substantial part of the events or omissions giving rise to the plaintiff's claims occurred within this judicial district.

## PARTIES

3. Vincent A. Sheperis is 34-year-old citizen of the United States who currently is domiciled in Connecticut. He has been member of the Stamford, Connecticut police department since September 2006. He has been a member of the Department's Special Response Team

(SRT), known in other contexts as Special Weapons and Tactics, since 2011.  He has received numerous commendations for his courageous and highly-skilled police work from his superiors, which has included major narcotics-trafficking arrests, and has never received discipline during his entire career.

4. Sig Sauer, Inc. designs and manufactures firearms for military, law enforcement, and commercial markets worldwide. It offers pistols, rifles, short barrel rifles, Sig Sauer Mastershop series, and firearms accessories; and apparel, CD/DVD training, and knives. The company also provides customized training in security subjects for corporate customers and law enforcement agencies on a contract basis.

It markets and sells its products through dealers. Sig Sauer, Inc. was formerly known as SIGARMS, Inc. and changed its name to SIG SAUER, Inc. in October 2007. The company was founded in 1985 and is headquartered in Exeter, New Hampshire.

## ALLEGATIONS

5. The discharge at issue occurred when Officer Sheperis accidentally dropped his fully-holstered P320 on the ground in the Department's Special Response Team bay parking area in Stamford, Connecticut on January 5, 2017.  The weapon fell to the ground from a distance of approximately three feet.  It was not thrown to the ground, "repeatedly or heavily dropped," or un-holstered when the incident occurred.

6. Due to a defect in the trigger's weight, known to SIG at the time, the weapon's impact with the ground resulted in an inertia-based unintended discharge, striking Officer Sheperis, a Special Response Team member, in his left leg.

7. Any and all of the weapon's internal and external safeties failed to prevent it from discharging and shooting Officer Sheperis.

4

8. The bullet entered beneath his left knee, traversed the tissue and part of a tendon behind his patella, and lodged slightly to the left of his knee with the round protruding from his leg.

9. Fellow officers and EMS took Officer Sheperis to the emergency room at Stamford Hospital where he was operated on by two trauma surgeons.

10. While the full extent of the physical damage to his knee and leg is not yet known, the incident has resulted in substantial physical harm and related mental trauma to Officer Sheperis, who was completely out of work thereafter, then placed on light duty due to loss of function from the wound, then put out of work again after an additional surgery.

11. It has also thus far resulted in physical therapy, and additional surgery to repair the damage caused by the discharged round.

12. Officer Sheperis's P320 pistol discharged on mere impact with the ground, without the trigger being pulled or even touched, which defendant SIG represented was not possible in marketing materials for the P320. The bullet could easily have taken his life had it moved on a different trajectory.

13. It also discharged while it was fully holstered in a Model 6360 ALS/SLS Mid Ride, Level III Retention Duty Holster, which attaches to, and detaches from, a mid-thigh area mount worn by Special Response Team members.

14. Because it was holstered, the trigger was protected from any manual movement upon impact with the ground.

15. At no time before, during or after the incident did Officer Sheperis place his finger on the P320's trigger or touch the holstered firearm in any manner.

16.     In a Supplemental Report dated January 5, 2017, Officer Sheperis stated:  "[a]t no time from when the firearm secured within the holster fell from my person, to when it struck the ground, or while I was waiting for assistance did I touch my firearm."

17.     The P320 in question was delivered to SIG's headquarters for testing days after the January 5, 2017 shooting.   SIG therefore had knowledge of the accidental discharge mere days after the incident in January 2017.  Yet no statement, recall or voluntary upgrade was ordered.

18.     Upon information and belief, SIG did not drop test the weapon, but simply fired approximately 50 rounds through it and declared it to be fine.  The Stamford Police Department provided SIG with the make and model of Sheperis's vehicle, height measurements from which the weapon fell, and the type of holster the weapon was in to assist SIG with drop testing of the weapon.  SIG, however, entirely ceased further communications with Officer Sheperis and the Stamford Police Department thereafter.

19.     In the process of testing the weapon in January 2017, a SIG employee noted a mark or scratch on the rear of the slide.

20.     In additional marketing material for the commercial version of the P320, under the heading "Striker Safety," defendant SIG SAUER further states:  The Striker Safety "[p]revents the striker from being released *unless the trigger is pulled*."  (emphasis added).

21.     At the same time, SIG SAUER contradictorily states in the manual for the P320, on page 25, that the weapon may fire if dropped without the trigger being pulled if the chamber is not empty.

22.     Upon information and belief, SIG SAUER inserted this warning into the P320 manual because its own internal testing, and/or other testing, revealed that it could fire if

6

dropped at an angle at which the rear of the weapon's slide and frame struck the ground, causing the trigger to move backward and fire the gun due to the inertial force caused by such an impact.

23. It is standard operating procedure for all U.S. law enforcement agencies, including the United States Secret Service, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, to carry pistols with a chambered round. SIG was fully aware of this fact at the time it sold any and all P320 pistols to U.S.-based law enforcement agencies and departments, and has recently changed the original P320 manual to delete a warning to not carry a chambered round unless firing.

24. Upon information and belief, SIG refrained from representing to the United States Army that the P320 could fire with a chambered round if it was dropped to the ground, in the process of competing for the $500,000,000 contract to replace the Army's existing firearm in the months leading up to January 2017.

25. Officer Sheperis and his employer the Stamford Police Department reasonably relied on SIG's marketing statements about the safety of the weapon's trigger, as well as SIG's reputation for producing high-quality weapons, when it purchased the commercial version of the P320.

26. The Department has since shelved all P320s issued to its Special Response Team Operators due to the January 2017 incident.

27. The commercial version of the P320 is a pistol model no doubt currently in use, or soon to be in use, by many other police departments around the nation. Since the filing of

this suit on August 4, 2017, SIG announced a "voluntary recall" of the weapon on August 8, 2017. Since that time, thousands of these weapons have been, or will be, shipped back to SIG to have a lighter, safer trigger installed.

28. SIG fixed the drop defect in the military version of the weapon - - installing a lighter trigger to prevent any inertia-related unintended discharges, long before January 2017, while in the process of testing the weapon and competing to obtain a contract worth more than $500,000,000 with the United States Army. This it successfully accomplished in January 2017, the same month Officer Sheperis was shot with the commercial version of the weapon.

29. Upon information and belief, there have been many prior incidents of unintended discharges involving Sig Sauer weapons that are dropped and fire without the trigger being pulled, or simply while being handled, or while being holstered.

30. For example, from 2005 to January 2011, the San Francisco Police Department reported 29 accidental discharges (a time when it issued SIG Sauers as its primary sidearm).

31. In 2002, a San Fernando police officer dropped his SIG Sauer, causing an accidental discharge that killed him, refuting claims the trigger must be pulled to fire the gun.

32. In 2008, an officer in Connecticut accidentally discharged his SIG Sauer while holstering it.

33. In 2011, a security guard in St. Louis dropped his SIG Sauer, unintentionally shooting someone.

34. In 2012, a New York transit officer accidentally discharged his SIG Sauer while holstering it.

35. In 2014, a federal air marshal in New Jersey unintentionally shot himself while

handling his SIG Sauer service weapon.

37. In 2016, a tactical response training instructor near Sacramento dropped his SIG Sauer, firing a bullet into a student's truck.

38. In the period between 2012 and 2015, the New York City Police Department reported 10 accidental discharges involving Sig Sauer weapons.

39. On August 3, 2017, the Dallas Police Department issued a recall of the P320 due to drop safety concerns, prohibiting its use by officers until repaired. In an interdepartmental memo, it stated:

> Sig Sauer has identified that there is a defect in the P320 handgun that could cause the weapon system to go off when dropped. The Sig Sauer P320 was approved for primary duty, secondary primary duty, and back-up use. The Firearms Training Center is currently working with Sig Sauer to obtain a solution for the safety issue. Until Sig Sauer is able to find a solution to the safety issue, the Sig Sauer P320 is no longer approved by the Dallas Police Department for any use.

40. Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to accidental discharges in both 2016 and 2017, including those involving the P320.

41. In an interview in 2013, Sig's Chief Financial Officer, Timothy Scullin, noted that Sig's revenue rose approximately 1,400 percent from 2012 to 2013 and stated that Sig Sauer's Growth has outpaced its industry's growth by "two or three times."

42. When asked what some of his biggest professional challenges he has faced in his career, he stated:

> At SIG, to grow this fast, people get really challenged. When you're growing 70 to 80 percent in a year, **all the systems get stretched, and the people really get stretched**. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down.

>It just creates a tremendous of stress on the people in the system.  But we've got people that have risen to the challenge.

(emphasis added).

43. Days after the Dallas Police Department announced that SIG had informed them of a defect with the P320 in July or August of 2017, SIG's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

44. This statement was false, in view of SIG's knowledge that Officer Sheperis had been shot by a drop fire some eight months earlier with a version of the weapon that was not the military version, but the commercial version of the weapon.

45. There is no difference between the version of the weapon purchased and used by law enforcement agencies and any civilians in the U.S. Commercial market.

46. On August 8, 2017, SIG announced a "voluntary upgrade" of the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies."  SIG further stated in this release that "[a]s a result of input from law enforcement, government and military customers, SIG has developed a number of enhancements in function, reliability, and overall safety including drop performance."

47. Upon information and belief, four months before this release, the SIG P320 failed German drop tests in April 2017, specifically the Ulm Proof House tests.  Four months before that, SIG had first-hand knowledge that a P320 had dropped and shot Officer Sheperis.

48. The safety standards SIG claims the weapon passed all require a pistol to be dropped on a one-inch thick rubber mat, and land on the same rubber mat after being dropped, a testing criterion which is plainly outdated and absurd given that end users of the weapon do not walk around on rubber mats when carrying the weapon.  Moreover, only one of the tests

(NIJ) requires that the weapon be dropped on the rear of the weapon.

49. The existing U.S. drop tests SIG claims the P320 passed, moreover, are well known to be antiquated and inadequate. This is the reason why SIG continued to test the P320 beyond the inadequate U.S. standards, both internally, and in foreign countries such as Germany in April 2017.

50. Upon information and belief, defendant recklessly failed to recall and fix this defect in the commercial model of this weapon when it first had knowledge of the defect in January 2017. In all likelihood, it had knowledge of the drop defect months before January 2017 while testing the P320 in the process of competing for the Army's $500,000,000 contract against various highly-qualified competitors, thereby putting thousands of lives unnecessarily at risk.

## COUNT ONE

## VIOLATION OF CONNECTICUT PRODUCTS LIABILITY ACT (CPLA)

### Conn. Gen. Stat. §§ 52-572m and 52-572n

51. Paragraphs one through 50 are incorporated by reference.

52. By its actions, in producing a weapon with a design and/or manufacturing defect, defendant Sig Sauer has violated the provisions of the CPLA.

53. Defendant is liable to Sheperis under CPLA under theories of strict liability, negligence, misrepresentation, punitive damages and breach of implied and express warranty.

54. The defendant's violation of CPLA has been the proximate and foreseeable cause of physical harm and substantial compensatory and actual damages to Sheperis, entitling him to recover compensatory and punitive damages.

## COUNT TWO

## VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT

### Conn. Gen. Stat. § 42-110a *et seq.*

55. Paragraphs one through 54 incorporated by reference.

56. By its actions, in representing in its marketing materials that the P320 is drop safe and will not fire unless the trigger is pulled, while simultaneously stating in the weapon's manual that it may discharge if merely dropped, or even "vibrated," without the trigger being pulled, defendant has engaged in duplicitous, unfair and deceptive trade practices in violation of CUTPA.

57. Defendant had knowledge of the drop defect with the commercial version of the P320 at least as early as January 2017, and in all likelihood months earlier, yet continued to represent in marketing materials that it would not fire unless the trigger was pulled.

58. Moreover, defendant modified the trigger on the military version of the P320 to remedy the defect in the commercial version's trigger, i.e., its weight, yet left the trigger unchanged on the commercial version to be used by police officers and any civilian purchasers.

59. Defendant engaged in these practices in the calculated and reckless hope that no one would accidentally drop the commercial version of the P320 and be shot or killed, to avoid spending in excess of $75 million to fix the problem.

60. The defendant's violation of CUTPA has been the proximate and foreseeable cause of physical harm and substantial compensatory and actual damages to Sheperis, entitling him to recover compensatory and punitive damages.

## COUNT THREE

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

61. Paragraphs one through 60 are incorporated by reference.

62. By its actions, defendant knew, or should have known, that the design and/or manufacturing defect in the P320 rendered it capable of discharging without the trigger being pulled. Yet is presented to the Stamford Police Department and Sheperis, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

63. Defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress;

64. The plaintiff's emotional distress was foreseeable;

65. The emotional distress was severe enough that it might result in illness or bodily harm, and in fact did result in such harm;

66. The defendant's conduct was the cause of the plaintiff's distress.

67. The trigger was not pulled by Sheperis, yet the weapon still fired and shot him in the leg.

68. The defendant's tortious conduct has been the proximate cause of substantial compensatory and actual damages to Sheperis, including emotional distress, sleeplessness, post-traumatic stress, and loss of function, entitling him to recover compensatory and punitive damages under Connecticut common law.

## COUNT FOUR

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

69. Paragraphs 1 through 68 are incorporated by reference.

70. Upon information and belief, defendant had knowledge of the drop safety defect with the commercial version of the P320 before Officer Sheperis was shot in January 2017.

71. Despite having such knowledge, it failed to issue a press release, recall or "voluntary upgrade" until eight months after he was shot, and the company was sued in this court.

72. Had defendant acted responsibly and repaired the defect in the commercial version of the P320 before January 2017, Officer Sheperis never would have been shot. The round discharged from his weapon easily could have taken his life.  He is lucky to be alive.

73. Defendant knew, or should have known, that severe emotional distress was a likely result of its outrageous and irresponsible conduct, which was designed to save in excess of $100 million in repair costs.

74. Defendant's irresponsible conduct in this matter was reckless, extreme and outrageous.

75. Defendant's conduct was the direct and proximate cause of the plaintiff's distress.

76. The emotional distress sustained by the plaintiff was severe.

77. The defendant's tortious conduct has been the proximate cause of substantial compensatory and actual damages to Sheperis, including emotional distress, sleeplessness, post-traumatic stress, and loss of function, entitling him to recover compensatory and punitive damages under Connecticut common law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court:

1. Assume jurisdiction over this case;

2. Empanel a jury;

3. Award actual and compensatory damages in the amount of $1 million or in any other amount determined by a jury for defendant's violation of the CPLA;

4. Award $2 million in punitive damages for defendant's violation of the CPLA;

5. Award actual and compensatory damages in the amount of $1 million or in any other amount determined by a jury for defendant's violation of CUTPA;

6. Award $2 million in punitive damages for defendant's violation of CUTPA;

7. Award $1 million in compensatory damages under Connecticut common law for negligent and/or intentional infliction of emotional distress;

8. Award plaintiff costs and reasonable attorneys' fees in bringing this action;

9. Order defendant to issue a recall notice or other enhanced, unambiguous warning to all purchasers of the P320 stating that the weapon is not drop safe with a chambered round, and can fire without a trigger pull;

10. Retain jurisdiction over this case until defendant has complied with all orders of the Court;

11. Award such other relief as the Court deems appropriate.

The plaintiff demands a trial by jury on all counts.

                        PLAINTIFF
                        VINCENT A. SHEPERIS

By:    /s/Jeffrey S. Bagnell
       Jeffrey S. Bagnell
       Federal Bar No. CT18983
       Jeffrey S. Bagnell, Esq., LLC

        55 Greens Farms Road, #200-60
        Westport, Connecticut 06880
        (203) 984-8820
        (203) 255-4454 (fax)
        jeff@bagnell-law.com


        Attorney for Plaintiff


## CERTIFICATION

     This is to certify that on this 31st day of August 2017 a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties, as listed below, by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.


                /s/Jeffrey S. Bagnell_____

16