UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VINCENT A. SHEPERIS,                        :        CIVIL ACTION NO.:
                                            :        3:17CV011318(JCH)
     Plaintiff,                           :
                                            :
     Individually, and on behalf of himself and   :
     others similarly situated,           :
                                            :
CITY OF STAMFORD,                           :
                                            :        **CLASS ACTION COMPLAINT**
     Intervening Plaintiff,               :
                                            :
v.                                          :
                                            :
                                            :
SIG SAUER, INC.                             :        JURY TRIAL DEMANDED
                                            :
     Defendant.                           :        DECEMBER 29, 2017

## SECOND AMENDED COMPLAINT

## NATURE OF ACTION

In this action plaintiff Vincent A. Sheperis seeks recovery of compensatory and punitive damages, and equitable relief, individually, and on behalf of similarly situated individuals numbering in the hundreds or thousands within the State of Connecticut (the "Class").

These damages have been caused by defendant Sig Sauer, Inc.'s deceptive marketing, assembly, sales, distribution, and failure to issue a mandatory recall, of a defective semi-automatic firearm that accidentally discharged in January 2017 and shot plaintiff Sheperis in his left leg.  Specifically, a semi-automatic pistol model known as the "P320" (the "Class Pistol," as further described below).  For the purposes of the claims made herein, the Class Pistol is considered an inherently dangerous commodity capable of causing serious bodily injury up to

and including death.

## <u>SUMMARY OF ALLEGATIONS AND CLASS ALLEGATIONS</u>

On January 5, 2017 the plaintiff, a member of the Stamford Police Department's Special Response Team (SRT), accidentally dropped his Department-issued P320 while loading SRT equipment into the rear of his vehicle.  Upon impact with the ground, the pistol discharged, without the trigger being pulled,[1] shooting him in his left leg, causing substantial physical harm, emotional distress, sleeplessness, and mental trauma.  At the time of its descent to the ground and the discharge, Sheperis's pistol was, further, fully holstered.  The trigger was therefore incapable of being touched or of any manual movement by Officer Sheperis.  SIG was made aware of this incident in January 2017, days after it happened, yet issued no recall or "voluntary upgrade" until after it was sued in this court eight months later.

The weapon should never have discharged upon mere impact with the ground, holstered or un-holstered.  In its own "Safety Without Compromise" marketing materials for the P320, SIG SAUER states:

> "We've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to."

SIG further expressly represented in the marketing materials that the P320 was drop safe:

"[a]nd, while available as an option, you won't need a tabbed trigger safety for your gun to be **drop safe**." (emphasis added) (attachments A and B).

---

[1]    In the weapons industry, this type of discharge is typically referred to as an inadvertent or unintended discharge, or "drop fire" in which the weapon fires without a trigger pull.  *See, e.g., O'Neal v. Remington Arms Co., LLC*, 817 F.3d 1055, 1060 (8th Cir. 2015) (referring to "inadvertent discharge" of weapon "without the trigger being pulled").

Plaintiff Sheperis, individually and on behalf of others similarly situated within Connecticut, brings a cause of action seeking compensatory and punitive damages, and equitable relief, under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), for unfair and deceptive trade practices in their marketing of the weapon, as further described below.  He also individually brings causes of action under Connecticut common law for negligent and intentional infliction of emotional distress, and breach of contract, in view of Sig's misleading representations about the safety of the weapon, the round that shot him in his leg, as well as the company's knowledge, months before and after January 2017, that there was a defect in the trigger that could cause an unintentional discharge if the weapon were dropped on the rear of the weapon's slide and frame.

As further described in the Class Allegations below, despite being aware of the accidental discharge in January 2017, and being sued in this matter in August 2017, defendant SIG has still recklessly failed to issue a mandatory recall of the commercial model of the P320 weapon, yet it has done so for other, less popular defective products it has manufactured. (attachment C).  The P320 is used by law enforcement agencies all over the country, and owned, upon information and belief, by hundreds and perhaps thousands of civilians in Connecticut, and hundreds of thousands of people throughout the country.

It also continues to deceptively represent to consumers that the weapon "meets U.S. standards for safety," when no U.S. government safety standards exist, and SIG is well aware of this fact.  It also continues to represent on its website that the weapon is drop safe to encourage purchases, while simultaneously warning consumers at the bottom of page 25 of the user manual that it is not drop safe with a chambered round.  Sheperis therefore seeks leave of this Court to add the Class Allegations below, and act as representative for the Class, pursuant to

Conn. Gen. Stat. § 42-110g(b), the Class consisting of all purchasers and/or owners of the weapon within Connecticut.

## JURISDICTION

1.      Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff Vincent Sheperis is a citizen of the United States and the State of Connecticut. Defendant Sig Sauer, Inc. has a principal place of business in New Hampshire.  The amount in controversy exceeds, exclusive of interest and costs, $75,000.

## VENUE

2.      Venue is proper in this judicial district under 28 U.S.C. § 1391(a)(2).  A substantial part of the events or omissions giving rise to the plaintiff's claims occurred within this judicial district.

## PARTIES

3.      Vincent A. Sheperis is 34-year-old citizen of the United States who currently is domiciled in Connecticut.  He has been member of the Stamford, Connecticut police department since September 2006.  He has been a member of the Department's Special Response Team (SRT), known in other contexts as Special Weapons and Tactics, since 2011.   He has never received discipline during his entire career.

4.      Sig Sauer, Inc. designs and manufactures firearms for military, law enforcement, and commercial markets worldwide. It offers pistols, rifles, short barrel rifles, Sig Sauer Mastershop series, and firearms accessories; and apparel, CD/DVD training, and knives. The company also provides customized training in security subjects for corporate customers and law enforcement agencies on a contract basis.

It markets and sells its products through dealers. Sig Sauer, Inc. was formerly known as SIGARMS, Inc. and changed its name to SIG SAUER, Inc. in October 2007. The company was founded in 1985 and is headquartered in Exeter, New Hampshire.

5.     The Class, as further described below, consists of all individual and law enforcement agency purchasers and/or owners of the pre-upgraded version of the P320 pistol residing or operating within Connecticut.  Excluded from the Class are:  (i) defendant Sig Sauer, Inc., its subsidiaries, affiliates, officers, directors, assigns and successors, and any entity in which it has a controlling interest; (ii) the Judge to whom this case is assigned and any member of her immediate family; and (iii) defense counsel including any member of his or her immediate family within Connecticut.  Plaintiff reserves the right, with Court permission, to modify the Class definition as further investigation and discovery so warrant.

## ALLEGATIONS OF PLAINTIFF SHEPERIS

6.     The discharge at issue occurred when Officer Sheperis accidentally dropped his fully-holstered P320 on the ground in the Department's Special Response Team bay parking area in Stamford, Connecticut on January 5, 2017.  The weapon fell to the ground from a distance of no more than two or three feet.  It was not thrown to the ground, "repeatedly or heavily dropped," or un-holstered when the incident occurred.

7.     Due to a defect in the trigger's weight, known to SIG at the time, the weapon's impact with the ground resulted in an inertia-based unintended discharge, striking Officer Sheperis, a Special Response Team member, in his left leg.

8.     Any and all of the weapon's internal and external safeties failed to prevent it from discharging and shooting Officer Sheperis.  The jagged, deformed surface of the bullet entered his left knee, tore  through tissue and part of his patellar tendon, which holds the

kneecap bone in place, and assists in the act of bending.  It lodged slightly to the left of his knee, protruding from his leg causing significant trauma, shock, pain and blood loss.

9.       Fellow officers and EMS took Officer Sheperis to the emergency room at Stamford Hospital where he was operated on by two trauma surgeons.

10.      While the full extent of the physical damage to his knee and leg is not yet known, the incident has resulted in substantial physical harm and related mental trauma to Officer Sheperis, who was completely out of work thereafter, then placed on light duty due to loss of function from the wound, then put out of work again after an additional surgery.

11.      It has also thus far resulted in physical therapy, and additional surgery to repair the damage caused by the discharged round.

12.      Officer Sheperis's P320 pistol discharged on mere impact with the ground, without the trigger being pulled or even touched, which defendant SIG represented was not possible in marketing materials for the P320.  The bullet could easily have crippled him or taken his life had it moved on a different trajectory.

13.      It also discharged while it was fully holstered in a Model 6360 ALS/SLS Mid Ride, Level III Retention Duty Holster, which attaches to, and detaches from, a mid-thigh area mount worn by Special Response Team members.

14.      Because it was holstered, the trigger was protected from any manual movement upon impact with the ground.

15.      At no time before, during or after the incident did Officer Sheperis place his finger on the P320's trigger or touch the holstered firearm in any manner.

16.      In a Supplemental Report dated January 5, 2017, Officer Sheperis stated:  "[a]t

6

no time from when the firearm secured within the holster fell from my person, to when it struck the ground, or while I was waiting for assistance did I touch my firearm."

17.     The P320 in question was delivered to SIG's headquarters for testing days after the January 5, 2017 shooting.   SIG therefore had knowledge of the accidental discharge mere days after the incident in January 2017.  Yet no recall of voluntary upgrade was ordered.

18.     Upon information and belief, SIG did not drop test the weapon, but simply fired approximately 50 rounds through it and declared it to be fine.  The Stamford Police Department provided SIG with the make and model of Sheperis's vehicle, height measurements from which the weapon fell, and the type of holster the weapon was in to assist SIG with drop testing of the weapon.  SIG, however, entirely ceased further communications with Officer Sheperis and the Stamford Police Department thereafter.

19.     In the process of testing the weapon in January 2017, a SIG employee noted a mark or scratch on the rear of the slide, and resisted drop testing the weapon, stating that it might do "more damage" to it.

20.     In additional marketing material for the commercial version of the P320, under the heading "Striker Safety," defendant SIG SAUER further states:  The Striker Safety "[p]revents the striker from being released *unless the trigger is pulled*."  (emphasis added).

21.     At the same time, SIG SAUER contradictorily states in the manual for the P320, at the bottom of page 25, that the weapon may fire if dropped without the trigger being pulled if the chamber is not empty.  On its web page, however, it states that the P320 "maximizes" users' "peace of mind" because it is, allegedly, "drop safe," with "or without a tabbed trigger safety."

22.     Upon information and belief, SIG SAUER inserted this warning into the P320 manual because its own internal testing, and/or other testing, revealed that it could fire if

dropped at an angle at which the rear of the weapon's slide and frame struck the ground, causing the trigger to move backward and fire the gun due to the inertial force caused by such an impact.

23.     Upon information and belief, it is standard operating procedure for all U.S. law enforcement agencies, including the United States Secret Service, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, to carry pistols with a chambered round.  SIG was fully aware of this fact at the time it sold any and all P320 pistols to U.S.-based law enforcement agencies and departments.

24.     Upon information and belief, SIG refrained from representing to the United States Army that the P320 could fire with a chambered round if it was dropped to the ground, in the process of competing for the $500,000,000 contract to replace the Army's existing firearm in the months leading up to January 2017.

25.     Officer Sheperis and his employer the Stamford Police Department reasonably relied on SIG's marketing statements about the safety of the weapon's trigger, as well as SIG's reputation for producing high-quality weapons, when it purchased the commercial version of the P320.

26.     The Department has since shelved all P320s issued to its Special Response Team Operators due to the January 2017 incident.

27.     The commercial version of the P320 is a pistol model no doubt currently in use, or soon to be in use, by many other police departments around the nation.  Since the filing of this suit on August 4, 2017, SIG announced a "voluntary recall" of the weapon on August 8,

2017.  Since that time, thousands of these weapons have been, or will be, shipped back to SIG to have a lighter, safer trigger installed.  No mandatory recall, however, has ever been issued.

28.     Upon information and belief, SIG fixed the drop defect in the military version of the weapon - - installing a lighter trigger to prevent any inertia-related unintended discharges, long before January 2017, while in the process of testing the weapon and competing to obtain a contract worth more than $500,000,000 with the United States Army, which it successfully accomplished in January 2017.  This was the same month Officer Sheperis was shot with the commercial version of the weapon.

29.     Upon information and belief, there have been many prior incidents of unintended discharges involving Sig Sauer weapons that are dropped and fire without the trigger being pulled, or simply while being handled, or while being holstered.

30.     For example, from 2005 to January 2011, the San Francisco Police Department reported 29 accidental discharges (a time when it issued SIG Sauer's as its primary sidearm).

31.     In 2002, a San Fernando police officer dropped his SIG Sauer, causing an accidental discharge that killed him, refuting claims the trigger must be pulled to fire the gun.

32.     In 2008, an officer in Connecticut accidentally discharged his SIG Sauer while holstering it.

33.     In 2011, a security guard in St. Louis dropped his SIG Sauer, unintentionally shooting someone.

34.     In 2012, a New York transit officer accidentally discharged his SIG Sauer while holstering it.

35.     In 2014, a federal air marshal in New Jersey unintentionally shot himself while

handling his SIG Sauer service weapon.

36.     In 2015, a Pennsylvania state trooper and firearms instructor accidentally killed another trooper with his SIG Sauer while conducting safety training.

37.     In 2016, a tactical response training instructor near Sacramento dropped his SIG Sauer, firing a bullet into a student's truck.

38.     In 2017, a sheriff's deputy in Michigan accidentally discharged his SIG Sauer, striking a schoolteacher in the neck.

39.     In the period between 2012 and 2015, the New York City Police Department reported 10 accidental discharges involving Sig Sauer weapons.

40.     On August 3, 2017, the Dallas Police Department issued a recall of the P320 due to drop safety concerns, prohibiting its use by officers until repaired.  In an interdepartmental memo, it stated:

> Sig Sauer has identified that there is a defect in the P320 handgun that could cause the weapon system to go off when dropped. The Sig Sauer P320 was approved for primary duty, secondary primary duty, and back-up use. The Firearms Training Center is currently working with Sig Sauer to obtain a solution for the safety issue. Until Sig Sauer is able to find a solution to the safety issue, the Sig Sauer P320 is no longer approved by the Dallas Police Department for any use.

41.     Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to accidental discharges causing injury in both 2016 and 2017.

42.     In an interview in 2013, Sig's Chief Financial Officer, Timothy Scullin, noted that Sig's revenue rose approximately 1,400 percent from 2012 to 2013 and stated that Sig Sauer's Growth has outpaced its industry's growth by "two or three times."

43.     When asked what some of his biggest professional challenges he has faced in his career, he stated:

> At SIG, to grow this fast, people get really challenged.  When you're growing 70 to 80 percent in a year, **all the systems get stretched, and the people really get stretched**. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down. It just creates a tremendous of stress on the people in the system.  But we've got people that have risen to the challenge.

(emphasis added).

44.     Days after the Dallas Police Department announced that SIG had informed them of a defect with the P320 in July or August of 2017, SIG's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

45.     This was statement was false, in view of SIG's knowledge that Officer Sheperis had been shot by a drop fire some eight months earlier with a version of the weapon that was not the military version, but the commercial version of the weapon.  There is no difference between the version of the weapon purchased and used by law enforcement agencies and any civilians in the U.S. Commercial market.

46.     On August 8, 2017, SIG announced a "voluntary upgrade" of the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies."  SIG further stated in this release that "[a]s a result of input from law enforcement, government and military customers, SIG has developed a number of enhancements in function, reliability, and overall safety including drop performance."

47.     The safety standards SIG claims the weapon passed all require a pistol to be dropped on a one-inch thick rubber mat, and land on the same rubber mat after being dropped, a testing criterion which is plainly outdated and absurd given that end users of the weapon do not walk around on rubber mats when carrying the weapon.  Moreover, only one of the tests (NIJ) requires that the weapon be dropped on the rear of the weapon.

48.     The existing U.S. drop tests SIG claims the P320 passed, moreover, are well known to be antiquated and inadequate.  This is the reason why SIG continued to test the P320 beyond the inadequate U.S. standards, both internally, and in foreign countries such as Germany in April 2017.

49.     Upon information and belief, defendant recklessly failed to recall and fix this defect in the commercial model of this weapon, used by law enforcement agencies all over the country, as well as any civilian purchasers of the weapon, when it first had knowledge of the defect in January 2017 and, in all likelihood, months before that while testing the P320 and competing for the Army's $500,000,000 contract against various highly-qualified competitors, thereby putting thousands of lives, including those of Officer Sheperis and members of the Class, unnecessarily at grave risk.   This is a gun, not a coffee maker, yet SIG has still not recalled it a year after it shot Officer Sheperis.

## CLASS ALLEGATIONS

50.     **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Plaintiff reasonably believes that the Class is comprised of hundreds or perhaps thousands of consumers in Connecticut.

51.     **Common Questions of Law Predominate.**   Common questions of law and fact exist as to all members of the Class.  These common questions predominate over any questions affecting only individual Class members.  The common legal and factual include, but are not limited to, the following:

(a)     whether SIG's claims regarding the P320 are deceptive and misleading;

(b)     whether SIG engaged in false and deceptive advertising;

(c )    whether SIG engaged in false and deceptive advertising to place profit over consumer safety;

(d)    whether SIG has been unjustly enriched by its conduct;

(e)    whether Class members have sustained monetary loss and the proper remedy for and measure of that loss;

(f)    whether Plaintiff and Class members are entitled to declaratory and injunctive relief, including a mandatory recall an unambiguous warning by SIG that the P320 is not drop safe;

(g)    whether SIG's own internal drop testing of the P320 revealed defects with the weapon's trigger weight and/or internal safeties before and/or or after January 2017;

(e)    whether SIG performed drop testing on the P320 when it was first produced beyond "U.S. standards for safety," and the results of any such testing;

(f)    the number of P320s sold to consumers including law enforcement agencies within Connecticut.

52.    **Typicality.**  Plaintiff's claims are typical of the claims of the members of the Class, as all Class members are similarly affected by Defendant's wrongful conduct. Plaintiff, like other members of the Class, purchased Karma after exposure to the same material misrepresentations appearing on and in the product packaging, including Karma's labels, print advertising, billboards, and the internet, and received a product that was not as represented. Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

53.    **Adequacy of Representation**. Plaintiff's claims are made in a representative capacity on behalf of the other members of the Class. Plaintiff has no interests antagonistic to the interest of the other members of the proposed Class and is subject to no unique defenses.

54.    Plaintiff is similarly situated in interest to all members of the proposed Class, is committed to the vigorous prosecution of this action and has retained competent counsel

experienced in the prosecution of CUTPA cases consumer class actions, including *Mytych v. May Department Stores*, 260 Conn. 152 (2002), in which he represented a class consisting of hundreds of retail employees seeking relief for unfair wage practices, *Steiner et al. v. Lewmar, Inc. et al.*, 3:09CV1976(DJS), an intellectual property case including a CUTPA claim, among others over a 24-year career.  Plaintiff's counsel is also trained in and familiar with gun function and safety, has consulted various firearms experts at length before and after commencing this case, and has extensively investigated the facts of this case and the weapon at issue.   The Class, moreover, is limited to residents of Connecticut at the present time.  Accordingly, Plaintiff is an adequate representative of the proposed Class and will fairly and adequately protect the interests of the Class.

55.    **Superiority of Class Action.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for members of the Class to individually redress the wrongs done to them effectively. Even if the members of the Class could afford such litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents no management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

56.     Unless a class is certified, Defendant will retain monies received as a result of its conduct that were taken from proposed Class members. Unless an injunction is issued, Defendant will continue to commit the violations alleged, and the members of the Class and the general public will continue to be misled.

## NOTICE TO ATTORNEY GENERAL OF ACTION

57.     A copy of this Complaint shall be mailed to the Attorney General, Administrators, Commissioners, or other officers, as required by the laws of Connecticut, upon and at the time of the filing of the Complaint pursuant to Conn. Gen. Stat. § 42-110g(c).

## COUNT ONE

## VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT

## Conn. Gen. Stat. § 42-110a *et seq.*

## (Plaintiff Sheperis and the Class)

58.     Paragraphs one through 57 incorporated by reference.

59.     By its actions, in representing in its marketing materials that the P320 is drop safe, offers "peace of mind" as a result, and will not fire unless the trigger is pulled, while simultaneously stating in the weapon's manual that it may discharge if merely dropped, without the trigger being pulled, defendant has engaged in unfair and deceptive trade practices in violation of CUTPA.

60.     Defendant had knowledge of the drop defect with the commercial version of the P320 at least as early as January 2017, and in all likelihood months earlier, yet continued to represent in marketing materials that it would not fire unless the trigger was pulled.

61.     Defendant also, moreover, changed the trigger on the military version of the

P320 to remedy the defect in the commercial version's trigger, i.e., its weight, yet left the trigger unchanged on the commercial version to be used by police officers and any civilian purchasers.

62.    Defendant engaged in these practices in the calculated and reckless hope that no one would accidentally drop the commercial version of the P320 and be shot or killed, to avoid spending in excess of $100 million to fix the problem.

63.    Defendant has also violated CUTPA by representing repeatedly that the P320 "meets U.S. standards for safety" when no U.S. standards for safety exist, and SIG is aware of this fact.

64.    The defendant's violation of CUTPA has been the proximate and foreseeable cause of physical harm and substantial compensatory and actual damages to Sheperis, and the Class, entitling them to recover compensatory and punitive damages.

## COUNT TWO

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (plaintiff Sheperis)

65.    Paragraphs one through 64 are incorporated by reference.

66.    By its actions, defendant knew, or should have known, that the design and/or manufacturing defect in the P320 rendered it capable of discharging without the trigger being pulled.  Yet is presented to the Stamford Police Department and Sheperis, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

67.    Defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress;

68.     The plaintiff's emotional distress was foreseeable;

69.     The emotional distress was severe enough that it might result in illness or bodily harm, and in fact did result in such harm;

70.     The defendant's conduct was the cause of the plaintiff's distress.

71.     The trigger was not pulled by Sheperis, yet the weapon still fired and shot him in the leg.

72.     The defendant's tortious conduct has been the proximate cause of substantial compensatory and actual damages to Sheperis, including emotional distress, sleeplessness, post-traumatic stress, and loss of function, entitling him to recover compensatory and punitive damages under Connecticut common law.

**COUNT THREE**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(plaintiff Sheperis)**

73.     Paragraphs 1 through 72 are incorporated by reference.

74.     Upon information and belief, defendant had knowledge of the drop safety defect with the commercial version of the P320 before Officer Sheperis was shot in January 2017.

75.     Despite having such knowledge, it failed to issue a recall or "voluntary upgrade" until eight months after he was shot, and the company was sued in this court.

76.     Had defendant acted responsibly and repaired the defect in the commercial version of the P320 before January 2017, Officer Sheperis never would have been shot.  The round discharged from his weapon easily could have taken his life.

77.     Defendant knew, or should have known, that severe emotional distress was a

likely result of its outrageous and irresponsible conduct, which was designed to save in excess of $100 million in repair costs.

78.     Defendant's irresponsible conduct in this matter was self-serving, extreme and outrageous.

79.     Defendant's conduct was the direct and proximate cause of the plaintiff's distress.

80.     The emotional distress sustained by the plaintiff was severe.

81.     The defendant's tortious conduct has been the proximate cause of substantial compensatory and actual damages to Sheperis, including emotional distress, sleeplessness, post-traumatic stress, and loss of function, entitling him to recover compensatory and punitive damages under Connecticut common law.

## COUNT FOUR

## BREACH OF CONTRACT

### (plaintiff Sheperis and the Class)

82.     Plaintiff, individually, and on behalf of all others similarly situated, incorporates by reference all preceding paragraphs and all Exhibits attached hereto as though expressly stated herein in this paragraph.

83.     By its actions, has breached the terms of its contract with all purchasers of the weapon, as well as all intended third party beneficiaries and end users resulting from any and all contracts entered into with corporate entities, regarding the Class Pistol, including plaintiff Sheperis.   Specifically, SIG represented the Class Pistol was and is drop safe, with or without a tabbed trigger safety, and would not fire without a voluntary trigger pull.  In exchange, SIG

offered for sale, and hundreds of thousands of individuals and law enforcement agencies

purchased, the Class Pistol for an amount in excess of $500 per pistol.

84.     The January 5, 2017 incident that resulted in plaintiff Sheperis demonstrates that

these contractual representations were and are false.

85.     SIG's breaches of contract have been the proximate and direct cause of

monetary and other harm to Plaintiff Sheperis and the Class, justifying monetary and equitable

relief.

## COUNT FIVE

## DECLARATORY RELIEF

### (plaintiff Sheperis and the Class)

86.     Plaintiff, individually, and on behalf of all others similarly situated, incorporates by

reference all preceding paragraphs and all Exhibits attached hereto as though expressly

stated herein in this paragraph.

87.     SIG has acted or refused to act on grounds that apply generally to the Plaintiff and

Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate

respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

88.     The defect in and deceptive marketing of the Class Pistol creates a definite threat

of future injury to Plaintiff and the Class.

89.     Plaintiff seeks a declaration that: (a) the Class Pistol as manufactured before the

"voluntary upgrade" was announced by SIG in August 2017 has a common design defect in

workmanship and/or design that could cause the Class Pistol to fire unexpectedly and

unintendedly when the Pistol is dropped from a height at which the pistol is normally used, or

much lower, and no trigger pull occurs; (b) SIG knew of the drop safety defect in the Class Pistol;

and (c) SIG shall issue a mandatory recall of all Class Pistols with a lighter trigger and all other already identified "improvements" to the P320 designated by SIG in the voluntary upgrade marketing materials about the Class Pistol, and compensate Plaintiff and Class Members as appropriate for all costs associated with returning the Class Pistol to have it repaired so it functions safely.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court:

1.      Assume jurisdiction over this case;

2.      Empanel a jury;

3.      Enter an Order certifying this action to proceed as a class action, and naming Plaintiff as the representative for the Class and his counsel as counsel for the Class;

4.      Enter an award in favor of Plaintiff and the Class that includes compensatory, exemplary or punitive damages, treble damages, and statutory damages, including interest thereon, in an amount to be proven at trial;

5.      Enter an award in favor of Plaintiff and the Class for compensatory damages that includes the cost of repair, replacement or modification of the Class Pistol to render it safe;

6.      Declare that SIG is financially responsible for notifying the Class of the various defects with the Class Pistol;

7.      Enter an Order enjoining SIG from further deceptive advertising, marketing, distribution, and sales practices with respect to the Class Pistol and requiring SIG to repair and/or replace Plaintiff's Class Pistol and Class Members' Class Pistols with a suitable alternative Pistol of Plaintiff's and Class Members' choosing.

8.      Declare that SIG must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of the Class Pistol, or order SIG to make full restitution to Class Members.

9.      Enter an Order permanently enjoining SIG from continuing to engage in the unlawful and inequitable conduct alleged herein;

10.     Granting Plaintiff and the Class all equitable remedies permitted by law against

SIG.

     11.     Enter an award of attorneys' fees and costs, as allowed by law;

     12.     Enter an award of pre-judgment and post-judgment interest, as provided by law;

     13.     Grant Plaintiff and the Class leave to amend the Complaint to conform to the evidence produced at trial; and

     14.     Grant such other relief against SIG as the Court may deem just and proper under the circumstances and applicable law.

     15.     Award actual and compensatory damages in the amount of $1 million or in any other amount determined by a jury for defendant's violation of CUTPA;

     16.     Award $2 million in punitive damages for defendant's violation of CUTPA;

     17.     Order SIG to issue a recall notice or other enhanced, unambiguous warning to all purchasers of the P320 stating that the weapon is not drop safe with a chambered round, and can fire without a trigger pull;

     18.     Retain jurisdiction over this case until defendant has complied with all orders of the Court;

     19.     Award such other relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

The plaintiff demands a trial by jury on all counts so triable.

PLAINTIFF
VINCENT A. SHEPERIS

By:

/s/Jeffrey S. Bagnell
Jeffrey S. Bagnell

Federal Bar No. CT18983
Jeffrey S. Bagnell, Esq., LLC
55 Greens Farms Road, #200-60
Westport, Connecticut 06880
(203) 984-8820
(203) 255-4454 (fax)
jeff@bagnell-law.com


Attorney for Plaintiff


**CERTIFICATION**

This is to certify that on this 29th day of December 2017 a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties, as listed below, by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.


_/s/Jeffrey S. Bagnell_