| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF CONNECTICUT |

```
 3   _____
     Vincent A. Sheperis )
 4          Plaintiff  )    NO: 3:17cv1318(JCH)
                       )    May 30, 2018
 5    vs.              )    1:20 p.m.
     Sig Sauer, Inc.   )
 6          Defendant. )
     _____)    141 Church Street
 7                            New Haven, Connecticut

 8

 9                  HEARING

10

11

12

13   A P P E A R A N C E S:

14   For the Plaintiff : Jeffrey S. Bagnell
                         Jeffrey S. Bagnell, Esq., LLC
15                       55 Greens Farms Road, #200-60
                         Westport, CT 06880
16
     For the Defendant : Robert Laurent Joyce
17                       Littleton Joyce Ughetta Park & Kelly
                         4 Manhattanville Road
18                       Suite 202
                         Purchase, NY 10577
19

20

21

22

23

24

25
```

1        THE COURT:  Good afternoon to you.  We're here

2  this afternoon in the matter of Sheperis versus Sig

3  Sauer, Inc., Case Number 3:17CV1318.  If I can have

4  appearances please.

5        MR. BAGNELL:  Your Honor, good afternoon.

6  Jeffrey Bagnell, Westport, Connecticut, for the

7  plaintiff, Vincent Sheperis.

8        THE COURT:  Good afternoon, sir.

9        MR. JOYCE:  Good afternoon, Your Honor.  Robert

10  Joyce with Littleton Park for the defendant Sig Sauer.

11        THE COURT:  Good afternoon.  This was calendared

12  for a motion to compel, which if I have time, I will take

13  up some of the other matters.

14        We do need to get through the motion to compel

15  and as I prepared yesterday and went through it all,

16  there's quite a few areas of disagreement.  I will put it

17  at that.

18        So starting with the first one which is

19  Interrogatory 2, I guess this problem applies to a lot of

20  things, but obviously I will have to rule on the

21  objections.

22        My view is that an answer with objections that

23  begin with subject to and without waiving objections is

24  basically useless, so I either need to resolve the

25  objections in which case then I will expect, Attorney

1    Joyce, that you are going to file amended responses that

2    don't contain those objections.

3        If I sustain the objection, obviously you don't

4    have to answer to the extent that you can redefine the

5    question and answer it the way I sustained your

6    objection.

7        And I think going forward just if you are ever

8    back in front of me on another matter, you are perfectly

9    within your rights to say I don't understand a term, but

10   so I'm going to interpret it to be as follows which you

11   seem to have done in many of these so that's fine.

12   That's the proper way to do it.

13       Then you have to answer with that term as your

14   understanding of how you are answering.  So I mean you do

15   that in the sense that you do give an answer.  It is

16   always preceded by subject to all of my objections, so it

17   is not entirely clear that you are, in fact, answering it

18   as you defined it.  It may not be fair in all instances,

19   but I think generally that is true in some of these

20   cases.

21       So turning to Interrogatory 2, the plaintiff

22   complains that you have given a very lengthy response,

23   but you haven't answered the question.  I would agree

24   with him as to what appears following your objections at

25   page 3 until the top of page 4.  And so unless you want

1   to try to persuade me, I would suggest that when you

2   answer that again in a supplemental response that you

3   strike that part of the answer.  If a witness were to

4   give that answer, I would have granted a motion to strike

5   in response to the question of have you represented

6   something.  I don't think there needs to be 20 plus lines

7   of description about standards.

8           MR. JOYCE:  Well, Your Honor, may I respectfully

9   disagree with the --

10          THE COURT:  Go right ahead.

11          MR. JOYCE:  I think we're allowed to provide

12  context to a complicated question.

13          THE COURT:  No.  You are to answer the question.

14  If you cannot answer the question, then say you cannot

15  answer it and this is why you can't answer it, but to

16  load it up with that, it is not providing a useful

17  answer.  It may be it is not a good question to ask in an

18  interrogatory.  It may be suitable for a deposition.

19  There may be a lot of other reasons why you don't or

20  can't answer it, but if you are going to answer it, you

21  don't get to get on your bully pulpit and give your pitch

22  of the case.

23          MR. JOYCE:  Well, I do think we get to say what

24  we said in marketing materials including the product

25  manual with respect to the performance of the firearm in

1  connection with the specific --

2       THE COURT:  Did he ask you what you said?  He

3  asked you did you represent in marketing materials that a

4  user would not have to worry about the weapon being

5  dropped save with or without a tabloid trigger.  The

6  answer is yes, no or I can't answer it yes or no.  You

7  can give me 20 pages of what you represented in marketing

8  material, but have you told him whether you think that's

9  what you said to the customer?  No.  You told me what you

10  said to the customer.  He's asked you did you represent

11  that they didn't have to worry.  If you don't think you

12  did make that representation, answer no.  If you think

13  you made the representation, answer yes.

14       MR. JOYCE:  I think then the answer, Your Honor,

15  would be reflected in what the marketing material say.

16  He's just asking what documents say at that point.  They

17  say what they say.

18       THE COURT:  Then maybe the answer is the

19  question can't be answered yes or no and the marketing

20  materials are documents and they speak for themselves and

21  no other representations are made to the public other

22  than through the marketing material.  That's probably a

23  decent answer.  You are allowed to refer to documents to

24  answer a question.  That's fine. The rest of it is

25  argument.  I don't need to know about standards this and

1  standards that.

2  The second page, which is page 4 to 5, my

3  reaction was well, you know, probably not.  You are

4  getting closer, but I still think if all you're doing is

5  relying on the marketing materials, you should say that.

6  That's your answer.

7  And there aren't any objections other than the

8  documents that answer the question, if, in fact, that's

9  true.  If there are no verbal representations as to the

10  subject of the question, then the answer is see attached

11  documents.  That's what we represented.

12  MR. JOYCE:  Okay, Your Honor.  I don't want to

13  belabor the point, but if you look at page 4, right, you

14  know, with respect to the representation in connection

15  with the tab trigger, that's right in there.  The

16  response is right in there.  The complaint is that we

17  have additional information beyond that what he's asking

18  for.  I don't think that's a reason to require us to put

19  a new response in.

20  THE COURT:  I do.

21  MR. JOYCE:  Okay.

22  THE COURT:  End of discussion on that subject.

23  MR. JOYCE:  Understood.

24  THE COURT:  Interrogatory Number 5, I would ask

25  the plaintiff why is this discoverable?  Doesn't the rule

1  prohibit introduction of evidence about after accident

2  repairs?  I think that's what this one is.  Since the

3  recall.  Give me a minute.

4        MR. JOYCE:  Your Honor, the upgrade is after.

5        THE COURT:  I know that.  I know that.  That's

6  why I thought I was starting with this question with the

7  plaintiff.  So why is it discoverable, sir?

8        MR. BAGNELL:  Your Honor, I think it is

9  discoverable in that --

10       THE COURT:  I'm sure you do.  You asked the

11  question.  I asked you why you are right.

12       MR. BAGNELL:  Because, Your Honor, our

13  information is that Sig Sauer has been on the side

14  informing some purchasers of the P320 that it's perfectly

15  safe in its nonupgraded form.

16       So the question is designed to find out if

17  that's correct, and I think it is relevant to the claims

18  of the plaintiff, Your Honor.

19       THE COURT:  Why?

20       MR. BAGNELL:  Because we're claiming that there

21  was misleading marketing here.  There was recklessness.

22       THE COURT:  This marketing that's going on now

23  which sounds reckless, if it is true, has nothing to do

24  with your clients.  He didn't buy it, but even of his use

25  at the time of the accident, he wasn't relying on

1    anything said after August 2017.  So what would you be

2    looking to obtain that discovery in order to get to

3    something that you might use at trial?

4            MR. BAGNELL:  I think, Your Honor, it goes to

5    their credibility.  I think that's -- I want to know if

6    they are saying one thing and doing another.  It is a

7    credibility question basically, Your Honor.  I will leave

8    it at that.  I think that was my thought at the time that

9    I posed it.

10           THE COURT:  Yeah.

11           MR. BAGNELL:  Also, Your Honor.

12           THE COURT:  I'm not sure I follow why it goes to

13   credibility.

14           MR. BAGNELL:  If they are representing to the

15   public, Your Honor, that this weapon should be shipped

16   back and on the side in verbal conversations are saying

17   it really doesn't, it is perfectly fine as it is.

18   Meanwhile people have been shot by it.  It is consistent

19   with our claim they have been reckless and careless not

20   only toward Officer Sheperis's safety but other end user

21   safety.

22           We have a pending motion to amend the complaint.

23   It would be relevant to the class plaintiffs, if that's

24   allowed.  I think I will leave it at that.

25           THE COURT:  I will not allow discovery today on

1   your motion to compel based upon a possible amendment to

2   make this a class action. We have to get over the first

3   issue of whether you state a claim the way you currently

4   pled your complaint.  We're not going to necessarily get

5   to that either.  We're going to go with what complaint

6   you have right now and what discovery you are entitled

7   to.

8           I will ask Attorney Joyce why doesn't he get it

9   on credibility if your folks are saying one thing in

10  writing and then saying something else on the side

11  sounds, which sounds, if that's what they're saying, is

12  not accurate?  Obviously it isn't perfectly safe,

13  something happened here with this plaintiff and I guess

14  other things have happened in different ways with other

15  people.  Why isn't this relevant?

16          MR. JOYCE:  Well, Your Honor, first of all, it

17  is after the occurrence.  It is --

18          THE COURT:  No.  He's claiming it would go to

19  credibility.  If your folks are going to defend this gun

20  is perfectly safe, the plaintiff misused, whatever, let

21  it fall, whatever your argument is going to be, then, I

22  don't know, I think he's entitled, isn't he entitled to

23  know what words are coming out of your client's mouth?

24  Are they telling people it is safe or are they recalling

25  it saying let's fix this?

1        MR. JOYCE:  Second of all, we did answer the

2    question.  We advised the plaintiff that our

3    representations to the marketplace are found in the

4    upgrade --

5        THE COURT:  Right.  Then you argued that you

6    haven't, you, as counsel, and your client as a party,

7    have not inquired of salespeople or other people at the

8    company, are you saying something different verbally?  If

9    you needed to answer it by referencing your website, why

10   wouldn't it then be discoverable to know what's being

11   said?

12       MR. JOYCE:  Well, we stand on the original

13   objection, Your Honor.  It is irrelevant to the claims

14   Officer Sheperis is making.

15       Second of all, we have made inquiries and to the

16   extent we're required to answer the question, the answer

17   would be the same.  We're not aware of anyone making that

18   representation that's set out in Interrogatory Number 5.

19   The information that went out into the marketplace is the

20   same information that folks when they get inquiries on

21   the telephone or email with respect to the availability

22   of the upgrade are making and Sig --

23       THE COURT:  They are the same things that are

24   being said as are in the website, is that what you said?

25       MR. JOYCE:  That's correct.

1    THE COURT:  Since it seems like you know the

2 answer, I'm going to sustain the objection to the

3 interrogatory.  But I would suggest to Attorney Bagnell

4 that he file a request to admit that no representations

5 are being made other than what is consistent with what's

6 on the website and the answer to that is that's correct

7 or that's true or yes, however you answer a request to

8 admit, then I think that's the end of it.  He's not

9 entitled to uncover this.

10    If the answer is no, he may be back asking me to

11 compel again.  All right.  So that's number 5.

12    Number 8 is I guess I'm back to the plaintiff

13 because I know what the defendant is going to say to me.

14 It is also what I wrote down.  Why are we doing discovery

15 about things that happened after the incident that's the

16 subject of this case?  The number of these guns that have

17 been sold.  Why is that relevant under your complaint?

18 Your complaint is your client was gravely injured on a

19 certain day in 2017.

20    MR. BAGNELL:  My response is that it is

21 relevant.  It goes to the demand we make for a recall or

22 unambiguous warning about the safety status of the

23 nonupgraded weapon.

24    THE COURT:  Is that in your complaint currently?

25    MR. BAGNELL:  It is in the prayer for relief.

1    We demand a recall.  Item nine in the prayer for relief.

2          THE COURT:  I guess, well, then I have a

3    question I have with respect to your motion to amend.

4    What cause of action would give me the power to order

5    this company to recall an entire line of product?  I mean

6    I have a feeling somebody in Washington, D.C. has that

7    power.  There may be a statute that talks about defective

8    or unsafe products.  Maybe the FTC gets to sue someone to

9    say recall it.  Little old me sitting here in

10   Connecticut, with a single plaintiff cause of action, I'm

11   going to tell a company take a product off the market?

12         MR. BAGNELL:  CUTPA does give you broad

13   discretion.

14         THE COURT:  I should tell all firearm makers to

15   remove all guns if I think they are not safe.  I can do

16   that?  I don't think so.

17         MR. BAGNELL:  No.  There's little dispute that

18   there is a serious problem with this weapon and --

19         THE COURT:  CUTPA assuming you have a CUTPA

20   cause of action.  If I have the time, I will get to.  I

21   have injunctive.  I have equitable powers.  Sure I do.

22   If you bring this claim and ask me to use my equitable

23   powers, you couldn't have me order the defendant to go

24   out of business, could you?

25         MR. BAGNELL:  No.

1    THE COURT:  No.  So by what right, what cause of

2 action, what theory under CUTPA would have me have the

3 power to tell this company recall every one of these guns

4 off the market?

5    MR. BAGNELL:  We said, Your Honor, there are

6 Second Amendment issues which we don't have to go into.

7 I demanded a recall, Your Honor, because Sig itself has

8 recalled its own defective products in the past.

9    You are right.

10    THE COURT:  You got out of bed this morning.  Am

11 I going to order you to get out of bed or can you choose

12 to get out of bad?  That's a big difference.

13    MR. BAGNELL:  I agree.  I do think there are

14 some Second Amendment issues on whether the Court can do

15 that or issue an unambiguous warning.  I think there's

16 hundreds of thousands of these weapons out there that

17 have not been fixed. They are a serious risk to people

18 and innocent bystanders as well.

19    THE COURT:  Mr. Sheperis has the power standing

20 alone as one user of the firearm, not even a purchaser

21 who relied on these statements, to get that remedy in his

22 lawsuit for damages?

23    MR. BAGNELL:  Again I think the remedies

24 afforded by CUTPA, Your Honor, are broad.  It's a

25 remedial statute.

THE COURT:  Okay.  How about the fact that

CUTPA.  Have you read -- I'm sure you must have read it,

Attorney Bagwell, Lamontanya.  It's Judge Cabranes'

decision when he was a lowly District Court Judge in

1993.  It was the first decision, in my opinion,

analyzing what did the Products Liability Act do to the

law of Connecticut and probably not the first, but it is

a very thorough opinion often cited by the state courts

until finally they built up a body of law.  It is plain

to me, based on Judge Cabranes' analysis which I think is

completely correct but not clear at the time he wrote it.

There's one cause of action for a product claim and I

don't see how to characterize your claim as anything but

a product claim.  You tell me, well, I want equitable

relief.  I want to get a recall.  I want to order

warnings.  I don't know under what cause of action you

get to do that.  You tell me CUTPA, but under CUTPA,

would I have the power to tell the defendant to replace

its president because he mismanaged the company in

selling under false warnings or lack of warnings products

that were unsafe?  I don't think so.  I don't know that

you have standing to do it.  And maybe standing is the

wrong word.  You are going to have to find a lot more law

for me before I can conclude that the CUTPA statute

enacted in 1973, still permits you to bring a CUTPA cause

1    of action for injunctive relief and surrender, as you

2    appear to have done what I think is your product

3    liability claim for money damages which in 1997, the

4    Connecticut legislature said will be the sole cause of

5    action for a product defect case, product liability case,

6    anything related to a product liability arising out of a

7    product.

8         MR. BAGNELL:  It's item number 9  CUTPA does

9    allow for equitable relief so it is on that basis.

10        THE COURT:  It does allow equitable relief, but

11   as I suggested to you, based on what?  You're claiming

12   this product there's a liability arising out of your

13   product.  Are you giving up your client's personal injury

14   damages in order to pursue a CUTPA claim for equitable

15   relief?  Is that your intention?

16        MR. BAGNELL:  No, Your Honor.  As we said in the

17   brief, if the Court feels that we should put the CPLA

18   claim back, we'll do that obviously.  At the time, I was

19   trying to simplify the issues.  I think the statutes to

20   some extent they both provide remedies for injuries.

21   Personal injury can be the basis of a remedy under CUTPA.

22        THE COURT:  Not when it is product I don't

23   believe.  I believe with you there are decisions in

24   Connecticut.  Many of them result of certifications from

25   the federal court in the cigarette area that talk about

1   when you can have a CUTPA claim and when you can't even

2   when a product is involved.

3           But I don't understand how you fit that

4   exception to the CPLA cause of action as a sole remedy

5   that's spoken about -- I can't remember if it's in

6   Garrity or Ganim.

7           MR. BAGNELL:  It is Garrity.  There's language

8   if the CUTPA remedy seeks a remedy at least in part

9   that's different from personal injury damages that it

10  can, that it stands on its own and can co-exist with a

11  CPLA claim.

12          THE COURT:  Right.  So you can seek a CUTPA

13  claim, this is my understanding, that's for an injury not

14  caused by the defective product or if the party is not

15  pursuing a claim for personal injury, death or property.

16  You have two common law causes of action in your

17  complaint right now, negligence and intentional

18  infliction of emotional distress.  Are those not personal

19  injury claims?

20          MR. BAGNELL:  I don't think they are.  If you

21  look at the legislative history of CPLA, it was designed

22  to codify the existing common law causes of action into a

23  single statute, things like breach of warranty, strict

24  liability.  I don't think these particular torts were

25  contemplated to have been subsumed into the CPLA statute

1    at the time.

2         THE COURT:  When Judge Cabranes, quoting the

3    Winslow case from the Supreme Court, wrote in other

4    words, the CPLA is an exclusive remedy for claims falling

5    within its scope, your arguing it is not within the scope

6    to seek damages for personal injury for mental or

7    emotional distress.

8         MR. BAGNELL:  Of course.  There's a remedy

9    sought that is not personal injury related to a recall or

10   unambiguous warning to all purchasers of this weapon,

11   that it goes outside the exclusivity provision.  I agree

12   with the Court.  Of course, we are seeking damages for

13   the personal injury aspect of this case.

14        THE COURT:  I don't think you have a right now.

15   But I guess that we'll maybe get to that at another

16   stage.

17        Turning to your Interrogatory Number 8, the

18   Court denies the motion to compel as really as not -- the

19   discovery does not fall within the definition under 26B

20   of the scope of discovery in general because I don't

21   think it relates to -- it doesn't relate to an issue

22   that's at stake.  Let alone an important issue.  And I

23   don't think the discovery is important in resolving the

24   issues.

25        So the Court is going to deny the motion to

1    compel on number 8 at least as under the current

2    complaint.  That's my ruling.

3        Number 9, the gross profits from the time it was

4    made available for sale to the present date.  I think,

5    Attorney Joyce, that it isn't -- isn't the plaintiff

6    entitled to punitive damages if he's going under CUTPA

7    but also under the CPLA.  Am I mistaken about that?  I

8    don't think I am, but I could be.  I had the statute.  I

9    will check.

10        As an aside, Attorney Bagnell, I would suggest

11   you read 52-572na that defines what a property liability

12   claim is.  It is in lieu of all other claims against

13   product sellers, which the defendant clearly is,

14   including actions of negligence.  I don't know how you

15   get negligent infliction of emotional distress to be a

16   standalone claim opposed to a basis for a CPLA claim.  I

17   don't have the right part of the statute telling me.

18        Attorney Bagnell, do you think you have a right

19   to punitives under CPLA, if you were to plead that?

20        MR. BAGNELL:  Yes, Your Honor, we do.

21        THE COURT:  I thought you did.  Why isn't he

22   entitled to some discovery about either profits, the size

23   of the company, its balance sheet, its compensation to

24   its CEO, I don't know, things of that sort because it

25   could be relevant to the amount of punitive damages?

1          MR. JOYCE:  Typically that type of discovery is

2     staged and doesn't take place until there's some evidence

3     to support as opposed to just allegations to support a

4     punitive damages claim.  Sig's position is this is not a

5     case where punitive damages would be available.  It lacks

6     the intentionality associated with the requirements under

7     the CPLA.

8          I think that type of discovery is obviously very

9     invasive and is typically deferred until such time as at

10    least there's a dispositive motion that goes to the

11    viability of the punitive allegations in the case, Your

12    Honor.

13         THE COURT:  Well, assuming you'd lose that

14    motion, are you going to produce this information within

15    seven days?  As soon as the summary judgment ruling is

16    decided and the case is going to trial.  There's a very

17    short window.  We go to trial and I don't intend to

18    bifurcate the case.  I don't intend to wait for you to

19    produce this relevant material.

20         So if you can tell me you can produce it in

21    seven days from a denial of motion for summary judgment

22    on the punitive damages claim, then maybe I will do that.

23    Otherwise I would make it attorneys' eyes only

24    production.

25         MR. JOYCE:  It obviously would have to be a

1    protective order but that's acceptable.  That's a

2    reasonable resolution of the issue.

3          THE COURT:  Attorney Bagnell, I'm not saying you

4    can't get this discovery.  I would suggest that on the

5    day you get the ruling on the summary judgment that keeps

6    your punitive damage claim alive, that you send an email

7    or letter to defense counsel asking him to respond in

8    seven days, as I ordered, to the discovery.  And there's

9    more than one of these in this group I think of discovery

10   but produce the information you need in order to make

11   your claim or defend against their argument about why the

12   amount should be less than what you are asking and that

13   that be produced.  All right?

14         MR. BAGNELL:  Yes.

15         THE COURT:  The motion to compel is denied

16   without prejudice I guess to renew at the stage I just

17   described.

18         Next is number 10.  I guess I'm asking.  I would

19   start with the plaintiff.  Why are you entitled to all

20   instances even if they have nothing to do with the

21   circumstance of your incident and why incidences

22   occurring after yours?

23         MR. BAGNELL:  Yes, Your Honor.  I think it goes

24   to punitive damages.  I would like to know generally what

25   they knew, when they knew it, how many times this has

1    happened, what the specific accidental discharge issue

2    was, was it a drop by or something else.  I would again

3    tie it to punitive damages, your Honor.  I think it is

4    relevant on that basis.

5         THE COURT:  Okay.  Then I will make the same

6    ruling that I did as to 9 on this one.  I want to be

7    clear, Attorney Joyce, because it is in my head I'm going

8    to get this information locked in there.  I want to be

9    sure that I understand your answer.

10        To the extent that you have answered, you have

11   identified several other drop incidences I guess after

12   this incident.  It seems implicit in the answer, but I

13   want to be sure the person who swore to the truth of the

14   responses understood this.  I read it to be there were no

15   incidences before the plaintiff's incident of a dropped

16   fire incident of a P320 model pistol.

17        MR. JOYCE:  That's correct.  Sig is not aware of

18   any drop prior to the Sheperis incident.  We did provide

19   incidents that we were aware of after the Sheperis

20   incident.

21        THE COURT:  I see it. There are none before I

22   don't think.  Unless I don't have the date right.

23        MR. JOYCE:  That's correct.

24        THE COURT:  Number 11 has to do with

25   settlements.  I guess I'll start with Attorney Bagnell.

1    How does this fit within the definition of discoverable

2    material under Rule 26B?

3           MR. BAGNELL:  Again, Your Honor, at the

4    settlement agreements, I think would reveal obviously

5    they would probably reveal the dates of any incidents

6    that occurred before Officer Sheperis was shot.  I know

7    Attorney Joyce is saying his client does not know of any.

8    At the time I drafted it, I wanted to know of any and all

9    settlements related to drop fires and the answer we got I

10   think was evasive.

11          THE COURT:  I guess counsel just represented

12   that there were none before and I presume if there's some

13   settlement of some claims that comes out of nowhere that

14   is before, they are going to supplement their answer

15   because they are obliged to supplement.

16          Right now the state of the world is there were

17   none before, let alone settlements.  You asked were there

18   incidences and he's answered.  My question to you is how

19   do you get to ask for settlements of other claims?  How

20   is that relevant?

21          MR. BAGNELL:  Because, Your Honor, if an

22   incident occurred before my client was shot, I wanted to

23   know about it.

24          THE COURT:  No.  You want to know what the

25   settlement of that incident was.  I don't disagree with

1    you you are entitled to know every incident of a dropped

2    fire of this gun before your client's incident.  I have

3    no question with that one.  That's not what this question

4    is. You want all settlement payments.  What does that

5    have to do with the scope of discovery under Rule 26B?

6          MR. BAGNELL:  Your Honor, I want to note also

7    just briefly number 10 was answered subject to an

8    objection.  Whenever I see that, I think okay.  I can't

9    tell if I'm being given the whole story or not.  So the

10   settlement agreements I agree they are relevant to the

11   extent they were before Officer Sheperis being shot.  I

12   couldn't tell from Mr. Joyce's client's answer whether

13   they were withholding something.  All I got is a claim

14   these are confidential.  You can't know about them.

15        THE COURT:  Let's go back to 10.  You respond

16   with this lovely introductory phrase without waiving its

17   objection. Are there other objections besides the one

18   that appear on the second half of page eight, sir?

19        MR. JOYCE:  No, Your Honor.

20        THE COURT:  Your first objection there is it

21   seeks information about alleged drop incidences that Sig

22   Sauer was not made aware prior to the date of the subject

23   incident.

24        MR. JOYCE:  We answered over the objection to

25   that.

1          THE COURT:  The objection is stricken then.  You

2    need to answer without the objection.  I want you to

3    answer for number or the date, location of each

4    accidental discharge of the P320 up to the time of this

5    plaintiff's incident.  Whether you learned of it, you can

6    tell me when you learned of it.

7          MR. JOYCE:  We did answer that.

8          THE COURT:  Fine.  Then I'm striking your

9    objection.  That's my point.  The objection makes the

10   answer useless and wastes everybody's time.

11         Further objects to the extent it seeks

12   information discharges that are different.  Have you

13   answered for all?  You have answered only as to dropped

14   fire incidences, correct?

15         MR. JOYCE:  That's correct, Your Honor.

16         THE COURT:  I would ask the plaintiff why is it

17   appropriate for you to learn about every other accident

18   that caused by whatever means other than the ones that

19   are similar to your case?

20         MR. BAGNELL:  Well, Your Honor, I do think

21   respectfully that is relevant.  I think an accidental

22   discharge of this weapon.  We're not talking about a

23   different weapon.  We're talking about the same weapon.

24   We're talking about a weapon that has been subject to

25   repairs after we filed the lawsuit.  So accidental

1    discharge has a specific meaning.  There are different

2    types on them, but if there other kinds of accidental

3    discharges other than dropped firearms, we would like to

4    know about it.  We would like to know what the

5    malfunction was.

6         THE COURT:  We all would like a lot of things in

7    our lives.  I would like to work less.  It is not

8    happening.  That doesn't make it discoverable, sir.

9    Dropped fire incidents to me there can't be -- what

10   happened to your client is pretty clear the gun fell to

11   the ground.  It made contact with the ground having

12   fallen and it discharged and your claim is that's wrong.

13   It shouldn't have done that.  It is defective, whatever.

14   You are entitled to recover.  That's fine.  That's a

15   perfectly sound theory.  I'm not that knowledgeable about

16   guns.  I don't know.  There's probably a thousand other

17   ways you can have an accidental discharge of a firearm.

18   I don't know why it would tell you anything or more

19   importantly, why it would be relevant to your claim or

20   the defense and in addition proportional to the needs of

21   the case, et cetera.  I just don't see.  I don't see why

22   that's relevant to your claim.

23        MR. BAGNELL:  Respectfully, Your Honor, I guess

24   I would disagree.  If the gun went off accidentally just

25   being handled and Sig knew about that, that's a red flag

1    to the manufacturer that there's a serious problem with

2    this gun.  It is going to go off while it's being

3    handled, it is certainly going to go off if it's dropped.

4    I think it goes to their knowledge.  I do think it

5    relates to our claims.

6         THE COURT:  Attorney Joyce, when was the product

7    introduced to the market?

8         MR. JOYCE:  I have to look at that date.  It's

9    been out a number of years, three.  I have to check on

10   the date when it was first introduced to the market, a

11   number of years.

12        THE COURT:  That's helpful.  There's a written

13   interrogatory that asks about that.

14        MR. JOYCE:  I'm sure we answered an

15   interrogatory on that.

16        THE COURT:  What are other ways does this

17   firearm discharge accidentally?

18        MR. JOYCE:  Like any firearm, pulling the

19   trigger, it is going to make the firearm discharge and

20   one of the reasons that people have accidental discharges

21   is they inadvertently pull the trigger on the firearm.

22        THE COURT:  I'm not interested in that.  Is

23   there any other way this firearm discharges other than

24   being dropped to the floor, without a person putting

25   their finger into the trigger position and squeezing?  If

1    somebody is tickling them and they squeezed and they

2    didn't mean to, that's obviously accidental.  I'm not

3    interested in that.

4              MR. JOYCE:  The ways that this firearm can go

5    off is there has to be rotational movement on the

6    trigger.

7              THE COURT:  So what other ways than having --

8              MR. JOYCE:  Pulling the trigger or having

9    something come in contact with the trigger.  If you have

10   a foreign object in your holster, you look to holster the

11   firearm, and it pulls the trigger while you're holstering

12   the firearm --

13             THE COURT:  Have you had those type of

14   accidental discharges?

15             MR. JOYCE:  I would have to check on that, Your

16   Honor.  The other way is people unintentionally can pull

17   a trigger of a firearm while they're handling it.  That

18   can cause an accidental discharge.

19             THE COURT:  Not interested.

20             MR. JOYCE:  That's a rotational movement of the

21   trigger.

22             THE COURT:  Why can't you answer this question

23   for accidental discharges not involving an index finger

24   inserted into the trigger?

25             MR. JOYCE:  Because, Your Honor, it is totally

1    irrelevant to the plaintiff's claim.

2         THE COURT:  As I think about it, it might be

3    relevant to the plaintiff's claim in terms of the dynamic

4    of what happened when this thing struck the ground.

5    Nothing was inserted into the trigger pull so for some

6    reason whether the stock or something else caused that

7    the trigger to go back.

8         MR. JOYCE:  We know that's the mass of the slide

9    and the trigger.  That's the physics that pulls the

10   trigger.  That's what occurred there.

11        THE COURT:  Why wouldn't it be discoverable to

12   other incidents in which there's no finger inserted

13   either accidentally, inadvertently, by mistake results in

14   the pull back of the trigger, but somehow the gun

15   discharged?

16        I would think that the dynamic of what happened

17   when it fell, there could be something helpful in

18   understanding that by other accidental discharges that

19   did not involve a finger or other object stuck in there

20   that gets pulled back against the weight of the trigger.

21        MR. JOYCE:  First of all, the dynamic of what

22   causes a drop fire is not in dispute.  I think there's no

23   dispute with respect to what happens when this particular

24   firearm drops at a 30 degree angle.

25        THE COURT:  I have no idea if it is in dispute,

1    sir. I think everything in this case is in dispute. Let's

2    cut to the chase.  You're going to modify your answer to

3    this interrogatory.  You are going to get your objections

4    out and you are going to answer the interrogatory as if

5    what the plaintiff asked you, identify by number, date

6    and location all accidental discharge incidences

7    involving P320 to date including but not limited to drop

8    fires and other inadvertent discharges not involving an

9    object inserted into the trigger pull.

10            MR. JOYCE:  An object including the finger?

11            THE COURT:  Right.  A finger, some kid sticks a

12   stick in there, happens to lean on the stick and bam, the

13   gun goes off because the trigger pull comes back, trigger

14   finger, whatever it is called.  I don't want any of

15   those.  You don't have to look for any of those.  But

16   something else other accidental discharge that didn't

17   involve a finger or object in that area.

18            MR. JOYCE:  Other than a rotational movement of

19   a trigger caused by an object or finger basically?

20            THE COURT:  Correct.  That's what you are going

21   to answer.  That includes before and I'm not sympathetic

22   to the argument about the after, but on this one, I have

23   a feeling the number is not great.  You've answered as to

24   some already, so I will allow him to ask this one up to

25   the present.

1          MR. BAGNELL:  Your Honor, briefly.

2          THE COURT:  Do you want to try to lose this one

3   for yourself, sir?

4          MR. BAGNELL:  No.  To provide some context, Your

5   Honor, the evidence I think will show this gun was

6   introduced in 2014, so for me that they all, all the AD's

7   only happened in 2017, I found suspect.  So I'm trying to

8   find out again what the company knew, when they knew it.

9          THE COURT:  That really wasn't particularly

10  helpful to me.  Maybe it made you feel better.

11         Let's move on to number 11.  I believe I denied

12  that one because I don't think discovery of settlements

13  falls within the scope of 26B.

14         Number 13, I think we just dealt with that in 11

15  or 10, right, 10, we dealt with it.  Other than I haven't

16  asked anybody a question, so I don't want to hear from

17  anybody.  I have read plaintiff's argument and I don't

18  understand why your argument at page 8 in any way

19  justifies what you are asking.  I think you could ask

20  them for something about why do you design this gun the

21  way you designed it.  You're basically taking 11 and put

22  it on steroids to cover every one of their semi-automatic

23  pistols for the past seven years.  You've already asked

24  it in 11 to the extent I think it is relevant to your

25  claims or defenses.  Otherwise the Court is going to deny

1    13.

2         14, I have the same reaction.  Again I'm going

3    to deny.  I will tell you that I think you can ask

4    questions why did they design or develop the firearm the

5    way they did.  You can ask as to P320 prior to the

6    incident or prior to the sale date of the firearm at

7    incident, you know.  Why did you design it the way you

8    did and did you think it was going to be drop safe and if

9    so, why.  But I don't know that that last one is going to

10   get you anything more than their web warnings.  It is a

11   very argumentative question.  That's the main reason I

12   deny it.

13        As to 15, you claim he refused to answer, but I

14   think he did answer.

15        MR. BAGNELL:  That's correct.  That's a mistake.

16        THE COURT:  So 15 we're going to pass.  The next

17   is 17.  Again you say he refused to answer, yeah, I guess

18   I mean you answered it, Attorney Joyce.

19        But I don't understand what the answer means

20   because I don't know, have you done a fully responsible

21   outside counsel job of asking your client for the answers

22   to this question and telling them how and where to search

23   for what might be responsive answers, interviewed the

24   right people and then able to then respond it is not

25   currently aware?  I understand why you would answer you

1    are not currently aware in the sense that some salesman

2    Joe out in Montana might have said something over lunch.

3    Have you asked all the salesmen?  What have you

4    represented beyond what's on the website?  Because if you

5    have done that type of diligence, then an answer that you

6    are not currently aware is a perfectly responsible

7    answer.

8         If you sat down with the president or your

9    client representative and said what do we tell people?

10   It is on the website. He doesn't know what his guys are

11   saying in Montana.  I don't know what you have done

12   because you haven't told me.

13        When a lawyer signs something, I'm assuming that

14   you have done what you are supposed to do.  Before I pass

15   this one and telling the plaintiff I'm denying it, you

16   are going to have to represent to me that's what you have

17   done.

18        MR. JOYCE:  I think the scope of the

19   interrogatory becomes a problem.  We have made reasonable

20   investigation into that issue with the folks that are

21   running the company and people responsible for the

22   marketing department and engineering and folks like that.

23        The scope of this is any agent, any employee,

24   anyone on the line that might have said something at a

25   bar.  We haven't interviewed every single employee of the

1    company or every single agent of the company of what they

2    may have said orally to one of their friends.

3          I think we've made a reasonable investigation

4    into that the issue in terms of talking to the people who

5    would know as to what, you know, the position of the

6    company is with respect to the firearm, so I would to the

7    extent that you want us to go back.

8          THE COURT:  If you have done that, it sounds

9    fine. Just like when somebody asked for all emails, and

10   you have a 3,000 person company, and some people are over

11   here running the maintenance department, you probably

12   aren't going to ask them what was said to customers,

13   right?  But there's going to be a cohort of people who do

14   deal with customers.  Your client should be able to tell

15   you who those people are.  You tell your client you

16   better search the database for those people.

17         MR. JOYCE:  I have done that.  Documents are

18   easy.  We have looked for that.  When it goes to any oral

19   conversation all the way down to the rank and file guy on

20   the line.

21         THE COURT:  The people whose emails you

22   searched, is that the whole company you searched all the

23   emails or just the marketing --

24         MR. JOYCE:  We did an electronic search with

25   respect to communications on the 320 and looked for

1   documents.

2       THE COURT:  You did anybody's email, the

3   maintenance guy could have a 320 email, you could have

4   found it?  I just need an answer.  Did you or I don't

5   think you had to.

6       MR. JOYCE:  I don't think that we looked at the

7   maintenance guys.

8       THE COURT:  Fine.  Then the people whose emails

9   you searched, you should have at least sent an email to

10  all of them saying someone has to answer this question

11  for the company.  Can you tell me have you made any

12  verbal representations in the course of your work in the

13  technical, marketing or in the corporate suit, you know,

14  anywhere.  If the answer came back no, then I think a

15  response that says Sig Sauer is not currently aware of

16  any employee expressing concerns about the safety of this

17  P320 pit model from a drop safety perspective prior to

18  the date of the incident.

19      MR. JOYCE:  That's correct, Your Honor.  That is

20  correct.

21      THE COURT:  Then you should answer.  You should

22  strike the first part without subject to without waiving

23  objections.  You should -- it is not -- okay.  I don't

24  think it's asking.

25      You can object that you are answering only as to

1    dropped situations and you can say that in your answer,

2    but I'm not compelling you to answer.  That's what I'm

3    doing is I am telling the plaintiff he's not going to get

4    every incident and then that's it.  That's not really an

5    objection. It will become a redefinition of the question.

6    The question is asking you about the safety of P320

7    before or after it was released with respect to its

8    safety, dropping, however, I don't know how to phrase it.

9    With respect to its drop safety.  Let's call it that.  I

10   think hopefully we all understand what that means.

11        MR. JOYCE:  Well, Your Honor, on interrogatory

12   number 17, obviously Sig has made communications with

13   respect to drop safety as part of the voluntary upgrade

14   program.

15        THE COURT:  No.  I guess what I'm saying is the

16   second line is rewritten concerns regarding the drop

17   safety of P320, so the amendment to the interrogatory is

18   to insert the word "drop safety" in the second line and

19   it relates only to "concerns".  Not that it is a great

20   gun, accurate light, no kick, whatever else you might

21   say.

22        MR. JOYCE:  Can we limit that to prior to the

23   Sheperis occurrence?

24        THE COURT:  I couldn't understand.  Can you get

25   the mic.

1        MR. JOYCE:  Can we limit that prior to the

2   Sheperis occurrence, Your Honor?  I don't know what the

3   relevance is of statements post the Sheperis occurrence

4   would be.

5        THE COURT:  For now you can.  If the landscape

6   of the plaintiff's complaint were to change, it is

7   without prejudice for plaintiff coming back to request

8   this information after.

9        Number 19, I think that's a reasonable request.

10  I think your objection about the time is stricken.  Your

11  objection about models that are different than the P320

12  model pistols that are different from the subject P320

13  model pistol, that's stricken.  You may think they are

14  different.  Maybe they are different.  They have the same

15  model number.  I'm not going to sit here and figure out

16  one has pink trim or something. I don't know why they are

17  different or how they are different or whether it is even

18  relevant to drop safety.  If it has the same model

19  number, I'm going to assume that the company views it as

20  pretty similar.

21       The last objection is I don't think that's not

22  relevant.  I think for the product, you know, safety or

23  product liability claim, however it was tested could be

24  relevant to the plaintiff's claim.  So all those

25  objections are stricken.

1          MR. JOYCE:  Understood, Your Honor.

2          THE COURT:  Answer it without the objections.

3    That's what plaintiff asks for and I think that's right.

4          Interrogatory 21 I've got a problem with the

5    plaintiff and I have read your memo, but I still don't

6    understand why it is the relevant.  Rule 407 bars

7    subsequent remedial efforts, so I'm not sure what this

8    would be.  What you would offer this at trial as relevant

9    to or would tend to prove something that's at issue.

10         MR. BAGNELL:  We'll withdraw it, Your Honor.

11         THE COURT:  Okay.  My problem is I am sorry to

12   say, but normally I don't spend more than an hour on

13   discovery disputes. We haven't got to the request for

14   production, but I have to catch a train to the New York

15   this afternoon for a bar event.  So I have about five

16   more minutes which definitely means we're not getting to

17   the motion to amend.  I guess the defendant hasn't

18   opposed it so obviously we're not ready for that one.

19   I'm sorry.  That's the class hasn't been done.  The

20   motion to amend is joined.

21         MR. JOYCE:  Well, Your Honor, we have made a

22   motion for judgment on the pleadings.

23         THE COURT:  It is the motion for judgment on the

24   pleading that is joined, not the motion to amend.  I'm

25   confused.  I will take a few minutes here, Attorney

1    Bagnell, I'm really concerned.  You may be right, but I

2    don't see it yet that you aren't under the Product

3    Liability Act here.

4         MR. BAGNELL:  But Your Honor as we said.

5         THE COURT:  But let me finish my thought.  You

6    have said several times I can add that back in.  I'd

7    probably let you.  The facts aren't any different.  It is

8    just legal theory.  I don't see how you have negligent or

9    intentional infliction of emotional distress, if you have

10   a product claim.  I don't see here how you come under

11   Garrity or whatever one it is.  That somehow you have --

12   how did they phrase that.  That this is not just a

13   product liability claim dressed in the robes of CUTPA.

14   That's Garrity.

15        MR. BAGNELL:  Yes, I read that, Your Honor.

16   Again just to be -- I know your time is short. It is

17   because of our item number nine where we do ask for a

18   recall or other warning.  In my view, at the time,

19   perhaps I be wrong, I thought that took it out of a CPLA.

20   Obviously that's not a demand for damages for personal

21   injury.  It is something else.

22        THE COURT:  It is something else.

23        MR. BAGNELL:  That's my thought.

24        THE COURT:  But as I said, you could have had a

25   demand to replace the president on Sig Sauer on the

1  grounds he let this horrible thing happen, this unsafe

2  gun go to market.  I guess what I'm asking.  Maybe I

3  don't know the answer.  Isn't there some limit to the

4  exercise of equitable jurisdiction under CUTPA?  Doesn't

5  it have to -- I don't know.  I'm worried about things

6  like federal preemption.  I don't know what federal

7  statute governs recalls of products. I know there are

8  federal legislation that governs recall of products, so

9  I'm wondering do I get to do that under a state statute?

10         MR. BAGNELL:  Since filing the case, I've

11  learned that firearms are exempt from mandatory recalls

12  under the Consumer Protection Agency.  So you are right.

13  I don't think the court can.  At the time, I made that

14  request in good faith.

15         THE COURT:  I appreciate your frankness.  I

16  haven't done the work to get that answer.

17         MR. BAGNELL:  Firearms were excepted because of

18  Second Amendment concerns.  Of course, there's limits,

19  Your Honor.  I think that when we're talking about a

20  recall or a warning about a weapon, that presents a

21  lethal risk of harm to other people who bought it, that

22  concerns me, Your Honor, not as an attorney but as a

23  human being.  I thought CUTPA would provide an avenue.

24  The defendant itself says on its website customer safety

25  is paramount.  To me it is not a big leap to say kind of

put your money where your mouth is. You can warn the
general public that there's a serious problem here. Not
just maybe send your gun back to us if you can, but you
should send it back right now. Sig itself has issued
mandatory recalls.

THE COURT: Are there any cases, lets take
automobile cases, the Takata airbag situation, did
somebody get equitable relief in a private lawsuit that
said, Okay, Audi and VW and everybody else who uses
Takata airbags, you have to recall those now.

MR. BAGNELL: The Ford Pinto case, Your Honor, I
believe Ford was ordered to recall that car.

THE COURT: I'm sure that companies have been
ordered to recall. But I'm asking who is the plaintiff?
The United States of America? Was it a federal cause of
action, not a state unfair trade practice?

MR. BAGNELL: Again there's no -- There is no --
there are no federal regulations on firearms, Your Honor.
There just aren't any. The state statute to me was it.
That's really all I had. Unless I wanted to strictly
limit the case to a personal injury case. I viewed it as
having broader implications than solely the personal
injury to Mr. Sheperis which shouldn't have happened.

THE COURT: That may be. He may be entitled to
very significant money damages. I am not sure how a

1    single individual turns his personal injury case into

2    what is effectively a class action on behalf of -- I mean

3    is he going to be the representative of people who have

4    been injured by this gun or is he a representative of

5    people who bought it?

6         MR. BAGNELL:  Bought it, who might buy it.

7         THE COURT:  You don't think you and he have a

8    conflict with the other members of the class because you

9    might want to settlement for some big money.  Maybe if

10   they put big money on the table for your client, you

11   would be willing to give up the equitable relief for the

12   class you want to represent.  That's a huge conflict for

13   him and you.

14        MR. BAGNELL:  I suppose that conflict exists in

15   any potential class action, Your Honor.

16        THE COURT:  No.  If it does, you won't see the

17   class certified.

18        MR. BAGNELL:  I'm not saying I agree.  I don't

19   see the conflict right now.

20        THE COURT:  I really do need to recess.  I would

21   ask the parties to do two things.  I apologize.  I should

22   have realized this was going to take forever.

23        The first thing I ask you to confer on the

24   request for production.  I have my own notes. If you can

25   agree on some.  Obviously some of the things I have done

1    today is to narrow the scope and order the defendant to

2    answer it straight up under that revised question.  Other

3    times I've denied the plaintiff's request.  Other times I

4    granted the plaintiff's request.  Hopefully some of what

5    I said is going to be responsive to many of those. See if

6    you can agree, do it in writing, the answers will follow

7    as appropriate.

8          The ones you can't agree on, if you let me know

9    which ones they are. I know what your objections are.  I

10   know what your claim is, what you want.  I will issue a

11   ruling unless I think I need to hear from you again.

12         I would ask the parties do that as to the

13   interrogatory, as to the request for production within

14   say, I don't know, 10 days from today.  Is that possible?

15   Then as to your providing the further answers as to the

16   ones we've talked about, Attorney Joyce.  How long are

17   you asking me for that?  Normally it is 14 days.

18         MR. JOYCE:  I think we can work within the

19   normal time frame.

20         THE COURT:  Right now it is just interrogatory

21   answers.  I guess on the question of the motion for

22   judgment on the pleadings, I may call you back for

23   argument.  But I guess what I'd really appreciate is and

24   I don't know that the briefs really tackle this, the

25   thing I have been raising.  This idea of whether you're

1  hanging your hat that they shouldn't get judgment on the

2  pleadings because you do have a Garrity kind of

3  standalone claim under CUTPA that isn't for the personal

4  injury.  You want this recalled.  You want better

5  warnings, I guess that begs the question of do you have

6  and standing is the only word I can think of, but do you

7  have standing to bring that claim or do you have -- under

8  CUTPA something has to violate.  I guess you say it is a

9  bad product and that's the violation.  I guess I'm

10 troubled is there something else out there at the federal

11 level about recall of products which you tell me they

12 can't recall guns.  I don't know how then.  If the

13 federal law says you can't order the recall of guns, how

14 I get to order the recall of guns as a remedy in a

15 private litigation.  If I were persuaded that you would

16 have this CUTPA cause of action for that remedy, I

17 probably would say okay, you come within the narrow thing

18 of Garrity.  But I can't swallow the idea that you can

19 get that remedy.  That's where I'm stuck on their motion.

20 So I don't know if anybody wants to brief that a little

21 bit more maybe, maybe look closer at that issue than you

22 had before and submit a supplement even five

23 pages identifying the issue or call out a couple of

24 cases. That would be very helpful to me.

25         If I think argument is helpful, I will schedule

1    it.  Otherwise I will do a ruling once I see if you

2    submitted anything.

3         MR. JOYCE:  <u>Garrity</u> talks about direct financial

4    loss, doesn't talk about someone who wants some

5    injunctive relief about recalling a product so.

6         THE COURT:  I understand but you are arguing the

7    motion and I'm not having the argument on the motion.  I

8    apologize for speaking over you. I don't want to have

9    argument on the motion.  I'm aware of that.  I'm focused

10   on the one that I'm really hung up on.  All right then so

11   I guess if you want to submit something supplemental, I

12   would say 10 days.  I will sit on the motion for 10 days

13   at least.  We'll stand adjourned.  Thank you.

14        (Whereupon, the above hearing adjourned at 2:20

15   p.m.)

16

17        <u>COURT REPORTER'S TRANSCRIPT CERTIFICATE</u>.

18   I hereby certify that the within and foregoing is a true

19   and correct transcript taken from the proceedings in the

20   above-entitled matter.

21

22   <u>/s/  Terri Fidanza</u>

23   Terri Fidanza, RPR

24   Official Court Reporter

25