UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Derick Ortiz,

      v.                                    Civil No. 19-cv-1025-JL
                                                   Opinion No. 2022 DNH 047

Sig Sauer, Inc.

**<u>MEMORANDUM ORDER</u>**

     This is a putative class action concerning an alleged design defect in a semi-automatic pistol, the SIG P320. The defendant, Sig Sauer Inc., is a New Hampshire-based firearms manufacturer that produces the P320 pistol. The plaintiff, Derick Ortiz, is an Arizona law enforcement officer who purchased the civilian version of the P320 in 2016 to use as his primary duty pistol. In September 2019, Ortiz filed suit against Sig Sauer, alleging that the P320 has a design defect that makes it susceptible to "drop firing," or discharging after being dropped.[1] Ortiz seeks to represent a nationwide class of purchasers and to recover for violation of the Magnuson-Moss Warranty Act, breach of express warranty, breach of implied warranty of merchantability, unjust enrichment, fraudulent concealment, fraud, and violation of the Arizona Consumer Fraud Act.[2]

---

[1] The court refers to the P320's drop fire defect throughout the opinion, sometimes without qualifying it as an alleged or purported fact. To clarify, the existence of the defect is not an established fact in this litigation; it is alleged.

[2] In his September 2019 complaint, Ortiz also asserted one claim of violation of the New Hampshire Consumer Protection Act, NH RSA § 358-A:1. Compl. (doc. no. 1) at ¶¶ 120-30. The court granted Sig Sauer's motion to dismiss this count "because Ortiz failed to plead that he

In 2017, roughly two years before Ortiz filed his complaint, Sig Sauer launched the Voluntary Upgrade Program, which offers P320 owners a free upgrade aimed at enhancing the pistol's drop safety.  Now, Sig Sauer moves for summary judgment as to all of Ortiz's claims, on the basis that Ortiz is not entitled to damages because the VUP provides him with a complete remedy—a defect-free P320—at no cost to him.  Separately, Sig Sauer also moves for summary judgment on Ortiz's breach of warranty and MMWA claims, arguing that Arizona, and not New Hampshire, law applies to the claims, and that Ortiz fails to satisfy Arizona's privity requirement for such claims.

The court has class action jurisdiction over this case under 28 U.S.C. § 1332(d) (diversity).  After considering the parties' submissions and hearing oral argument, the court grants Sig Sauer's motion in part and denies it in part.  First, the court concludes that Arizona law applies to the breach of warranty and MMWA claims, and Sig Sauer merits summary judgment as to these claims because Ortiz is not in privity with Sig Sauer.  The court denies Sig Sauer's motion as to Ortiz's remaining claims, finding that Sig Sauer's damages-based argument is unavailing on this record.  Ortiz provided evidence establishing genuine disputes of material fact as to the VUP's availability to him and its effectiveness in curing the alleged drop defect.  These factual disputes preclude the court from concluding that the VUP can make Ortiz whole and thereby obviates the need for any further damages.

---

received any misrepresentations or omissions within the State of New Hampshire."  Doc. no. 23 at 2.

## I.    <u>Applicable legal standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the potential of affecting the outcome of the case." <u>Vera v. McHugh</u>, 622 F.3d 17, 26 (1st Cir. 2010) (internal quotation omitted).

At the summary judgment stage, the moving party must "assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary quality." <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d 15, 19 (1st Cir. 2003) (citing <u>Quintero de Quintero v. Aponte-Roque</u>, 974 F.2d 226, 227-28 (1st Cir. 1992)). Where, as here, the nonmovant (the plaintiff) bears the ultimate burden of proof, once the movant has made the requisite showing, the nonmovant can no longer "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." <u>Torres-Martínez v. P.R. Dep't of Corr.</u>, 485 F.3d 19, 22 (1st Cir. 2007) (quoting <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995)). The "party opposing summary judgment must 'present definite, competent evidence to rebut the motion.'" <u>Maldonado-Denis v. Castillo-Rodríguez</u>, 23 F.3d 576, 581 (1st Cir. 1994) (quoting <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991)). "Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." <u>August v. Offices Unlimited, Inc.</u>, 981 F.2d 576, 580 (1st Cir. 1992).

As it is obligated to do in the summary judgment context, the court "rehearse[s] the facts in the light most favorable to the nonmoving party (here, the plaintiff), consistent with record support," and gives them "the benefit of all reasonable inferences that those facts will bear." Noviello v. City of Boston, 398 F.3d 76, 82 (1st Cir. 2005) (internal citation omitted).

## II.    Background

The SIG P320 pistol is a semiautomatic, striker-fired handgun manufactured by the defendant, Sig Sauer. Prior to entering the pistol into the market, Sig Sauer tested it for compliance with certain firearms industry standards. In particular, Sig Sauer performed drop-fire tests to determine whether the P320 was vulnerable to discharging after being dropped. The goal of the tests was to determine whether the primer would ignite (or nearly ignite) upon impact, likely causing the gun to fire.[3]

Various organizations promulgate their own standards for drop-fire testing, including the American National Standards Institute / Sporting Arms and Ammunition Manufacturers Institute (ANSI/SAAMI), the North American Treaty Organization, the National Institute for Justice,[4] the United States Army, and the Federal Bureau of

---

[3] See Deposition of Sean Manning ("Manning Dep.") (doc. no. 41-9) at 28:3-16.

[4] The National Institute for Justice is "the research, development[,] and evaluation agency of the U.S. Department of Justice." About the National Institute of Justice, https://nij.ojp.gov/about-nij.

Investigation.[5]  The testing "standards vary chiefly in their requirements for drop height, gun orientation, safety position, and impact surface."[6]

While testing, Sig Sauer's technicians "encountered primer ignition" after dropping the P320 pistol on "a couple" of occasions, including in December 2013 and April 2014, "and the engineers were immediately notified."[7]  Sig Sauer determined that the pistol satisfied the drop safety standards propounded by the NIJ and ANSI/SAAMI.[8,9]  Sales of the P320 pistol began in January 2014, and by August 2017, consumers in the U.S. commercial market had purchased 314,059 P320 pistols.[10]

---

[5] See Expert Report of William P. Munsell, Jr. ("Munsell Report") (doc. no. 50-13) at 4.

[6] Id.

[7] Manning Dep. (doc. no. 41-9) at 53:13-23; see also doc. no. 41-2 (tabulating the results of drop tests conducted on ten guns in December 2013 and noting that the seventh gun fired on impact when dropped at an orientation described as "muzzle up horizonal bottom up"); doc. no. 41-3 at 3 (April 2014 report from P320 drop testing, noting that "SAAMI, NATO, and additional 45° drop tests were conducted on two pistols (one with a full magazine well, one with an empty magazine well). The pistol with . . . the empty magazine well performed on orientation 12 when it fired on impact").

[8] This refers to the Sporting Arms and Ammunition Manufacturers Institute's "Voluntary Industry Performance Standard," which "provides [] firearm designer[s] and manufacturer[s] with recommendations for test procedures to evaluate new designs of centerfire and rimfire rifles, shotguns[,] and handguns as defined under the Federal Gun Control Act of 1968."  Doc. no. 50-7 at 8.  The "[t]est parameters simulate conditions where abusive mishandling could possibly result in accidental discharge."  Id.

[9] See Deposition of Sean Toner ("Toner Dep.") (doc. no. 50-2) at 38:15-23; Mot. for Summ. J. (doc. no. 50-1) at 9; Manning Dep. (doc. no. 41-9) at 88:7-9.

[10] See Deposition of Thomas Taylor ("Taylor Dep.") (doc. no. 50-4) at 19:14-24.

## A.    Reports of P320 drop fires

Sig Sauer began receiving notice of P320 drop fires by late 2016 or early 2017.  At that time, Caracal, a foreign firearms manufacturer that contracted with Sig Sauer to sell a version of the P320 under Caracal's brand name, notified Sig Sauer that the P320 discharged during drop testing when dropped at a -30° orientation.[11]  Meanwhile, in January 2017, the U.S. Army awarded Sig Sauer a production contract for M17 and M18 pistols, which had "a substantially similar design" as the P320.[12]  Upon testing the pistols, the Army also found that they discharged at times when dropped, including at the -30° orientation.[13]

Through its own testing, Sig Sauer confirmed the Army's findings and observed that "the trigger was pulling itself . . . when dropped at certain angles."[14]  The Army instructed Sig Sauer to remedy the issue, and Sig Sauer responded by "implementing lightweight components in the trigger group mechanism."[15]  During that same year, the

---

[11] The record does not confirm whether the version of the P320 sold to Caracal had the same trigger mechanism parts as the pre-upgrade P320 sold to consumers such as Ortiz.  See Deposition of Adrian J. Thomele ("Thomele Dep.") (doc. no. 41-6) at 90:3-6 ("Q.  And the version of the P320 that was sold to Caracal, did that have the same trigger mechanism parts?  A. I can't tell based off top of my head.").

[12] Munsell Report (doc. no. 50-13) at 5; see also Thomele Dep. (doc. no. 41-6) at 66:1-15 (noting that the "basic design concept" of the triggers and "basic principles" of the M17, M18, and P320 pistols were "the same," though the sear spring was different).

[13] See id.; see also Thomele Dep. (doc. no. 41-6) at 77:3-10.

[14] Toner Dep. (doc. no. 41-7) at 32:13-23.

[15] Thomele Dep. (doc. no. 41-6) at 59:12-21; doc. no. 40-19 at 2.

Army found that "the [modification] corrected the deficiency[,] and the pistol no longer fired when dropped."[16]

Later that year, on August 5, 2017, an employee at Omaha Outdoors, a store that sells "a lot of Sig [Sauer] [products] including the P320," emailed two individuals at Sig Sauer to inform them that Omaha tested "four different 320s" and found that "three of these four 320s . . . consistently" fired or nearly fired when dropped at a -30° angle.[17] The Omaha employee, Andrew Tuohy, provided links to YouTube video recordings of Omaha's drop-fire tests, and he stated that Omaha communicated with Sig Sauer's customer service department about this issue.

Days later, individuals connected to a blog entitled The Truth About Guns conducted drop tests on a newly purchased P320 and confirmed Omaha's findings, and then notified Sig Sauer of the same.[18]  After that, Sig Sauer replicated Omaha's test with the same results.[19]  Shortly thereafter, Sig Sauer decided to launch the Voluntary Upgrade Program, offering P320 owners the same component adjustments as Sig Sauer implemented earlier that year to address the M17 and M18 drop fires.[20]

---

[16] Doc. no. 40-19 at 3.

[17] See Andrew Tuohy August 5, 2017 email (doc. no. 40-20) at 2-3; Thomele Dep. (doc. no. 41-6) at 77:1-10 (discussing the videos of drop tests that Tuohy attached to his email and confirming that the drops occurred at -30° orientation).

[18] See Deposition of Jordan Hunter ("Hunter Dep.") (doc. no. 41-8) 37:16-38:13.

[19] See Thomele Dep. (doc. no. 41-6) at 98:24-99:2; Hunter Dep. (doc. no. 41-8) at 132:1-22.

[20] See Munsell Report (doc. no. 50-13) at 5; Hunter Dep. (doc. no. 41-8) at 132:2-12; Toner Dep. (doc. no. 41-7) at 97:10-98:22.

### B.    Sig Sauer initiates the Voluntary Upgrade Program

On August 8, 2017, Sig Sauer publicly announced the launch of the Voluntary

Upgrade Program for the P320 through a press release.  In the press release, Sig Sauer

explained that the P320 passed ANSI/SAAMI, NIJ, and other safety and testing

protocols, but "[r]ecent evidence indicate[d] that dropping the P320 beyond U.S.

standards for safety may cause an unintentional discharge."[21]  Accordingly, the press

release continued, Sig Sauer was offering to customers "a number of enhancements in

function, reliability, and overall safety including drop performance."[22]

Sig Sauer made more details about the VUP available on its website.[23]  The

Frequently Asked Questions section stated, as the press release did, that the P320 "meets

and exceeds" various U.S. safety standards, but "usually after multiple drops, at certain

angles and conditions, a potential discharge of the firearm may result when dropped."[24]

The website explained that the upgraded design, which was also incorporated into all

subsequent shipments of new P320s, "reduces the physical weight of the trigger, sear, and

striker while additionally adding a mechanical disconnector."  Further, Sig Sauer stated

on the website that customers could participate in the VUP at no cost, and once Sig Sauer

---

[21] Doc. no. 41-2 at 2.

[22] Id.

[23] See id.

[24] Doc. no. 41-3 at 5-6.

received the pistol from the customer in the mail, the turnaround time in the U.S. commercial market would be approximately three to four weeks.[25]

In order to register for the VUP, Sig Sauer instructed customers to enter their serial numbers on the website to determine if their pistols had already been upgraded, and, if they had not been upgraded, to reach out to the Customer Service Department.[26] The website also explained that the "next steps" varied depending on the "type of consumer"; for example, the website had separate weblinks detailing the next steps for "U.S. [d]omestic consumer[s]" and "U.S. and Canadian military, law enforcement, and first responders."[27]  As of May 2021, Sig Sauer had upgraded 142,485 P320 pistols (roughly 45.4% of the P320 pistols with the alleged drop fire defect)  through the VUP.[28]

### C.    Plaintiff Ortiz's experience with the P320 and VUP

Around September 30, 2016, roughly a year before Sig Sauer launched the VUP, Ortiz purchased a P320 for $539.38 from ProForce Law Enforcement, a dealer in Arizona.[29]  Ortiz is a police officer in the Snowflake-Taylor Police Department in Arizona.  He selected the P320 as his duty weapon, and he occasionally used it for recreational shooting.[30]

---

[25] See doc. no. 41-3 at 2, 9; see also Toner Dep. (doc. no. 50-2) at 85:13-87:11.

[26] See doc. no. 41-3 at 2.

[27] Id. at 7-8.

[28] Expert Report of Andrew Y. Lemon (doc. no. 61-2) at ¶ 73.

[29] See Deposition of Derick Ortiz ("Ortiz Dep.") (doc. no. 63) at 64:13-20.

[30] Declaration of Derick Ortiz ("Ortiz Decl.") (doc. no. 40-2) at ¶ 3, 76:12-21.

Prior to the purchase, a ProForce representative introduced the pistol and its features to Ortiz and sent a sample of the pistol to his police department, which Ortiz test-fired at a shooting range in Arizona.[31]  Ortiz also researched the pistol online and learned from "several locations, including [Sig Sauer's] website" and YouTube, that the P320 was drop safe.[32]  More specifically, Ortiz viewed the phrase "safety without compromise" on a portion of Sig Sauer's website dedicated to the P320.  The following language appears below that phrase on the website: "We've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to."[33]  Ortiz asserted in a signed declaration that he would not have purchased the P320 if he knew "it was prone to drop firing due to design defect."[34]  Once he decided to purchase the P320, Ortiz called ProForce to place the order, and his pistol was subsequently shipped to the Snowflake-Taylor Police Department.

At some point after Ortiz purchased the P320, Range Master Daniel Rush told Ortiz that he was not allowed to carry the P320 as his duty weapon anymore because of reports that the P320 was not drop safe.[35]  Following this incident, Ortiz saw the videos

---

[31] See Ortiz Dep. (doc. no. 63) at 52:1-55:18.

[32] See Ortiz Decl. (doc. no. 40-2) at 69:4-19.

[33] Doc. no. 41-18 at 5.

[34] Doc. no. 59-1 at ¶ 6.

[35] See Ortiz Decl. (doc. no. 40-2) at 84:3-23.

of Omaha's P320 drop tests.[36] After viewing those videos, Ortiz visited Sig Sauer's website to learn more about the issue.  He saw some information about the VUP, but the program "wasn't up and running yet."[37]

Later, Ortiz visited Sig Sauer's website again and entered his "serial number multiple times" in order to register to participate in the VUP.[38]  He received an e-mail from Sig Sauer stating that it received his online submission for the P320 VUP; the email also acknowledged that Ortiz is a member of U.S. law enforcement, and his P320 pistol was his primary duty weapon.[39]  In the email, Sig Sauer requested information about the Upgrade Point of Contact for his office.  Ortiz replied to the email on November 17, 2017, stating that he would be the point of contact, and he was the only person in his department carrying a P320.  That same day, Ortiz received a response from the email address PublicSafetySales@sigsauer.com, stating that a Sig Sauer representative would reach out to Ortiz shortly.  Ortiz did not attempt to reach out to Sig Sauer about the VUP again.[40]

Five months later, on April 17, 2018, Ortiz received an email from a Sig Sauer customer service representative, Matt Dustin, with an email address of Matthew.Dustin@sigsauer.com.  The subject line read "SIG SAUER."  The email

---

[36] See id. at 86:3-21.

[37] See id. at 86:13-87:22.

[38] Id. at 95:7-9.

[39] See doc. no. 63-2.
[40] See Ortiz Dep (doc. no. 63) at 101:18-22.

consisted of a single line: "Derick, Just give me a call or shoot me an email when you want to get this set up. Thanks!"[41] Ortiz testified that he did not see this email until September 2020, when he forwarded it to his attorney in connection with this litigation.[42] Ortiz did not receive any other communication from Sig Sauer regarding the VUP, and Ortiz's P320 has not been upgraded.

In March 2018, Ortiz purchased another P320 pistol. He then purchased three more P320s between 2018 and 2020. Ortiz made these purchases with the understanding, based on information from Sig Sauer and online reviews, that the drop safety defect "that had previously been discovered had been corrected in [the] gun[s] that [he would] be purchasing."[43] Ortiz still has his pre-upgrade P320 that he purchased in 2016, but he does not use it because he believes it is not drop safe.[44] Nor has he attempted to resell the pistol.[45]

### D.    Expert reports

Ortiz retained expert witnesses to render opinions and prepare reports in connection with his claims, and particularly his damages theories, in this case. These

---

[41] Doc. no. 63-1.

[42] See Ortiz Dep. (doc. no. 63) at 99:19-100:18.

[43] See id. at 106:5-107:21, 109:8-24.

[44] See id. at 114:3-17.

[45] Id. at 115:9-12.

opinions contain information that is relevant to the summary judgment arguments, so the court describes the expert reports, in brief and in pertinent part, here.[46]

**_Plaintiff's expert William P. Munsell, Jr._**  Munsell is a mechanical engineer tasked to opine on whether the P320, as originally designed and sold to U.S. consumers beginning in 2014, was drop safe.  Munsell replicated the drop tests performed by Omaha Outdoors and the U.S. Army on the pre-upgrade P320 pistol.  He completed "30 controlled drop tests" at a drop height of about 1.5 meters, onto a concrete impact surface covered with a 2.46 millimeter polycarbonate sheet, and with the muzzle pointed upward and the barrel angled "from [seven] to 63 degrees from the vertical."[47]  Munsell found, in part, that "[f]or drops in which the angle of the barrel was between 26 and 36 degrees, 64% produced uncommanded discharge," and "[f]or drops between 26 and 52 degrees, 71% of tests produced failures or near-failures."[48]

He concluded that his tests "verified the essential results obtained by the other independent investigators" from the U.S. Army and Omaha Outdoors.[49]  He further

---

[46] Sig Sauer has moved to exclude the opinions of two of the plaintiff's experts—Steven Gaskin and Colin Weir.  See doc. no. 49.  The court has not made a determination on the motion yet. For the purposes of this summary judgment motion, the court will assume that the opinions are admissible.  The court may revisit this order if necessary if it grants the motion to exclude, either in whole or in part.

[47] See Munsell Report. (doc. no. 50-13) at 5-6.

[48] Id. at 6.

[49] Id.

opined that "all [P320] units with the pre-upgrade components" are "defective and unreasonably dangerous relative to [their] drop test performance."[50]

**_Plaintiff's Expert Steven P. Gaskin._**  Gaskin is an independent survey expert who holds Bachelor and Master of Science degrees in Management.  Gaskin began with the premise that the pre-upgrade P320 pistols had a "design defect" that made them "inadvertently discharge a round of ammunition if dropped on the ground."[51]  He utilized survey methodology to estimate the difference in market value between P320 pistols "with the Drop Fire Defect" and those "without the Drop Fire Defect . . . at the time and point of first purchase."[52]  He concluded "that the reduction in market value for the SIG P320 pistols due" to drop fire susceptibility is 25.49% for all pre-upgrade P320 pistols, including the one owned by Ortiz.[53]

Gaskin used a survey methodology called choice-based conjoint analysis to formulate his opinion.  He conducted an online survey with 1,010 participants who resided in the United States and indicated that they had purchased a semi-automatic pistol in the previous seven years.[54]  He presented the participants with descriptions of semi-automatic pistols with differing sets of features, including brand, firing mechanism, frame

---

[50] Id. at 10.

[51] Expert Report of Steven P. Gaskin ("Gaskin Report") (doc. no. 40-5) at ¶ 7.

[52] Id. at ¶ 10.

[53] Id. at ¶¶ 11, 53.

[54] See id. at ¶¶ 29, 35-36.

material, caliber, chamber support, drop fire susceptibility, and price.[55] The participants then completed a series of "choice tasks," in which they selected their top preference from a set of three hypothetical product profiles.[56] Gaskin employed regression analysis and consumer behavior theory to translate the preference responses from 943 respondents into an estimate of the average or median value that consumers place on the feature of interest—in this case, drop fire susceptibility.[57]

**Plaintiff's Expert Colin B. Weir.** Weir holds a Master of Business Administration degree. He "received graduate level training in conjoint analysis as part of [his] MBA" and has "12 years of experience using conjoint analysis professionally."[58] He was tasked to "determine whether it would be possible to calculate economic damages, if any, in this litigation, and if so, to set forth a framework for, and a calculation of those damages."[59]

Weir opined that "damages for the Class can be measured as the reduction of the economic value of the [P320] [p]istols, if any, solely attributable to the [drop fire] [d]efect at the time and point of sale."[60] He referred to this as Overpayment Damages. Weir then reviewed Gaskin's expert report and materials pertaining to Gaskin's conjoint

---

[55] See id. at ¶ 23.

[56] See id. at ¶ 42.

[57] See id. at ¶¶ 16-19.

[58] Declaration of Colin B. Weir ("Weir Decl.") (doc. no. 43-1) at ¶ 3.

[59] Id. at ¶ 7.

[60] Id. at ¶ 13.

survey and concluded that Gaskin's survey "is properly designed to measure the reduction in economic value of the [P320] [p]istols at the time and point of sale as a result of the [drop fire] [d]efect."[61]  Next, Weir proposed a formula for calculating Overpayment Damages.  He multiplied three values: the average purchase price of the pre-upgrade P320 pistol; Gaskin's reduction in market value percentage (25.49%); and the number of pistols sold during the Class Period.[62]  Weir concluded that the Nationwide Class is owed over $46 million in Overpayment Damages.[63]

## III.  <u>Analysis</u>

Sig Sauer moves for summary judgment as to each of Ortiz's claims against it. The court begins with the warranty claims.  The court grants Sig Sauer's motion as to Ortiz's breach of warranty and MMWA claims after finding that they fail under applicable Arizona law because Ortiz lacks privity with Sig Sauer.  Next, the court denies Sig Sauer's motion as to Ortiz's remaining claims after finding that, contrary to Sig Sauer's contention, material disputes of fact remain as to Ortiz's entitlement to compensable damages.

### A.  **Warranty claims (Counts 1-3)**

Ortiz brings three breach of warranty claims in his complaint.  In Counts 3 and 2, respectively, Ortiz claims that Sig Sauer breached a warranty of merchantability that was

---

[61] <u>Id.</u> at ¶ 29.

[62] <u>Id.</u> at ¶ 54.

[63] <u>Id.</u> at ¶ 55.

implied in the P320's contract for sale, and Sig Sauer breached an express warranty, stated in its labeling, marketing, and advertising (including on its website), that the P320 pistol is drop safe.  In Count 1, Ortiz asserts that Sig Sauer violated the Magnusson-Moss Warranty Act by breaching its written warranties.  The MMWA provides consumers a private right of action against a supplier like Sig Sauer for "failure . . . to comply" with a written or implied warranty, 15 U.S.C. § 2310(d)(1), and it "incorporate[s] the requirements of a state law cause of action."  Duncan v. Nissan North America, Inc., 305 F. Supp. 3d 311, 322 (D. Mass. 2018) (citing Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1022 n.3 (9th Cir. 2008) and Voelker v. Porsche Cars N. Am., Inc., 353 F.3d 516, 525 (7th Cir. 2003)).

The parties disagree as to whether the laws of New Hampshire or Arizona apply to Ortiz's breach of warranty claims.  Ortiz argues that New Hampshire law applies, and Sig Sauer argues that Arizona law applies.  Sig Sauer further argues that it merits summary judgment as to each of Ortiz's breach of warranty claims because Arizona law limits these contract-based actions to parties that are in privity with one another, and Ortiz fails to satisfy this privity requirement.

In a diversity action, as here, the forum state's substantive law governs, so the court must apply New Hampshire's choice-of-law principles to determine the applicable law.  Coldwell Banker Real Est., LLC v. Brian Moses Realty, Inc., 752 F. Supp. 2d 148, 164 (McCafferty, M.J.) (D.N.H. 2010).  According to New Hampshire's choice-of-law rules, the party claiming that another state's law applies must demonstrate "that the relevant substantive New Hampshire law is in actual conflict with that of the other

17

interested state." <u>Fujifilm N. Am. Corp. v. M&R Printing Equip., Inc.</u>, No. 20-CV-492, 2021 WL 722861, at *5 (D.N.H. Feb. 24, 2021) (McCafferty, J.) (internal citation omitted).  If the moving party demonstrates an actual conflict, the court must proceed with the choice-of-law analysis, but "[i]f the moving party does not so demonstrate, the court applies New Hampshire law." <u>Id.</u> (internal citation omitted).

   ***Conflict between Arizona and New Hampshire law.***  The parties agree that Arizona law, unlike New Hampshire law, imposes a privity requirement for breach of warranty claims.  <u>Compare</u> <u>Chaurasia v. Gen. Motors Corp.</u>, 212 Ariz. 18, 24 (Ariz. Ct. App. 2006) ("the privity requirement extends to both implied and express warranties" (citing <u>Flory v. Silvercrest Industries, Inc.</u>, 129 Ariz. 574, 578 (1981)), <u>with</u> NH RSA § 382-A:2-318 ("Lack of privity shall not be a defense in any action brought against the manufacturer, seller or supplier of goods to recover damages for breach of warranty, express or implied, . . . if the plaintiff was a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume[,]or be affected by the goods.").  Ortiz does not dispute that he is not in privity with Sig Sauer, since he purchased his P320 from ProForce, and not from Sig Sauer.  Ortiz contends, however, that there is no actual conflict between Arizona and New Hampshire law because "several" exceptions to the privity requirement apply to his claims.  Ortiz's argument does not persuade the court.

   First, Ortiz asserts that Arizona law recognizes an exception to the privity requirement for non-parties who are the intended beneficiaries of a warranty, and he claims that Sig Sauer's representations regarding drop safety constitute a warranty

directed at end consumers like him.  Ortiz fails to note that this exception applies under specific circumstances—when "the contracting parties . . . intend to directly benefit" the non-party as the "<u>primary</u> party in interest and as privy to the promise[,]" and the contracting parties "indicate that intention in the contract itself."  <u>Sherman v. First Am. Title Ins. Co.</u>, 201 Ariz. 564, 567 (Ariz. Ct. App. 2002) (emphasis in original) (internal quotations omitted); <u>see also</u> <u>Hayden Bus. Ctr. Condominiums Ass'n v. Pegasus Dev. Corp.</u>, 209 Ariz. 511, 513 (Ariz. Ct. App. 2005) (noting that the privity exception applies "when the contracting parties specify a non-party as the intended beneficiary"), <u>disapproved of on other grounds by</u> <u>Lofts at Fillmore Condo. Ass'n v. Reliance Com. Const., Inc.</u>, 218 Ariz. 574 (2008).  Ortiz does not identify how Sig Sauer's statements regarding drop safety constitute a warranty that "indicate[s] th[e] intention" to "directly benefit" him.  <u>See</u> <u>Sherman</u>, 201 Ariz. at 567.  Thus, Ortiz has not properly developed his argument regarding the applicability of this exception, nor does it seem, based on case law from Arizona, that the exception applies here.  <u>See</u> <u>United States v. Zannino</u>, 895 F. 2d 1, 17 (1st Cir. 1990)  ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put the flesh on its bones.").

Ortiz also references, only in passing, two other exceptions to the privity requirement, which he describes as "generally recognized."  The first exception applies when the product is dangerous.  Ortiz does not point to authority, nor can the court find any, confirming that the danger exception is recognized under Arizona law.  Instead, Ortiz cites to two federal district court cases in which the courts first confirm that the

exception is recognized under applicable New York law, and then proceed to determine whether it applies under the facts of the case. The second exception applies when a plaintiff can demonstrate reliance on the manufacturer's written representations on product labels or in advertisements. Again, Ortiz does not elaborate on this exception or its applicability under Arizona law.[64] For support, he simply cites two cases confirming that the exception is applicable in other states.

The court concludes, based on Ortiz's meager arguments and its own research, that these two exceptions are not recognized under Arizona law in the context of product defects such as the one at issue here. Further, even if the exceptions were recognized,

---

[64] It is possible that, in mentioning this exception, Ortiz is alluding to a common law breach of express warranty claim, which is recognized under Arizona law and does not require privity. See Seekings v. Jimmy GMC of Tucson, Inc., 130 Ariz. 596, 601 (1981) (a "lack of privity between a manufacturer and retail purchaser does not preclude a claim outside the U.C.C. for breach of express warranty."). A plaintiff may be able to recover against a remote manufacturer under a common law breach of warranty theory if the plaintiff relied on the manufacturer's written representations prior to purchasing the defective goods. See Flory, 129 Ariz. at 580-81 (citing cases embracing this principle and finding that the manufacturer's written warranty of materials and workmanship "might not constitute an express warranty outside the U.C.C. because the record indicates that [the warranty] was not given to [the plaintiffs] until sometime after the sale and delivery of the" defective good). Under Arizona law, courts evaluating this claim look to the warranty's language and apply the "basic rules of contract interpretation" to determine the parties' rights and obligations under the warranty. Goelz v. Winnebago Indus., Inc., No. CV-03-1290-PHX-SRB, 2005 WL 8160919, at *4 (D. Ariz. Aug. 2, 2005) (applying Arizona law). In his complaint, Ortiz alleges that Sig Sauer's marketing and labeling contain statements regarding drop safety which constitute an express warranty, and the record contains some evidence (from Ortiz's signed declaration) that Ortiz relied on the representations before purchasing the pistol. Still, Ortiz waived the argument that his breach of express warranty claim is a common law claim that is excepted from the privity requirement because he did not brief such an argument (by, for example, interpreting the purported express warranty and its scope). See Zannino, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Nor did Ortiz state that his claim does not fall under the U.C.C. Rather, when raising the breach of express warranty claim in his complaint, Ortiz cites the U.C.C.'s pre-suit notice requirements and alleges that he satisfied them. See Compl. (doc. no. 1) at ¶ 76 (citing U.C.C. § 2-607).

Ortiz's arguments regarding their applicability are too cursory to be considered.  See

Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) (a "district

court is free to disregard arguments that are not adequately developed" (citing McCoy v.

MIT, 950 F.2d 13, 22 (1st Cir. 1991)).

 In sum, the privity requirement applies to Ortiz's breach of warranty claims under

Arizona law, but not under New Hampshire law.  Arizona and New Hampshire law are

thereby in "actual conflict."  Fujifilm, 2021 WL 722861, at *5.  The court proceeds to

apply New Hampshire's choice-of-law rules to determine which state's law applies to

Ortiz's warranty claims.

**Choice-of-law analysis.**  "The 'traditional choice-of-law considerations'

articulated by the New Hampshire Supreme Court are: (1) 'predictability of results,' (2)

'maintenance of reasonable orderliness and good relationships among the states,' (3)

'simplification of the judicial task,' (4) 'advancement of the forum state's governmental

interest,' and (5) 'preference for what the court regards as the sounder rule of law.'" TIG

Ins. Co. v. EIFlow Ins. Ltd., No. 14-CV-459, 2015 WL 5714686, at *4 (D.N.H. Sept. 29,

2015) (quoting Clark v. Clark, 107 N.H. 351, 354-55 (1966)).  "The relative importance

of each factor varies depending on the type of case."  Barron v. Atrium Med. Corp., No.

17-CV-742, 2019 WL 4221412, at *4 (D.N.H. Sept. 5, 2019) (McCafferty, J.) (internal

quotation omitted).

Here, the court applies the choice-of-law analysis to breach of warranty claims,

which sound in contract.  See Lofts at Fillmore Condo. Ass'n v. Reliance Com. Const.,

Inc., 218 Ariz. 574, 575 (2008) ("A claim for breach of the implied warranty sounds in

contract"); <u>Fenton v. Hunt</u>, 2011 WL 6210659, at \*4 (Ariz. Ct. App. Dec. 13, 2011) ("In

general, a claim for breach of an express warranty sounds in contract"); <u>Kelley v.</u>

<u>Volkswagenwerk Aktiengesellschaft</u>, 110 N.H. 369, 371 (1970) ("Today breach of

warranty actions are generally treated as contract actions.").  "[I]n contract cases, New

Hampshire has . . . adopted 'the approach taken by the Restatement (Second) of Conflict

of Laws, which is that the law of the State with the most significant relationship to the

contract will govern questions regarding the contract's performance.'"[65] <u>TIG</u>, 2015 WL

5714686, at \*4 (quoting <u>Glowski v. Allstate Ins. Co.</u>, 134 N.H. 196, 197-98 (1991)).

More specifically, the Second Restatement guides that, in the absence of an

"effective choice" of law by the parties to a contract,

> The rights and duties of the parties with respect to an issue in contract are
> determined by the local law of the state which, with respect to that issue, has the
> most significant relationship to the transaction and the parties under the principles
> stated in § 6.
>
> . . .
>
>  [T]he contacts to be taken into account in applying the principles of § 6 . . .
> include: (a) the place of contracting, (b) the place of negotiation of the contract, (c)
> the place of performance, (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business

---

[65] The New Hampshire Supreme Court specified that the "adoption of the Second Restatement
position does not suggest that a <u>Clark</u> [five-factor] analysis is no longer applicable," but instead
recognizes that "for specific problems," the <u>Clark</u> analysis "do[es] not provide enough guidance
to reach the correct result.  Because predictability of results, the first <u>Clark</u> factor, is perhaps of
greatest concern in contracts cases, the adoption of the more mechanical approach of the Second
Restatement is appropriate in those cases."  <u>Glowski v. Allstate Ins. Co.</u>, 134 N.H. 196, 198
(1991).  Despite this suggestion that the <u>Clark</u> factors may still be relevant to the choice-of-law
analysis in a contract case, the court does not include an in-depth analysis of the <u>Clark</u> factors
here, in part because the New Hampshire Supreme Court also acknowledged that "the policy
behind the Second Restatement substantially mirrors those considerations contained in
[Professor] Leflar's work[,]" upon which the <u>Clark</u> factors are based.  <u>Id.</u> at 198.

of the parties.  These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflicts of Laws § 188(1)-(2).

Based on these listed factors, Arizona has more substantial contacts with the warranties at issue than New Hampshire.  First, Arizona is the place of contracting, since it is the "place where occurred the last act necessary . . . to give the contract binding effect"—that is, Ortiz's purchase of the P320.  Id. § 188 cmt. e.  The second factor is not readily applicable, since the record does not indicate that the parties negotiated the contracts or warranties at issue here.  But, to the extent that Ortiz's testing of the gun and interactions with the ProForce sales representative may be considered negotiations, they occurred in Arizona, as well.  The third and fourth factors also point to Arizona, as it was the state in which Ortiz received, kept, and used the P320.  And the final factor points to both states, since Ortiz resides in Arizona and Sig Sauer's principal place of business is New Hampshire.  New Hampshire's presence on this list does not meaningfully weigh against a finding that Arizona has a more significant relationship with the warranties, as "[t]he fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or of performance . . . ."  Id.

The Restatement also guides that the overarching choice-of-law "principles stated in § 6" should inform the court's analysis.  These principles provide a less clear answer, but they do not sway the court to apply New Hampshire law.  The Restatement highlights two principles from § 6 that may have particular force in contract issues.  The first

principle is the "[p]rotection of the justified expectations of the parties[,]" which is "the basic policy underlying the field of contracts" and "gives importance in turn to the values of certainty, predictability[,] and uniformity of result." Id. § 188 cmt. b. The second principle focuses on "the purpose sought to be achieved by the contract rules of the potentially interested states, and the relation of these states to the transaction . . . ." Id. § 188 cmt. c.

Beginning with the first principle, "it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the [subject of the contract] was located would be applied to determine many of the issues arising under the contract." Id. § 188 cmt. e. Indeed, it would be reasonable for Ortiz, having purchased and used the P320 in Arizona, to expect that Arizona law would apply to his contract claims related to the pistol. And Sig Sauer, as a manufacturer of products that are used around the country and the world,[66] should have reasonably

---

[66] On its website, Sig Sauer notes that it is "an international leader in the small arms industry," and refers to the "worldwide" demand for its products. Our History, SIG SAUER, https://www.sigsauer.com/history.

expected that it could be subject to the laws of any number of states.[67]  This principle,

then, also supports the application of Arizona law.[68]

The second principle, which focuses on the purpose of each state's contract rules,

provides reason to apply either state's laws to this dispute.  The Supreme Court of

Arizona stated that, at least in the context of breach of warranty claims with economic

damages, the privity requirement reflects the belief that "[d]isclaimers and limitations of

certain warranties and remedies are matters for bargaining," and "a buyer who chooses

his seller with care has an adequate remedy should any warranties be breached."  Flory v.

Silvercrest Indus., Inc., 129 Ariz. 574, 580 (1981) (quoting State ex rel. Western Seed

---

[67] Ortiz points out that the Terms and Conditions of Sig Sauer's website include a provision stating that New Hampshire law applies to any conflict arising from the website.  Ortiz did not explain the importance of this provision to his choice-of-law arguments; in particular, Ortiz did not specify whether it constituted a valid agreement between the parties that New Hampshire law would apply to this dispute.  The court offered the parties an opportunity, prior to oral argument, to clarify their positions on this issue through supplemental briefing.  The plaintiffs did not provide supplemental briefing.  Instead, Ortiz notified the court during oral argument, for the first time, that the statement on the website should be factored into the choice-of-law analysis as an indication of Sig Sauer's expectation of the applicable law.  The court has considered this and finds that it does not overcome the other facts that weigh heavily in favor of the conclusion that Arizona law applies to Ortiz's claims.

[68] One disclaimer is pertinent here.  The protection of the parties' justifiable expectation has limited importance here for at least two reasons.  First, the Restatement notes that this principle has "greater importance with respect to issues involving the validity of a contract[,]" and less importance "with respect to issues that involve the nature of the obligations imposed by a contract upon the parties[.]"  Id. § 188 cmt. b.  Ortiz's warranty claims go to the nature of Sig Sauer's obligations towards Ortiz, as a remote manufacturer not in privity with Ortiz, and not to the validity of any contract.  Second, Ortiz, as a consumer of a good, was unlikely to have contemplated or expected that a particular law would be applicable to his warranty claims, so he may not have had an expectation regarding the applicable law.  See id. (noting that it is important to protect the justified expectations of parties to a contract in part because "parties enter into contracts with forethought and are likely to consult a lawyer before doing so").  The court has taken these factors into consideration and still finds that the choice-of-law analysis favors the application of Arizona law.

Prod. Corp. v. Campbell, 250 Or. 262, 267-68 (1968)).  The Court further explained that the privity requirement "may save costly law suits and even some economic losses against which buyers, knowing they have the responsibility" to choose their sellers, "may protect themselves."  Id.  The New Hampshire legislature, on the other hand, "chose to remove the privity defense to breach of warranty claims" in order to, in part, "forc[e] manufacturers who represent to the public that their products are suitable and safe for use to make good on their representations . . . ."  Caldwell v. Atrium Med. Corp., No. 17-CV-021, 2019 WL 4600382, at *5 (D.N.H. Sept. 23, 2019) (McCafferty, J.).  Based on this, both states have a vested interest in applying their law to Ortiz's breach of warranty claims.  While Arizona seeks to encourage buyers in its state, like Ortiz, to exercise caution when purchasing goods, New Hampshire seeks to hold accountable manufacturers in its state, like Sig Sauer, for the quality of their products.  This factor of the choice-of-law analysis is a wash.

When considered as a whole, New Hampshire's Restatement analysis directs the court to apply Arizona law to Ortiz's MMWA, breach of express warranty, and breach of implied warranty of merchantability claims.  Under Arizona law, each claim fails for lack of privity.  The court accordingly grants summary judgment to Sig Sauer as to Counts 1, 2 and 3, Ortiz's breach of warranty claims.

**B.  Ortiz's entitlement to damages**

The court now turns to Sig Sauer's remaining argument, concerning Ortiz's entitlement to damages.  Ortiz seeks the same type of damages for each of his claims: Overpayment Damages, more commonly referred to as benefit-of-the-bargain damages.

26

This measure of damages would restore to Ortiz the benefit of his bargain by compensating him for the difference in value, at the time of purchase, between the pistol he bargained for (a drop safe pistol) and the pistol he received (with a drop-fire defect). Sig Sauer argues that Ortiz is not entitled to any damages, and thus summary judgment is warranted as to all of his claims, because the VUP offers a remedy to the drop fire defect that provides Ortiz with the benefit of his bargain at no cost to him.

While Sig Sauer moves for summary judgment as to all of Ortiz's claims on this basis, in developing its damages argument, it solely focuses on the warranty claims. The court, however, has disposed of Ortiz's warranty claims for lack of privity, and four of Ortiz's claims remain. In Count 4, Ortiz asserts an unjust enrichment claim, in which he alleges that Sig Sauer unlawfully obtained a benefit by selling defective pistols. Counts 5 and 6 are fraudulent concealment and fraud claims, premised on allegations that Sig Sauer knew of the drop fire defect but concealed it and published misleading information about the safety of the pistol. Finally, in Count 7, Ortiz alleges that Sig Sauer engaged in false, misleading, and deceptive practice in violation of the Arizona Consumer Fraud Act, by, again, concealing the drop fire defect and stating that the P320 was drop safe.

During oral argument, Sig Sauer stated that its damages arguments, though focused on case law and principles grounded in breach of warranty claims, apply equally in the context of Ortiz's other claims, and Ortiz agreed. Thus, the court addresses the arguments as they have been presented. The court sees no reason to reject the parties' agreement to assess Ortiz's entitlement to damages under the framework of warranty claims, since Ortiz seeks compensation for the same loss, stemming from the same drop

fire defect, under each theory of liability.  See John A. Cookson Co. v. New Hampshire

Ball Bearings, Inc., 147 N.H. 352, 358 (2001) (approving an arbitrator's finding that the

plaintiff's "complaint for interference with business relationships is a restatement of its

claims for damages flowing from the defendants' breach of the [contract] . . . .  Since the

claims are essentially the same, the damages award for breach of contract will

compensate the plaintiff for whatever injuries it received from the alleged interference");

see also In re Gen. Motors LLC Ignition Switch Litig., 407 F. Supp. 3d 212, 221

(S.D.N.Y. 2019) (noting, in the context of a tortious misrepresentation claim, that "the

benefit-of-the-bargain theory is not limited to the contract realm," and "where the

benefit-of-the-bargain theory applies in a tort case, it compensates an injured plaintiff in

the same way and according to the same theory as in a contract case." (internal quotation

omitted)).  The court references both New Hampshire and Arizona law in the analysis

below, as the parties agree, and the court's research confirms, that the two states' laws do

not differ with respect to the damages analysis.

   As an initial matter, Article 2 of the Uniform Commercial Code, as adopted in

Arizona and New Hampshire, provides that "the measure of damages for breach of

warranty is the difference at the time and place of acceptance between the value of the

goods accepted and the value they would have had if they had been as warranted, unless

special circumstances show proximate damages of a different amount."  AZ ST § 47-

2714(B); NH RSA 382-A:2-714(2).  Ortiz asserts that, under this theory, he is entitled to

an award of $137.48 in damages.  According to Ortiz, this amount represents the

reduction in market value of the P320, at the time of purchase, as a result of the drop fire

defect.  He calculates this number by multiplying Gaskin's estimate of the diminution in

market value associated with the defect (25.49%) by the purchase price of Ortiz's P320

pistol ($539.38).

The benefit-of-the-bargain is not the exclusive measure of damages, however, for

breach of warranty.  The cost of repair can be awarded, "provided that [the] repair will

bring the goods up to the value they would have had if they had met the contract terms."

11 Corbin on Contracts § 60.15 (2021); see also 24 R. Lord Williston on Contracts

§ 66:53 (4th ed.)  ("Difficulty in proving the value of the goods may justify using the cost

of repairs as the measure of damages" for breach of warranty); Sargent v. Janvrin, 109

N.H. 66, 68 (1968) (noting, in a case concerning a home's faulty sewage system, that

"[t]he rule [for calculating damages for breach of warranty] with respect to chattels . . .

[is] the difference between the actual value of the goods at the time of sale and what they

would have been worth if they had corresponded to the warranty[,]" but finding it

"reasonable" to "award[] this difference by allowing the cost of remedying the defect."

(citing Danforth v. Freeman, 69 N.H. 466, 470 (1899)).  Further, the cost of repair "may

be the measure" of damages if the defective property is not "totally destroyed" and "[i]f

by reasonable expenditure goods may be made to conform to the warranty" through the

repair.  Downs v. Shouse, 18 Ariz. App. 225, 230 (1972); see also MW. Goodell Const.

Co. v. Monadnock Skating Club, Inc., 121 N.H. 320, 322-23 (1981) (noting, in a

construction case, that the cost of repair is not the appropriate measure of damages for

defective work if the repair "would involve unreasonable economic waste by destruction of usable property or otherwise.").[69]

Ortiz's pre-upgrade P320 is not destroyed, nor is there any evidence to suggest that the upgrade would involve unreasonable economic waste or destruction. The weight of authority therefore directs that the cost of repair can serve as the measure of damages in this case.

Importantly, however, if the repair offered by the VUP does not "totally restore[] [the P320] to the value [it] should have had, the remaining diminution in value can be recovered." 11 Corbin on Contracts § 60.15. Sig Sauer attempts to downplay this factor of the damages analysis, largely by referring the court to out-of-circuit product defect cases in which plaintiffs were awarded the cost of repair, and not the benefit-of-the-bargain, as damages. In the cases that Sig Sauer cites, however, the courts determined that the manufacturer's repair provided a complete cure to the defect. These cases do not undermine or contradict the principle that, if the repair does not fully restore the value of the defective product, plaintiffs may be entitled to recover the remaining diminution in value resulting from the defect.

For example, Sig Sauer references In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Products Liab. Litig., in which the plaintiff class filed suit against car manufacturer Toyota, alleging that their vehicles' anti-lock braking systems were

---

[69] Ortiz suggests that New Hampshire law does not recognize the cost of repair as a measure of damages for breach of warranty. As noted here, the court disagrees and finds that controlling New Hampshire precedent and prominent contract law treatises recognize this measure of damages for breach of warranty.

defective.  915 F. Supp. 2d 1151, 1152 (C.D. Cal. 2013).  After receiving customer complaints about the ABS, Toyota issued a voluntary safety recall of the vehicles "to facilitate a software update to the vehicles' ABS intended to" remedy the defect.  Id. at 1153-54.  The software was installed in the named plaintiff's vehicle, and the plaintiff agreed that it cured the defect.  Id. at 1154.  Toyota's witnesses also testified that the software completely cured the defect, and the plaintiff did not present contradictory evidence.  Id. at 1156-57.  The court rejected the named plaintiff's request for benefit-of-the-bargain damages, given that undisputed evidence showed that he "had no problem with braking performance of his vehicle" after the software update.  Id. at 1159.

Similarly, in Kommer v. Ford Motor Co., the court held that the plaintiff was not entitled to benefit-of-the-bargain damages for the defective door handle in his Ford vehicle, reasoning that the plaintiff did not "suffer[] an injury if the defect [could] be repaired for free as part of the warranty."  2017 WL 3251598, at *5 (N.D.N.Y. July 28, 2017).  The court specified that "if Ford was unable to fix the defect, then Kommer may have suffered a cognizable injury under" New York law, but the court did not need to "decide [that] issue because [the plaintiff] [did] not allege that he actually experienced . . . problems" with his door handle after Ford completed the repair.  Id.; accord Waller v. Hewlett-Packard Co., 295 F.R.D. 472, 487-88 (finding that the availability of a free software update, which the plaintiff conceded remedied the product defect at the heart of his class action complaint, "call[ed] into question the Court's very benefit-of-the-bargain theory of injury in this case," as "[w]ith the upgrade, [the consumers] now have just what they paid for.").

31

The availability of benefit-of-the-bargain damages to Ortiz turns, then, on whether the VUP completely restores the P320's value. Ortiz argues that the VUP has several shortcomings that render it an ineffectual remedy, including that the VUP was not available to him; did not cure the drop defect; was introduced months after he purchased the defective P320 pistol; results in the loss of the use of the pistol while it is upgraded; and does not account for the diminished resale value of the pistol resulting from the defect. The court considers each critique in turn and finds that some are not compelling, but others present material disputes of fact that preclude summary judgment for Sig Sauer.

First, Ortiz asserts that the VUP was not available to him. The record shows that Sig Sauer advertised the VUP and its purpose, including on its website, and Sig Sauer created avenues for consumers to take advantage of the upgrade. Ortiz learned of the VUP through the information that Sig Sauer displayed on its website. He also utilized Sig Sauer's online registration process to sign up for the VUP, and received a communication from Sig Sauer in November 2017 acknowledging his request and stating that a customer service representative would contact him shortly.

The record also includes evidence, on the other hand, of barriers to participation in the VUP. Five months elapsed before a Sig Sauer representative reached out to Ortiz, in April 2018. The representative's email did not reference the VUP or the P320; instead, the representative requested that Ortiz inform him of "when [Ortiz] want[ed] to get this set up." Thus, it is not clear that the email concerned the VUP, as opposed to some other business Ortiz may have had with Sig Sauer. Nor is it indisputable that, if Ortiz viewed

32

the email (which he claims he did not), he could or should have recognized that it pertained to the VUP and responded accordingly.

On this record, material factual disputes remain as to whether Ortiz properly pursued the opportunity to obtain the free upgrade, or whether Sig Sauer denied Ortiz a chance to participate in the VUP by furnishing incoherent and untimely communications on the program. Thus, the court cannot conclude as a matter of law that the VUP was available to Ortiz and thereby eliminates his damages.

Next, Ortiz argues that the VUP is not effective in curing the drop fire defect. Again, the record contains conflicting evidence on this issue. The U.S. Army concluded that the upgrades that Sig Sauer applied to the M17 and M18, which are the same or substantially similar to those applied under the VUP, successfully cured the drop defect. One of the plaintiff's experts, Munsell, also states that the upgrades to the M17 and M18 were effective in eliminating drop fires.[70]

But Ortiz points to two instances in which upgraded P320 pistols still exhibited drop fire susceptibility. The record includes an internal document from Sig Sauer dated June 2020, concerning a customer complaint that his P320, which was upgraded through

---

[70] Specifically, Munsell wrote in his expert report that "Sig Sauer was directed [by the Army] to redesign the [M17 and M18] pistol[s] to eliminate these [drop fire] defects. Sig Sauer complied, and the design changes instituted proved effective in eliminating drop fire events." Munsell Report (doc. no. 63-3) at 5. While it is noteworthy that one of the plaintiff's experts made a statement that lends support to Sig Sauer's position on the effectiveness of the VUP, the statement does not eliminate or overcome the factual disputes surrounding this issue. Further, Munsell does not explain the basis of this statement in his report, so the court is left to assume that Munsell is repeating the Army's conclusion, instead of further strengthening the evidence in favor of Sig Sauer's position by confirming the Army's findings through his own testing.

the VUP, "discharged when he dropped it[.]"[71]  Also, a newspaper article recounts a

December 2020 incident in which an upgraded P320 discharged while holstered in a

police detective's purse.  The detective is quoted in the article explaining that she picked

up her bag and walked around her desk; then, her "purse sw[u]ng out" and the pistol

fired.[72]

Sig Sauer claims, without adequate evidentiary support, that these incidents do not

involve drop fires.  As for the first incident, Sig Sauer points out that the record includes

a note from a gunsmith who inspected the pistol and found "no outward signs of damage

or abuse," and "[n]othing to indicate an impact anywhere on the pistol."[73]  But Sig Sauer

provides no evidence from which the court can conclude that the absence of external

indications of impact necessarily signifies that a gun was not dropped or did not make

similar contact with an object resulting in primer ignition.  Next, Sig Sauer avers that

there was no claim of a drop in the incident involving the detective's gun.  The court

agrees that the evidence in the record does not confirm that the detective's pistol was

dropped before it discharged, but it does not rule out that possibility, either.  The

newspaper article leaves open the possibility that the pistol made impact with another

---

[71] Doc. no. 41-16 at 3.

[72] David Scott, et al., <u>Detective Sues Sig Sauer After She Says Her Holstered P320 Handgun Nearly Killed Her</u>, ABC NEWS, https://abcnews.go.com/US/detective-sues-sig-sauer-holstered-p320-handgun-killed/story?id=79605906.

[73] Doc. no. 41-16 at 4.

surface or otherwise dropped after the purse swung around, and this impact led to the pistol's discharge.

At oral argument, Sig Sauer notified the court that the detective filed suit against Sig Sauer, and she does not allege a drop defect in her complaint. The complaint is not in the record. Regardless, this assertion does not satisfy Sig Sauer's burden at summary judgment. By pointing out the absence of an allegation of a defect in the complaint in another case, Sig Sauer has not provided "affidavits, admissions, or other document[s] of evidentiary quality" ruling out the possibility that the detective's gun fired after a drop. See Mulvihill, 335 F.3d at 19. Though the complaint is a public record that can be the subject of judicial notice, "[a]s a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." M/V Am. Queen v. San Diego Marine Const. Corp., 708 F.2d 1483, 1491 (9th Cir. 1983); see also Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); In re Synchronoss Sec. Litig., 705 F. Supp. 2d 367, 390 n.35 (D.N.J. 2010) ("there is a distinction between the existence of judicial records and the truth of the facts recorded, and while the court may take judicial notice that a pleading was filed and the filing contained certain allegations, the truth of these allegations and findings are not proper subjects of judicial notice."). While not resounding, these two incidents bar the court, at this stage, from concluding that Sig

Sauer's upgrades cure the drop fire defect and thereby offer Ortiz the benefit of his bargain.

Ortiz's remaining arguments concerning the VUP's shortcomings are less convincing.  He argues for incidental damages by stating that he possessed a defective pistol for roughly a year before Sig Sauer launched the VUP, and the VUP cannot compensate him for losses suffered during this period.  Incidental damages can be awarded for breach of warranty, including in the form of "commercially reasonable . . . expenses . . . in connection with effecting cover," that is, obtaining "reasonable substitutes" to the defective good.  AZ ST §§ 47-2712, 47-2715(A); NH RSA §§ 382-A:2-712, 382-A:2-715(1).  But Ortiz cannot point to any record evidence of the expenses he incurred to effect cover, rendering such damages speculative.  For example, Ortiz testified that Range Master Rush instructed him to change his duty weapon due to the safety risks associated with the pre-upgrade P320, but Ortiz does not describe any costs associated with this change.  Similarly, Ortiz confirmed during his deposition that he does not use his pre-upgrade P320, but he does not enumerate any harm or loss associated with replacing the P320 with other firearms or not using the defective pistol.

Ortiz further asserts that the VUP would render him unable to use his pistol for the duration of the upgrade process.  Sig Sauer effectively undercuts this argument by presenting an affidavit asserting that, as a law enforcement officer, Ortiz is eligible for a new, upgraded pistol under the VUP, and he would not be required to return his pre-

upgrade pistol to Sig Sauer until after he receives the new pistol.[74]  Other evidence on the record also suggests that Ortiz's position would affect the manner in which is upgrade was handled—the November 2017 communication from Sig Sauer to Ortiz regarding the VUP specifically acknowledged that Ortiz was a law enforcement officer who uses the P320 as his duty pistol, and the website's explanation of the VUP includes separate weblinks detailing the next steps for domestic consumers and for military or law enforcement officers.  Aside from testifying that he was not aware of it, Ortiz does not provide evidence disputing the existence of this special offer for law enforcement officials.  Thus, the court concludes that Ortiz would not be without his P320 at any point if he participated in the VUP.

Ortiz's assertion that the VUP does not compensate him for the reduction in resale value caused by the drop fire defect also falls short.  Ortiz testified that he has not tried to resell his P320.  Further, Ortiz has not presented any evidence that could support the inference that he intends to resell the P320, or that he intended to do so when he purchased it.  Thus, the resale value is not part of what Ortiz bargained for when he bought the P320, and it cannot form part of the calculation of damages for breach of warranty.

In sum, Ortiz has successfully rebutted Sig Sauer's motion for summary judgment by pointing to "specific facts that demonstrate the existence of an authentic dispute" as to whether the VUP was available to him and whether it remedied the drop fire defect.  See

---

[74] See Declaration of Tom Jankiewicz (doc. no. 50-12) at ¶ 5.

<u>Torres-Martínez</u>, 485 F.3d at 22.  These factual disputes preclude the entry of summary judgment on Sig Sauer's theory that the VUP provides Ortiz with the benefit of his bargain, and he is thereby not entitled to damages.

As previously mentioned, the court applies the outcome of its analysis to all of Ortiz's remaining claims.  Sig Sauer's motion for summary judgment is accordingly denied as to Ortiz's unjust enrichment, fraud, and ACFA claims.

IV.    <u>**Conclusion**</u>

For the reasons stated above, Sig Sauer's motion for summary judgment[75] is GRANTED with respect to Ortiz's warranty claims (Counts 1-3) and DENIED without prejudice as to Ortiz's remaining claims (Counts 4-7).  The court recognizes that Sig Sauer has moved to exclude the expert opinions of Gaskin and Weir.[76]  If the court finds one or both opinions inadmissible, it may revisit the latter decision <u>sua sponte</u>, given that the plaintiff's theory of damages relies on these experts' opinions.

**SO ORDERED.**

Joseph N. Laplante
United States District Judge

April 1, 2022

cc:    Joshua Arisohn, Esq.
       Neal J. Deckant, Esq.
       Charles G. Douglas, III, Esq.

---

[75] Doc. no. 50.

[76] <u>See</u> doc. no. 49.

Brent Dwelkotte
Benjamin B. Folsom, Esq.
Brian Keith Gibson
Robert L. Joyce, Esq.
Benjamin T. King, Esq.
Joseph Marchese, Esq.
Michael J. Quinn, Esq.