# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

DERICK ORTIZ, individually and on behalf of
all others similarly situated,

                Plaintiff,

   v.

SIG SAUER, INC.,

                Defendant.

CASE NO. 1:19-cv-01025-JL

## MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ......................................................................................................... 1

STATEMENT OF DISPUTED MATERIAL FACTS ............................................... 1

I.     THE DEFECTIVE P320 PISTOL ................................................................. 1

     A.    Production And Testing History ......................................................... 1

     B.    Product Sales And SIG's False Drop Safety Claims ........................ 3

     C.    The P320's Drop Fire Defect ............................................................ 4

     D.    SIG's Knowledge And Concealment Of The Defect......................... 4

          1.    █████  Reports A Drop Fire Defect To SIG...........................4

          2.    The U.S. Army Reports A Drop Fire Defect To SIG ..................5

          3.    Reported Drop Fires And Physical Injuries From The Defect ...................6

          4.    ████████  Reports A Drop Fire Defect To SIG...........................7

          5.    In Response To Drop Fire Reports, SIG Shockingly Reaffirmed The Safety Of P320 Pistols........................8

          6.    SIG Admits The Defect ..............................................................9

II.    SIG'S "VOLUNTARY UPGRADE PROGRAM" ..................................... 10

     A.    Timeline ......................................................................................... 10

     B.    "Voluntary Upgrade Program" Is A Misleading Name..................... 10

     C.    SIG's Misrepresentations Regarding The VUP ............................... 11

     D.    The VUP Was Not A Safety Warning Or A Recall............................ 13

     E.    Many P320s Are Still Defective ..................................................... 14

III.   PLAINTIFF ORTIZ'S EXPERIENCE.................................................... 15

     A.    Plaintiff's P320 Purchase ............................................................... 15

     B.    Plaintiff Applied For The Voluntary Upgrade, But SIG Ignored His Application................................................................... 16

     C.    Diminished Resale Value ................................................................ 17

IV.   PLAINTIFF IS DUE DAMAGES ............................................................ 17

ARGUMENT .............................................................................................................. 18

I.     CHOICE OF LAW ....................................................................................... 18

     A.    SIG Concedes That New Hampshire Law Applies Nationwide For Plaintiff's Fraud-Based Claims............................................... 18

i

B.      New Hampshire Law Applies To All Of Plaintiff's Other Claims ....................... 19

II.      PLAINTIFF HAS ESTABLISHED DAMAGES ........................................................... 19

     A.      SIG Failed To Give Plaintiff The Requested "Upgrade," And The VUP Is An Inadequate Remedy ..................................................................... 19

     B.      The Voluntary Upgrade Program Does Not Obviate Plaintiff's Damages ............................................................................................................ 25

III.      PLAINTIFF'S WARRANTY CLAIMS ARE VALID AS A MATTER OF LAW .............................................................................................................................. 30

     A.      Privity Is Not Required Under New Hampshire Law, And Numerous Privity Exceptions Apply Under Arizona Law ................................... 30

     B.      Plaintiff's MMWA Claim Is A Stand-Alone Cause Of Action, Independent Of His Common Law Warranty Claims ........................................... 31

     C.      SIG Had Ample Notice Of Plaintiff's Warranty Claims ...................................... 32

IV.      SIG DOES NOT CONTEST PLAINTIFF'S UNJUST ENRICHMENT AND FRAUD-BASED CLAIMS ......................................................................................... 33

CONCLUSION ....................................................................................................................... 33

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Borchardt v. Mako Marine Int'l, Inc.*,
2011 WL 2084177 (S.D. Fla. May 24, 2011)........................................................................... 31

*Caldwell v. Atrium Medical Corp.*,
2019 WL 4600382 (D.N.H. Sept. 23, 2019)........................................................................... 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................................ 33

*Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*,
537 N.E.2d 624 (Ohio 1989) .................................................................................................. 32

*Doll v. Ford Motor Co.*,
814 F. Supp. 2d 526 (D. Md. 2011)........................................................................................ 30

*Downs v. Shouse*,
18 Ariz. App. 225 (1972) ........................................................................................................ 29

*Edwards v. Ford Motor Co.*,
603 F. App'x 538 (9th Cir. 2015)............................................................................................ 28

*Fairway Builders, Inc. v. Malouf Towers Rental Co.*,
124 Ariz. 242 (Ct. App. 1979)................................................................................................ 29

*Gilmore v. Wingate*,
21 Ariz. 542 (1920) ................................................................................................................. 29

*Hayden Bus. Ctr. Condominiums Ass'n v. Pegasus Dev. Corp.*,
209 Ariz. 511 (Ct. App. 2005)................................................................................................ 30

*In re Gen. Motors LLC Ignition Switch Litig.*,
2016 WL 3920353 (S.D.N.Y. July 15, 2016)......................................................................... 27

*In re Gen. Motors LLC Ignition Switch Litig.*,
407 F. Supp. 3d 212 (S.D.N.Y. 2019) ...................................................................... 22, 23, 27

*In re Scotts EZ Seed Litig.*,
304 F.R.D 397 (S.D.N.Y. 2015).............................................................................................. 20

*In re Toyota Motor Corp. Hybrid Brake Marketing, Sales Practices and Products Liab. Litig.*,
915 F. Supp. 2d 1151 (C.D. Cal. 2013) ................................................................................. 24

*Kaupelis v. Harbor Freight Tools USA, Inc.*,
   2020 WL 5901116 (C.D. Cal. Sept. 23, 2020) ........................................................... 21, 23, 24

*Keeton v. Hustler Magazine, Inc.*,
   549 A.2d 1187 (N.H. 1988) ...................................................................................... 19

*Kommer v. Ford Motor Company*,
   2017 WL 3251598 (N.D.N.Y. Jul. 28, 2017) ............................................................ 25

*Melvin v. Stevens*,
   10 Ariz. App. 357 (1969) ......................................................................................... 29

*Nataros v. Fine Arts Gallery of Scottsdale, Inc.*,
   126 Ariz. 44 (Ct. App. 1980) ................................................................................... 29

*Nichols v. Gen. Motors Corp.*,
   1999 WL 33292839 (N.H. Super. Dec. 13, 1999) ................................................... 25

*Petrie-Clemons v. Butterfield*,
   122 N.H. 120 (1982) ................................................................................................ 25

*Prairie Prod., Inc. v. Agchem Div.-Pennwalt Corp.*,
   514 N.E.2d 1299 (Ind. Ct. App. 1987) ..................................................................... 31

*Royal Typewriter Co., Div. of Litton Business Systems, Inc. v. Xerographic Supplies Corp.*,
   719 F.2d 1092 (11th Cir. 1982) ................................................................................ 32

*Sanders v. City of Fresno*,
   2006 WL 1883394 (E.D. Cal. July 3, 2006) .............................................................. 31

*Verde v. Stoneridge, Inc.*,
   137 F. Supp. 3d 963 (E.D. Tex. 2015) ....................................................................... 28

*Wade v. Tiffin Motorhomes, Inc.*,
   686 F. Supp. 2d 174 (N.D.N.Y. 2007) ...................................................................... 30

*Waller v. Hewlett-Packard Co.*,
   295 F.R.D. 472 (S.D. Cal. Sept. 29, 2013) ............................................................... 24

**STATUTES**

Ariz. Rev. Stat. Ann. § 47-2714 ....................................................................................... 25, 27

Ariz. Rev. Stat. Ann. § 47-2719 ....................................................................................... 28

N.H. Rev. Stat. Ann. § 382-A:2-714 ................................................................................ 25, 27

N.H. Rev. Stat. Ann. § 382-A:2-719 ................................................................................ 28

U.C.C. § 2-714(2) .................................................................................................. 29

U.C.C. § 2-607(3)(a) ............................................................................................. 32

U.S.C. § 2301(7) ................................................................................................... 31

**RULES**

Fed. R. Civ. P. 56(c) ............................................................................................... 1

## INTRODUCTION

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). Defendant SIG Sauer Inc. ("Defendant," "SIG Sauer," or "SIG") fails to meet this burden – Plaintiff Derick Ortiz ("Plaintiff") has established genuine issues of material fact as to all of his claims, and Defendant's arguments to the contrary are unavailing.  Its motion should be denied in its entirety.

## STATEMENT OF DISPUTED MATERIAL FACTS

**I.     THE DEFECTIVE P320 PISTOL**

**A.     Production And Testing History**



Defendant SIG Sauer Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment (Dkt. No. 50-1) ("MSJ") at 4.  But SIG was aware of the Defect even before then. Ex. 73[1] (Manning Dep.) at 28:3-18, 30:10-16 (                    ).                    Ex. 2.

---

[1] All exhibits referenced herein, with the exceptions of exhibits numbered 87 to 89, refer to exhibits to the 8/13/21 Declaration of Joseph I. Marchese (Dkt. No. 40-6).



Ex. 2.  Ex. 73 (Manning Dep.) at 50:24-51:12.  Despite ████████████████, SIG began

to sell the P320 commercially just three months later claiming it was "drop safe."  Ex. 74 (SIG-

ORTIZ001336).



Exs. 3-4.  ████████████████████████

Ex. 5; Ex. 73 (Manning Dep.) ████████████████████████

████ ).  As a result of SIG's internal drop testing of the P320, it knew prior to any sales that the

pistol had a drop fire defect:



Ex. 73 (Manning Dep.) at 52:24-53:3, 53:20-23.[2]

## B. Product Sales And SIG's False Drop Safety Claims

From its release in 2014 to August 2017, SIG sold approximately ▮▮▮▮ P320s.  Ex. 71

(Toner Dep.) at 23:13-21.  Throughout this period, SIG's marketing ironically highlighted safety.

The P320 selling guide stresses "safety" as one of the key selling points.  Ex. 9 at SIG-

ORT1Z00006173.  P320 promotional materials promised "SAFETY WITHOUT

COMPROMISE," and specifically (and falsely) warranted that the P320 was "drop safe:"



SAFETY WITHOUT COMPROMISE.

Safety isn't negotiable. The P320 maximizes peace of mind with a robust safety system. Never again will you need to pull the trigger to disassemble your pistol. And, while available as an option, you won't need a tabbed trigger safety for your gun to be drop safe.

Ex. 11 at SIG-ORTIZ000374.  Similarly, a "webisode" video on the SIG website noted "[t]here

are important features to keep the user safe," including that "[t]he 320 is drop-safe."  Ex. 26.

SIG states that "[b]ecause it passed the firearms industry standards for drop safety in the

United States – specifically the SAAMI and NIJ standards – the P320 pistol was determined to

be 'drop safe.'"  MSJ at 3.  But the SAMMI and NIJ standards specified by SIG are but two of

several standards that propose drop-fire tests for pistols – NATO, the U.S. Army, the

Commonwealth of Massachusetts, the State of California, and the FBI all have their own

standards.  Munsell Rep. at 3.  The U.S. Army, under Test Operations Procedure 3-2-045 section

4.10, Rough Handling Test, requires that its modular handguns survive a 1.5 meter drop onto

concrete without discharge, and separately requires that they incorporate an internal safety that

prevents the striker from contacting the primer unless the trigger is "purposefully pulled."  *Id.*

---

[2] Through this evidence, Plaintiff disputes SIG's contention that "Prior to producing the P320
pistol for resale …. the P320 pistol was tested to and confirmed to comply with various firearms
industry standards."  MSJ at 3.

The original Sig Sauer P320 design sold to the public does not meet either of these requirements. *Id.*

Importantly, SIG's claim of "drop safe[ty]" is absolute. It is not qualified or limited in any way. Plaintiff read and relied on that representation on SIG's website in making his purchase decision. 8/12/21 Ortiz Decl. (Dkt. 40-2) ¶ 5. Thus, SIG falsely claimed "drop safe[ty]" **despite being aware the of multiple drop test failures**. SIG could have changed or modified its product claims, but it did nothing.

SIG says it unambiguously warned that the pistol may fire if dropped. MSJ at 4. But SIG's generic and vague boilerplate disclaimer cannot cure SIG's false advertising, deceptive omissions, and the design defect that makes the P320 unduly prone to drop firing.

### C. The P320's Drop Fire Defect

The P320's heavy trigger "pulls itself" upon impact when dropped at certain angles. Thus, the P320 has a drop fire defect as originally designed. Munsell Report at 7. Indeed, SIG does not dispute the existence of the defect. Nor does it provide any evidence to rebut the existence of the defect. SIG did not even engage a subject matter expert for this case. Plaintiff's firearms expert, William Munsell, drop tested the P320 and found that, "[f]or drops in which the angle of the barrel was between 26 and 36 degrees, 64% produced uncommanded discharge" and "for drops between 26 and 52 degrees, 71% of the tests produced failures or near-failures." Munsell Report at 6. Based on these tests, Mr. Munsell concluded that the P320 is "defective and unreasonably dangerous relative to its drop test performance, and that this defect is a design defect that spans all units with the pre-upgrade components." *Id.* at 9. This testimony is uncontested.

### D. SIG's Knowledge And Concealment Of The Defect

#### 1. ████ Reports A Drop Fire Defect To SIG

Separate from SIG's own internal testing, third-parties had also discovered the drop fire

defect and warned SIG of the problem. The first such report came from ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 70 (Thomele Dep.) at 89:7-16. In

late 2016 or early 2017, ██████ conducted its own drop testing on the P320 and found a drop

fire defect, also at the -30° orientation. *Id.* at 90:7-12. ██████ reported the drop fire defect to

SIG, and SIG then confirmed the defect through its own testing. *Id.* at 93:13-21. ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 75

(SIG_ORTIZ00007248) (████████████████████████████████████████████

████████████████████████); Ex. 32.

### 2.     The U.S. Army Reports A Drop Fire Defect To SIG

Meanwhile, on January 19, 2017, the U.S. Army selected the P320 pistol for the Army's

Modular Handgun System ("MHS") and awarded SIG a production contract, ██████

████████████████████████. Ex. 28. The Army's version of the full-size P320 is called the

M17, and its version of the compact P320 is known as the M18. *Id.* ████████████████████

████████████████████████████████████████████████████████████████ Ex. 70

(Thomele Dep.) at 66:3-4; Ex. 72 (Hunter Dep.) at 39:21 (" ██████████████████ .").

████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 70 (Thomele Dep.) at 49:6-50:17. ██████

████████████████████████████████████████████████████████████████

████████████████████████ *Id.* at 50:23-52:17; Ex. 28 (" ██████████████████████

████████████████████████████████████████████████████████████████

██████████).

In response to the drop fire report from the Army, SIG replicated the Army's testing and

confirmed the drop fire defect in the P320:



*Id.* at 59:12-17; Ex. 71 (Toner Dep.) at 32:18-19 ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ *Id.* at 60:3-19, 62:7-9.

Even though the civilian version of the P320 was nearly identical to the Army version,

and was designed with the same heavy trigger mechanism, SIG did not concurrently make any

changes to the non-military versions of the P320 or take any meaningful steps to ensure the drop

safety of those pistols. Ex. 71 (Toner Dep.) at 97:10-98:11 (▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮).

### 3. Reported Drop Fires And Physical Injuries From The Defect

In addition to its own testing, as well as drop fire reports from ▮▮▮ and the Army,

P320 users started to report drop fire incidents directly to SIG before it took any action

whatsoever to address the problem in the non-military versions of the gun:

- On January 5, 2017, a P320 shot Vincent A. Sheperis, a Stamford SWAT team member, in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered. Ex. 76 (SIG-ORTIZ 002341). SIG admits that it inspected Officer Sheparis's P320 pistol following his injury, and that it had knowledge of the incident in January 2017. *See* SIG's Answer ¶ 28, Dkt. 24.

- On February 28, 2017, a P320 discharged without a trigger pull while in use by the University of Cincinnati Police Department. Ex. 76 (SIG-ORTIZ 002341). "The weapon was dropped barrel up at about a 15 to 20 degree off center to the left. The gun discharged and the round went into the wall with no injury." Ex. 40.

- On June 20, 2017, a P320 discharged without trigger pull while in use by the Howell Township, NJ Police Department. Ex. 76 (SIG-ORTIZ 002341). The detective involved reported that he "dropped it in the holster and it discharged." Ex. 42.

This evidence directly contradicts SIG's statement that "for over two-and-a-half years [from 2014 to August 2017], SIG Sauer was not informed of any alleged drop fire incidents in the field or in testing conducted by third-parties."  MSJ at 4.

<h4 style="text-align:center">4.        █████████████        Reports A Drop Fire Defect To SIG</h4>

By August 2017, despite years of drop fire reports internally and from ██████ the Army, and other users, SIG still had not taken any steps to fix the P320 for the putative class members. Any of these incidents, even taken alone, should have caused SIG to take remedial actions.  Ex. 72 (Hunter Dep.) at 115:21-116:1.  Even worse, SIG continued to make drop safety claims to promote sales of the P320.

Then, on August 4, 2017, SIG received a phone call from █████████████



. Ex. 30.

Also on August 4, 2017, Stamford, CT police officer Vincent Sheperis filed suit against SIG for damages resulting from his drop fire injury.  Ex. 76 (SIG-ORTIZ-002341).

The next day, ████████████████████████████



Ex. 16.  The videos showed that a P320 would inadvertently discharge if it was dropped at an orientation of -30°.  Ex. 70 (Thomele Dep.) at 77:3-10. ████████████████████████████

████████████████████████████ Ex. 72 (Hunter Dep.) at 37:16-38:11, 126:8-27:8. ████████████████████████████

████████████████████████████ Ex. 13.

### 5.    In Response To Drop Fire Reports, SIG Shockingly Reaffirmed The Safety Of P320 Pistols

SIG had a major public relations crisis on its hands.  By this time, SIG was already well

aware from its own testing, as well from as reports from ███████ the Army, and various gun

users, that the P320 had a drop fire defect:



Ex. 71 (Toner Dep.) at 69:8-19 (objections omitted).

SIG convened an emergency team on August 4, 2017 and set out agenda items to manage

the crisis.  Ex. 31.  Its first response was to issue a press release immediately asserting that the

P320 was safe and dismissing the P320's widely established safety deficiencies as mere "social

media rumors:"

#### SIG SAUER® Reaffirms Safety of P320® Pistol

*Striker-fired pistol exceeds safety standards of ANSI/SAAMI® and U.S. military testing*

**Newington, NH (August 4, 2017) –** In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

Ex. 14.  SIG's statement about "zero (0) reported drop-related P320 incidents" was deceptive at

best:



8



Ex. 77 (Taylor Dep.) at 141:8-18.  This press release also expressly reaffirmed that the P320 was

drop safe, stating that: "All SIG SAUER pistols incorporate effective mechanical safeties to

ensure they only fire when the trigger is pressed."  Ex. 14.  And SIG did not disclose any

information about the P320's known drop fire incidents and test failures.

> **6.    SIG Admits The Defect**

SIG then conducted various rounds of drop tests that confirmed what it already knew:

the P320 had a drop fire defect.



Ex. 70 (Thomele Dep.) at 98:24-99:2.  The testing that SIG conducted on August 4, 2017 showed

the P320

*Id.* at 116:15-22; Ex. 32.

SIG now admits that the original P320 was not "drop safe":



Ex. 70 (Thomele Dep.) at 139:22-40:5.

Ex. 72 (Hunter Dep.) at 92:5-14 (objections omitted); Ex. 77 (Taylor Dep.) at 136:4-5 (

███████████████████████████████████████████ SIG further admits that

all P320s are affected by the defect. Ex. 27 ("All current serial number ranges are affected.").

## II.    SIG'S "VOLUNTARY UPGRADE PROGRAM"

### A.    Timeline

On August 8, 2017—just three days after ███████████—SIG issued a press release

announcing a "Voluntary Upgrade of [the] P320® Pistol." Exs. 33-34. Like the changes

previously implemented for the Army's version, the Voluntary Upgrade Program ("VUP")

replaced various components of the trigger mechanism for the P320 with lighter parts to diminish

the risks of drop fires. Ex. 70 (Thomele Dep.) at 124:22-25:3. The purpose of the VUP was to

fix the drop fire defect for the P320:



Ex. 72 (Hunter Dep.) at 132:10-12. However, SIG mislead consumers about the VUP.

### B.    "Voluntary Upgrade Program" Is A Misleading Name

Although SIG states that it "announced that it was implementing an upgrade program to

enhance the performance and drop safety of the P320 Model Pistol[,]" (MSJ at 5), the

announcements about the VUP did nothing to warn consumers of the defect. In fact, there was

no mention of a drop fire defect. Moreover, the name "Voluntary Upgrade Program" was itself

misleading because the P320s were not in a safe condition as originally designed.



Ex. 72 (Hunter Dep.) at 166:10-16 (objections omitted). And while the design for the M17 and

M18 was changed across the board for the Army due to the drop safety issue, the VUP was not

universal.  This was not a safety recall, but something that consumers could choose to purportedly *enhance* their gun.  According to SIG, a recall was not required because the P320 could pass some (but not all) types of drop testing.  Ex. 77 (Taylor Dep.) at 98:23-99:8.

SIG also took minimal efforts to notify the public about the VUP.  While it issued a misleading press release, and posted a misleading advertisement on Facebook, SIG has no idea how many P320 purchasers it actually reached and never tried to determine the reach of its notifications.  Ex. 77 (Taylor Dep.) at 107:23-24, 109:16 ███████████████████ ███████████████████████████████████████████████████ Ex. 72 (Hunter Dep.) at 79 ███████████████████████████████ ██████████████████████████████████████████████████████

And, for those who did learn of it, utilizing the VUP was often difficult.  When the "upgrade" first became available, it took 4-6 weeks for consumers to get their pistols returned.  Ex. 78 (Larson Dep.) at 18:4-11.  Moreover, there is evidence that SIG did not even provide an upgrade to all P320 owners who tried to get one.  In fact, Plaintiff Ortiz tried to participate in the VUP multiple times by visiting SIG's website and inputting his P320's serial number in the appropriate place, but SIG never upgraded his pistol.  8/12/21 Ortiz Decl. (Dkt. 40-2) ¶¶ 10-11; *see also infra*.

## C.    SIG's Misrepresentations Regarding The VUP

SIG purports that "the information provided on SIG Sauer's website about the upgrade program makes clear that the program was designed to enhance the drop fire safety of the P320 Pistol[.]"  But the contrary is true.  SIG's press release about the VUP repeatedly sent the message that the P320 was safe as-is:

### SIG SAUER® Issues Voluntary Upgrade of P320® Pistol

*P320 pistol meets requirements for industry and government safety standards; performance enhancements optimize function, safety, and reliability.*

**Newington, NH (August 8, 2017) –**
The P320 meets U.S. standards for safety, including the American National Standards Institute (ANSI) / Sporting Arms Ammunition Manufacturers' Institute, Inc. (SAAMI®), National Institute of Justice (NIJ), as well as rigorous testing protocols for global military and law enforcement agencies.

Ex. 33.  The press release did not state anywhere that the VUP was announced because of a drop fire defect.  *Id.*  Similarly, SIG's Facebook advertisement about the VUP made the P320 sound perfectly safe:



Ex. 25.  To downplay the issue and suppress use of the VUP, SIG's communications spoke only of enhancements and optimizations, and not about the known safety deficiency or any known reported drop fire incidents.  Even worse, the Frequently Asked Questions portion of the VUP page on SIG's website falsely stated that the P320 was safe in its current configuration:

### Is my P320 safe in its current configuration?

Yes. The P320 meets and exceeds all US safety standards. However, mechanical safeties are designed to augment, not replace safe handling practices. Careless and improper handling of any firearm can result in an unintentional discharge.

### What if I don't want to upgrade the trigger assembly on my P320?

This is a voluntary service, as the P320 meets and exceeds all ANSI/SAAMI, NIJ, DOJ, California, Massachusetts, and safety standards. Sig Sauer welcomes all of its P320 owners to take advantage of this program.

Ex. 34.  And SIG has never offered any monetary refund to P320 owners as part of the VUP.

SIG also posted a video on its YouTube Channel and website titled "Explanation of

Changes Made to the P320 Pistol."[3]  In this video, a SIG employee explains:  "Okay, so you get your upgraded P320 from the box, and the first thing you're probably going to notice is the triggers.  The upgraded guns have a much smaller and lightweight trigger.  It's been reduced in weight by about 35%.  It's going to reduce inertia to the rear."  Compl. ¶ 46.  However, the SIG employee does not explain that these changes are intended to fix the drop design defect.  *Id.*  In fact, the drop fire design defect is not mentioned **anywhere** in this informational video.  Rather, "drop safety" is only mentioned twice.  And both times, the emphasis is that the changes have "**nothing to do with drop safety**."[4]

### D.    The VUP Was Not A Safety Warning Or A Recall

The Voluntary Upgrade Program was not a safety warning or a recall.  There are two examples of <u>actual recalls</u> by SIG Sauer currently available on the SIG website.[5]  In these recalls, SIG does <u>not</u> state that the affected firearms are "safe in [their] current configuration."  Unlike the Voluntary Upgrade Program, both recall notices emphasize that the recall is needed for **safety**.  *See* Rifle Safety Warning: Safety Warning and Recall Notice ("Over time, this could result in a trigger malfunction creating a **significant safety hazard**.") (emphasis added); Safety Recall Notice: Sig Sauer Cross Bolt-Action Rifle ("Sig Sauer has decided to issue a safety recall in order to implement a modification to the firing action to address **this potential safety concern**.")  (emphasis added).  The Rifle Safety Warning: Safety Warning and Recall Notice states that the recall is "mandatory."

---

[3] *See* https://www.youtube.com/watch?v=u9vIY2EoJwE&t=1s (MSJ at 7)
[4] *See* https://www.youtube.com/watch?v=u9vIY2EoJwE&t=1s at 1 minute, 35 seconds and 2 minutes, 18 seconds
[5] *See* https://www.sigsauer.com/rifle-safety-warning ("Rifle Safety Warning: Safety Warning and Recall Notice") (last checked Nov. 12, 2021); https://www.sigsauer.com/blog/safety-recall-notice-sig-sauer-cross-bolt-action-rifle ("Safety Recall Notice: Sig Sauer Cross Bolt-Action Rifle") (last checked Nov. 12, 2021).

The Cross Bolt-Action Rifle recall further requests that "**consumers should immediately discontinue use of the rifle**" and states that "Sig Sauer is committed to providing the highest quality, industry leading firearms in the marketplace and is requesting that consumers **take immediate action and follow the recall process** as described." *See* Safety Recall Notice: Sig Sauer Cross Bolt-Action Rifle (emphasis added).  Notably, SIG's Cross Bolt-Action Rifle was recalled after SIG "viewed an online video that presents a single CROSS Bolt-Action Rifle with a potential safety concern." *Id.*  On a linked recall page, SIG instructs owners to "stop using and unload your CROSS rifle immediately."[6]

Language such as this is conspicuously absent from the Voluntary Upgrade Program, which, as discussed above, falsely states to this day that the P320 is "safe in its current configuration."  SIG could and should have issued similarly severe warnings and a full-scale recall for the P320 at many points during the timeline of the pistol's development and release.  It chose not to.

### E.    Many P320s Are Still Defective

As a result of these issues—SIG's use of the VUP instead of a mandatory recall, its continued insistence that the P320 was safe as-is, its limited and misleading publication efforts, the extended time periods for getting the "upgrade," SIG's failure provide the "upgrade" to some customers, and SIG's failure to offer a monetary refund—the VUP is not a silver bullet for this case.  Indeed, more than half of the P320s on the street (approximately ████ pistols) remain defective. Ex. 77 (Taylor Dep.) at 31:8-20.  And, even since the start of the VUP, numerous reports of P320 drop fire incidents have continued to come in, indicating that the offered "upgrades" have not fixed the problem:

- ████████████████████████████████████████████████

---

[6] https://www.sigsauer.com/crossrecall

████████████████████████████████████ Ex. 76 (SIG-ORTIZ 002341).

- On March 29, 2018, a P320 shot a SWAT officer with the Orlando Police Department in the left leg after being dropped onto a concrete driveway while holstered. *See* SIG's Answer ¶ 31, Dkt. 24.

- ████████████████████████████████████ Ex. 80 (SIG-ORTIZ00007527) (emphasis added).

- In December 2020, Detective Brittney Hilton of the Bridge City, Texas, Police Department experienced a P320 drop fire while the gun was holstered inside her purse.[7] **"Hilton's P320 was the upgraded version."** *Id.*

## III.   PLAINTIFF ORTIZ'S EXPERIENCE

### A.    Plaintiff's P320 Purchase

Plaintiff Ortiz purchased his SIG P320 Pistol in September 2016 from ProForce Law Enforcement.  8/12/21 Ortiz Decl. (Dkt. 40-2) ¶ 4.  He paid $539.38.  *Id.*  Prior to purchasing his pistol, Plaintiff Ortiz researched the P320 on SIG's website, and read and relied on the drop safety claims on the website in making his purchase decision.  *Id.* ¶ 5.  In his June 17, 2021 deposition, Plaintiff Ortiz testified that he recalled "reviewing the website, and seeing the 'safety without compromise,' and understanding that [the P320 is] drop safe."  *Id.*  Plaintiff Ortiz purchased his P320 for use as a duty weapon, as well as for personal carry use and recreational shooting.  *Id.* ¶ 6.

While SIG states that "Plaintiff confirmed he read the *entire* owner's manual, *including the warning that a dropped pistol may fire*[,]" (MSJ at 10), SIG neglects to clarify that Plaintiff "did not review the Sig Sauer P320 Owner's Manual, including the dropped pistol warning contained therein, until <u>after</u> [he] purchased [his] first P320 pistol on September 30, 2016."

---

[7] https://abcnews.go.com/US/detective-sues-sig-sauer-holstered-p320-handgun-killed/story?id=79605906 (last checked Nov. 12, 2021)

11/11/21 Ortiz Decl. at 4 (emphasis added); *see also* Ortiz Dep. at 71:8-16.

In 2017, when he was carrying his P320 at work, Plaintiff was informed by Snowflake-Taylor Police Department Range Master Daniel Rush that he was no longer allowed to carry the P320 on duty because of reported drop safety issues with the pistol.   8/12/21 Ortiz Decl. (Dkt. 40-2) ¶ 8.   Range Master Rush sent Plaintiff home from work to get a different duty gun that day. *Id.*   Plaintiff has not used that P320 since the day he learned about the drop safety issue.   *Id.* ¶ 13.

**B.     Plaintiff Applied For The Voluntary Upgrade, But SIG Ignored His Application**

After first learning about the P320's drop safety issue from his Range Master, Plaintiff Ortiz conducted online research about the problem, including visiting SIG's website, where he learned about the Voluntary Upgrade Program for the P320.   *Id.* ¶¶ 9-10.   The information that Plaintiff Ortiz read about the VUP did not say that there was a drop safety defect with the P320, nor did it say that the upgrade would fix the drop safety issue.   *Id.* ¶ 10.   Thus, Plaintiff understood the voluntary upgrade program merely as an offer to upgrade his P320.   *Id.*   And it was not clear to Plaintiff Ortiz that the VUP was being offered to fix a drop fire problem.   *Id.*; *see also* Ortiz Dep. at 87:23-88:18.

Plaintiff Ortiz still tried to participate in the voluntary upgrade program multiple times by visiting SIG's website and inputting his P320's serial number in the appropriate place.   8/12/21 Ortiz Decl. (Dkt. 40-2) ¶ 11.   SIG never upgraded his pistol.   *Id.*; Ortiz Dep. at 94:9-95:16. Thus, while SIG states that "Plaintiff never reached back out to SIG to inquire about the upgrade, claiming he was waiting for SIG to contact him" (MSJ at 11), Plaintiff disputes this assertion. When Plaintiff Ortiz, in November of 2017, contacted SIG about the upgrade program, Plaintiff received an email stating "Thank you for contacting SIG SAUER Law enforcement sales.  We have received your email and a SIG SAUER representative will be reaching out to you **shortly**."

16

Ortiz Dep. Ex 7 (emphasis added) (Ex. 89).  SIG did not communicate with Plaintiff again until **five months later**, and then only **in a separate email chain** that Plaintiff Ortiz did not discover until searching his email pursuant to discovery requests in this litigation.  And SIG's subsequent email chain **did not contain any reference whatsoever to the VUP.**  Ortiz Dep. Ex. 8 (Ex. 88).

###### C.      Diminished Resale Value

SIG states that "Plaintiff confirmed that he has never attempted to resell his P320 pistol[,]" and further states that "Plaintiff has not produced a scintilla of evidence – either through expert testimony or through his own research – supporting [his argument that there is a diminished resale value to the non-upgraded P320 pistol."  MSJ at 13.  That is wrong.  Plaintiff Ortiz testified at deposition that he visited several websites, and "saw that the resale value of an originally designed, pre-upgraded P320 is lower than a post-upgrade model."  8/12/21 Ortiz Decl. (Dkt. 40-2) ¶ 14; Ortiz Dep. at 115:20-116:23.  Further, Plaintiff's expert Colin Weir stated that "the P320 Pistol's tarnished history will continue to leave a taint on the Pistols, impairing their resale value.  As alleged, the drop fire Defect has resulted in severe injury to P320 owners.  Both buyers and sellers will recognize these consequences, and that even if the repair was successful and fully effective, there will be a taint on the P320s that affects their value."  Weir Rebuttal ¶ 85.  *See also id.* ¶ 74 (stating the same).  And Plaintiff's expert Steven P. Gaskin has presented an alternative survey design to "model the effect of this upgrade on the reduction in market value for used Class Pistols in the resale market."  Gaskin Rep. ¶ 7 fn. 6; *see also* Gaskin Rep. Ex. P.

## IV.     PLAINTIFF IS DUE DAMAGES

Plaintiff alleges that the Drop Fire Defect resulted in, among other things, being overcharged (an "Overpayment" or "Overpayment Damages") at the time of purchase.  *See* Weir Rebuttal ¶ 8.  Plaintiff's expert witnesses, Steven P. Gaskin and Colin Weir, offer a choice based

conjoint ("CBC") survey and damages analysis that accurately and reliably measures the amount

of Overpayment Damages.  For the reasons outlined in Plaintiff's Motion to Exclude

Defendant's Proffered Expert Dr. Andrew Lemon (Dkt. No. 47) and Plaintiff's Opposition to

Defendant's Motion to Exclude the Opinions of Steven P. Gaskin and Colin Weir (Dkt. No. 55),

Plaintiff disputes SIG's contention that "Gaskin and Weir's opinions fail to calculate market

value, are unreliable, fail to meet the threshold admissibility standards set forth in Rule 702 and

*Daubert* and should be excluded altogether."  MSJ at 8.  As outlined in Plaintiff's briefings,

conjoint analysis is a reliable method for calculating classwide damages here.  *See* Plaintiff's

Memorandum of Law in Opposition to Defendant's Motion to Exclude The Opinions of Steven

P. Gaskin and Colin Weir (Dkt. No. 55) at 6-7 ("Daubert Opp").  Mr. Gaskin and Mr. Weir's

analysis is reliable and will be helpful to the jury.  *Id.* at 7-14.   In contrast, Dr. Lemon's

criticisms of Mr. Gaskin and Mr. Weir's methodology are incorrect and baseless, and Dr.

Lemon's testimony should be excluded.  *See id.* at 14-20; *see also* Memorandum of Law in

Support of Platiniff's Motion To Exclude Defendant's Proffered Expert Dr. Andrew Lemon

(Dkt. 47-1).  Importantly, Defendant's deadline to oppose Plaintiff's motion to strike Dr.

Lemon's testimony passed on November 3, 2021.  Defendant has not yet filed any opposition.

Plaintiff therefore considers his motion unopposed.  Thus, Dr. Lemon's testimony should be

stricken, and any arguments advanced by SIG relying on Dr. Lemon's testimony are null and

void.

## ARGUMENT

## I.  CHOICE OF LAW

### A.  SIG Concedes That New Hampshire Law Applies Nationwide For Plaintiff's Fraud-Based Claims

SIG concedes that "the *Clark* factors require the application of New Hampshire law"

regarding to Plaintiff's fraud-based claims.  MSJ at 15.  This is a critical admission which completely undermines SIG's predominance arguments as set forth in its Objection to Plaintiff's Motion for Class Certification.  This concession negates Defendant's predominance arguments based on variances in state law and thus paves the way for the court to certify a nationwide class for Plaintiff's fraud-based claims at a minimum.

> **B.**     **New Hampshire Law Applies To All Of Plaintiff's Other Claims**

Although SIG concedes that New Hampshire law **must** apply nationwide for fraud, that is not Plaintiff's only claim.  For the reasons explained in Plaintiff's Motion for Class Certification, and Plaintiff's Reply Brief in support, New Hampshire law applies to all of Plaintiff's claims.  *See* Memorandum of Law in Support of Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel (Dkt. No. 40) ("Class Cert Mtn."); Reply Memorandum of Law in Further Support of Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel (Dkt. No 54) ("Class Cert Reply").

But even if choice of law analysis applies, New Hampshire law applies to Plaintiff's contract-based claims nationwide under the "most significant interest" test of *Keeton v. Hustler Magazine, Inc.*, 549 A.2d 1187 (N.H. 1988) and the Restatement (Second) of Conflict of Laws. *See* Class Cert Mtn. at 20-21; Class Cert Reply at 3-4.

## II.     PLAINTIFF HAS ESTABLISHED DAMAGES

> **A.**     **SIG Failed To Give Plaintiff The Requested "Upgrade," And The VUP Is An Inadequate Remedy**

SIG argues, "even if Plaintiff could establish that he did not originally get what he bargained for at the time of purchase, that was remedied by the availability of the upgrade program, which repairs P320 pistols and eliminates the drop fire vulnerability at no cost to

consumers." MSJ at 20. But this is false as a matter of fact and law. Here, Plaintiff applied for an "upgraded" P320, but SIG never provided one. *See supra* at Statement of Disputed Material Facts ("SODMF") Sec.III.B.; 8/12/21 Ortiz Decl. (Dkt. 40-2) ¶ 11. Thus, prior to filing suit, Plaintiff tried to avail himself of SIG's so-called upgrade program. He did not ignore the upgrade program, but rather actively applied to participate. But SIG never provided Plaintiff with an "upgraded" pistol, and Plaintiff has not used his defective P320 since the day he was informed about the safety issue from his Range Master, who forbade him to continue using the P320 at the gun range. 8/12/21 Ortiz Decl. (Dkt. 40-2) ¶¶ 8, 11 & 13. A reasonable factfinder could find that Plaintiff still suffers damages on this factual basis alone. *See* 11/11/21 Ortiz Decl. ¶ 6 ("I would not have purchased a P320 in September, 2016 had I known that the pistol was prone to drop firing due to a design defect. Moreover, I was overcharged for my P320 when I purchased it in September, 2016 because I expected to receive a properly designed 'drop safe' gun, but instead received an unsafe, defectively designed gun that was prone to drop firing.").

Moreover, Plaintiff seeks additional remedies, including punitive damages and injunctive relief, which the VUP does not, and cannot, address. *See* Complaint (Dkt. 1) ¶¶ 100, 108, Prayer for Relief. Therefore, the VUP cannot compensate Plaintiff fully for the lawful remedies he seeks. *See In re Scotts EZ Seed Litig.*, 304 F.R.D 397, 407 n.5 (S.D.N.Y. 2015) ("There are reasons a rational purchaser might choose litigation over a refund, including the availability of statutory and/or punitive damages, or the desire to send a message to a company the consumer believes is behaving unlawfully.")

More broadly, SIG contends "[c]ourts analyzing this issue have held that the availability of an adequate remedy provided by the manufacturer precludes an award of benefit-of-the-bargain damages in product defect cases." MSJ at 21. This argument fails. As an initial matter,

at this time, with class certification pending, SIG moves for summary judgment solely as to Plaintiff's claims. And Plaintiff, as detailed above, was denied participation in the Voluntary Upgrade Program. Thus, even if the VUP did obviate damages for the putative class – which it does not for the reasons outlined throughout this brief – it cannot possibly obviate damages for Plaintiff, who applied for the Voluntary Upgrade and was ignored by SIG. The Court can end its analysis here.

But regardless, SIG's Voluntary Upgrade Program is not an adequate remedy. Even the name is deceptive. Although the purpose of the VUP was to fix a drop fire defect, SIG mislabeled the program as a "voluntary upgrade." *See* Ex. 72 (Hunter Dep.) at 132:10-12. In fact, SIG did not even publicize the VUP as a remedy or acknowledge a safety defect within the program. *See supra* at SODMF Sec.II.C.; 8/12/21 Ortiz Decl. (Dkt. 40-2) ¶¶ 10, 12. Plaintiff confirmed that during his deposition. What the Plaintiff read about the VUP did not say there was a drop safety defect with the P320, so he understood the Voluntary Upgrade Program merely as an offer to upgrade his gun. It was not at all clear to Plaintiff that the VUP was being offered to fix a drop fire problem. *See* 8/12/21 Ortiz Decl. (Dkt. 40-2) ¶ 10.

Even worse, rather than issue a clear and conspicuous recall or safety warning, SIG falsely stated in its VUP that consumers' P320s were safe as originally designed. *See supra* at SODMF Sec.II.C. As a result, more than ███████ originally designed P320s still contain the defective parts and are prone to drop firing. *See* Ex. 77 (Taylor Dep.) at 31:8-20. A reasonable factfinder may determine that these putative class members remain damaged. *See Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116, at *10 (C.D. Cal. Sept. 23, 2020) ("[H]ere the evidence suggests there is still a large number of consumers who still have not received a

remedy through the recall. … For those consumers who do wish to still take advantage of the recall to remedy their alleged loss, they may always opt out of the class action.").

The inadequacy of the Voluntary Upgrade Program is further laid bare when compared to the recalls and safety warnings that SIG has conducted for other gun safety issues. *See supra* at SODMF Sec.II.D.

Further, as detailed above, to maintain its government contract, SIG was required to substitute in a lighter trigger and sear for the military pistols – the same fix that it provided to ██████ and that it would eventually include as part of the Voluntary Upgrade Program. SIG could have provided consumers with a similar remedy by requiring them to submit their guns for upgrade through a safety recall, but did not do so. Instead, SIG prioritized its government contract at the expense of consumers, because doing so was best for SIG's bottom line. *See* Ex. 87 (Hunter Dep. at 134:12-136:11) (████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ For all the foregoing reasons, the VUP is woefully inadequate.

Moreover, each of Defendant's cases are materially distinguishable from these circumstances. First, in *In re: Gen. Motors LLC Ignition Switch Litig.* the defendant announced a *recall* for its vehicles that were manufactured with a *defective* ignition switch prior to the litigation. *See* 407 F. Supp. 3d 212, 216-217 (S.D.N.Y. 2019). Here, the defendant has not announced a recall, or publicly acknowledged any safety defect. Rather, SIG expressly reiterated the safety of its P320s in various press releases and in the VUP itself, despite first-hand actual knowledge and third-party notices of P320 drop test failures and injuries.

22

In *General Motors*, the court analyzed the plaintiffs' benefit-of-the-bargain theory of damages, which "are to be measured at the time of sale." *Id.* at 222. Ultimately, the court granted defendant's summary judgment motion of plaintiffs' difference-in-value damage claims because plaintiffs' expert failed to introduce any competent evidence of the market value of the allegedly defective vehicles that plaintiffs purchased. *See id.* at 217. The plaintiffs' expert, Boedeker, admitted that "his [damages] model measures only the effect that a disclosed defect has on *willingness to pay*," thus providing solely demand-side analysis as opposed to market valuation that accounted for supply-side considerations as well. *Id.* at 233-35 & 237 ("The Court thus concludes that Boedeker's demand-side-only evidence not only fails to estimate hypothetical market conditions, but also fails to qualify as evidence of benefit-of-the-bargain damages entirely."). This is not the case here, where Plaintiff's experts have accounted for both demand and supply side factors. *See supra* at SODMF Sec.IV.; *see also* Daubert Opp. at 9-13. At most, SIG's arguments go to the weight that should be awarded to Plaintiff's experts' testimony, not to the admissibility. *See Harbor Freight Tools USA*, 2020 WL 5901116, at *5-6 (addressing *In re GM* critiques as going to the weight of the evidence, and finding Gaskin conjoint methodology to be relevant and reliable for calculating benefit-of-the-bargain damages).

The *General Motors* court also concluded that "post-sale *repairs* are relevant to the *calculation* of benefit-of-the-bargain damages, even though such damages are initially calculated according to the bargain that was struck at the time of sale." *Id.* at 222-23 (emphasis added). The court stated, "where a defendant has *already* repaired the defect, that fact *may* reduce plaintiff's benefit-of-the-bargain damages to zero." *Id.* at 226 (emphasis added solely to the word "may"). But in this case, SIG failed to provide an "upgraded" P320 to Plaintiff even after he applied for one. And more than more than ▮▮▮▮▮ originally designed P320s still contain the

23

defective parts.  *See* Ex. 77 (Taylor Dep.) at 31:8-20.  Notably, the *General Motors* court suggested that "the effectiveness of [defendant's] recalls (or lack thereof)" may affect the calculation of damages, *id.* at 222, and it concluded that "the particular circumstances of a given case may affect the theory and content of an award." *Id.* at 226.  Here, there was no recall.  Nor does the Voluntary Upgrade Program qualify as an adequate remedy because it was deceptively publicized, and does not obviate damages or fully compensate for all the remedies being sought.

Defendant's other cases are also distinguishable.  In *In re Toyota Motor Corp. Hybrid Brake Marketing, Sales Practices and Products Liab. Litig.*, the defendant initiated a "safety recall of the Class Vehicles to facilitate a software update for the vehicles' [anti-lock braking system]."  915 F. Supp. 2d 1151, 1153 (C.D. Cal. 2013).  And, "[a]fter the announcement of Toyota's national recall, [plaintiff] received the software update to his Prius' ABS, which according to [plaintiff], 'solved' the skiddy feeling he experienced prior to the recall." *Id.* at 1154.  That is not the case here.  Moreover, in *Toyota*, the court noted that the plaintiff failed to present any evidence to contradict the manufacturer's experts; he "did not even retain an engineering expert," and "present[ed] no evidence of any injury that he suffered . . . ." *Id.* Finally, *Toyota* did not involve any misrepresentation claims like this case does.

The *Waller* case also differs materially from the instant case.  In *Waller v. Hewlett-Packard Co.*, there was no recall but rather a software update intended to add functionality to a computer program.  *See* 295 F.R.D. 472, 487.  There was no safety defect in the *Waller* case.  In *Waller*, however, "everyone who owned [the computer program] and had an internet connection either received the update or at least was offered it"—and the class representative had, in fact, downloaded the software update. *Id.* at 487-88.  "[Defendant's] devices were programmed to automatically check for updates like it when connected to the internet." *Id.* at 487.  Moreover,

*Waller* was solely a product labeling case and did not involve the omission, concealment and breach of implied warranty claims asserted here.  Nor did the *Waller* court address claims under Rule 23(b)(2) for injunctive relief, which Plaintiff asserts here.  *See* 295 F.R.D. at 475.  The *Waller* case is clearly different from this matter.  *See Harbor Freight Tools USA*, 2020 WL 5901116, at *10 (distinguishing *Waller* from a consumer class action involving an alleged safety defective about electric chainsaws with an inoperable off switch).

Lastly, *Kommer v. Ford Motor Company*, which decided a motion to dismiss, differs from this case because it was not a safety defect case, the defendant issued a service bulletin identifying the product issue months before the plaintiff bought his truck, and the plaintiff did not allege that he tried to get his truck repaired.  *See* 2017 WL 3251598, at *1, 5 (N.D.N.Y. Jul. 28, 2017).

### B.     The Voluntary Upgrade Program Does Not Obviate Plaintiff's Damages

Defendant argues that Plaintiff "cannot establish that he sustained any damages" because it "has offered to cure" the drop-fire defect "through the implementation of the upgrade program." MSJ at 15.  That is incorrect.  Plaintiff has demonstrated that he is entitled to damages for each of his claims because he did not get what he paid for.  The VUP does not negate these damages because it did not exist at the time and point of sale, and it is already incorporated into Plaintiff's damages calculation.  The U.C.C. also firmly establishes that Defendant cannot force Plaintiff to accept the remedy of repair to the exclusion of economic damages.  In addition, the VUP has not made Plaintiff whole because, despite trying, he was unable to get his P320 fixed through the program, and there is evidence that the VUP does not even effectively remedy the defect at issue.

For Plaintiff's warranty claims, the measure of damages "is the difference **at the time and place of acceptance** between the value of the goods accepted and the value they would have

had if they had been as warranted, unless special circumstances show proximate damages of a different amount." N.H. Rev. Stat. Ann. § 382-A:2-714 (emphasis added); Ariz. Rev. Stat. Ann. § 47-2714 (same). Similarly, for Plaintiff's unjust enrichment claim, the correct measure of damages "is the value of the benefit received by the unjustly enriched party." *Petrie-Clemons v. Butterfield*, 122 N.H. 120, 127 (1982). And, for Plaintiff's fraud-based claims, the appropriate measure of damages is "economic loss." *Nichols v. Gen. Motors Corp.*, 1999 WL 33292839, at *4 (N.H. Super. Dec. 13, 1999). Here, Plaintiff's experts have calculated each of these damages amounts using the same methodology. The results of Gaskin's conjoint survey reveal that "the reduction in market value for the SIG P320 pistols due to a change from 'Not susceptible to drop fires' to 'Susceptible to drop fires' is 25.49%." Gaskin Decl. ⁋ 11.[8] Accordingly, here, where Plaintiff purchased his SIG Sauer P320 pistol for $539.38, 8/12/2021 Ortiz Decl. ¶ 4, Plaintiff is entitled to benefit-of-the-bargain damages of $137.48.[9]

Defendant argues that damages are not appropriate here because "any drop-fire deficiency has been remedied by the free upgrade program." MSJ at 18. That is wrong as a matter of economics, law and fact. First, as Plaintiff's damages expert, Colin B. Weir, explains,

---

[8] Defendant argues that "Plaintiff has not proffered any evidence to show that pre-upgrade P320 pistol's market value is diminished." MSJ at 24. But that is exactly what Mr. Gaskin's conjoint survey demonstrates. In response to Defendant's other criticisms of Mr. Gaskin and Mr. Weir, Plaintiff hereby incorporates his briefing on class certification and on Defendant's motions to strike.

[9] Apart from measuring damages, Mr. Gaskin's conjoint analysis demonstrates that Plaintiff sustained an injury: he paid 25.49% more than he should have. In addition, Mr. Ortiz recounts his injury when he describes how his Range Master no longer permitted him to use the defective P320 on duty, even though that was the purpose for which he purchased the pistol. 8/12/2021 Ortiz Decl. ¶ 8. Accordingly, Mr. Ortiz states that he "would not have purchased a P320 in September, 2016 had [he] known that the pistol was prone to drop firing due to a design defect." Nov. 11, 2021 Ortiz Decl. ⁋ 6. In addition, Mr. Ortiz states that he "was overcharged for [his] P320 when [he] purchased it in September, 2016 because [he] expected to receive a properly designed 'drop safe' gun, but instead received an unsafe, defectively designed gun that was prone to drop firing." *Id.*

26

the VUP does not negate damages because it "occurred after the moment when damages would be incurred by Plaintiff and Class members: the time and point of first sale." Weir Rebuttal ¶ 70. The availability of a repair for the defect was also expressly included in Mr. Gaskin's conjoint survey, and so any reduction in damages attributable to the VUP is already incorporated into Plaintiff's damages calculation. *Id.* ¶¶ 71-72 ("In other words, the reduction in market value is calculated to reflect the possibility that, at some point *after* the time and point of first sale, the Defect may be remedied in a manner such as the 'Voluntary Upgrade' program."). Defendant assumes without any empirical evidence that the VUP would serve as a full offset, or 100% reversal of any damages caused by SIG, but there are several reasons why that would not be the case:

- The "Voluntary Upgrade" program occurred *after* the time and point of first sale, leaving Plaintiff and Class members with a Defective Pistol for a minimum period of up to three years;

- While ostensibly available at no cost, the "Voluntary Upgrade" program as advertised results in the loss of use of the P320 Pistols for up to six weeks plus the transit time;

- Although purportedly available to anyone, the "Voluntary Upgrade" program is not made available uniformly, as is evidenced by the exclusion of the named Plaintiff; and

- Even if the "Voluntary Upgrade" program were to perfectly remedy the Defect, the P320 Pistol's tarnished history will continue to leave a taint on the Pistols, impairing their resale value.

Weir Rebuttal ¶¶ 74-95; 8/12/21 Ortiz Decl. (Dkt. 40-2) ¶ 10-14; *see also In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, *40 (S.D.N.Y. July 15, 2016) ("Because the recalls, even those sufficient to remedy the defects, [did] not compensate Plaintiffs for the damages sought" the benefit-of-the-bargain damages claims were not "prudentially moot.").

The law likewise states that the VUP is not a proper consideration for measuring damages because it did not exist at the time and point of sale when Mr. Ortiz purchased his P320.  As noted above, the U.C.C. expressly states that warranty damages are measured "at the time and place of acceptance."  N.H. Rev. Stat. Ann. § 382-A:2-714; Ariz. Rev. Stat. Ann. § 47-2714; *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 231 (S.D.N.Y.) ("[B]enefit-of-the-bargain damages must be measured at the time of sale" because "[t]hat, after all, is when the 'bargain' was made, and the theory measures damages according to the bargain that was struck.").  In addition, the U.C.C. states that parties to a sales contract "may" agree to "limit[] the buyer's remedies to . . . repair and replacement of non-conforming goods or parts," but that resort to this type of remedy "is <u>optional unless the remedy is expressly agreed to be exclusive</u> . . . ."  N.H. Rev. Stat. Ann. § 382-A:2-719 (emphasis added); Ariz. Rev. Stat. Ann. § 47-2719.  Here, there is no evidence that Plaintiff agreed to repair or replacement as an exclusive remedy, and so he cannot be forced to accept the VUP repair in lieu of economic damages.  *See also Edwards v. Ford Motor Co.*, 603 F. App'x 538, 539 (9th Cir. 2015) (rejecting defendant's contention that the case was moot in light of its "repair and reimbursement program" because plaintiff sought "relief beyond that provided by the program, including reimbursement of the money consumers spent"); *Verde v. Stoneridge, Inc.*, 137 F. Supp. 3d 963, 972 (E.D. Tex. 2015) (holding that a Chrysler recall did not moot claims for diminished value).

Finally, on the facts, Defendant has failed to demonstrate that the VUP is either available or effective.  Plaintiff has testified that he tried to participate in the VUP multiple times by visiting SIG's website and inputting his P320's serial number in the appropriate place, but SIG

never upgraded his pistol.  8/12/2021 Ortiz Decl. ¶¶ 10-11.[10]  Accordingly, nothing about

Plaintiff's P320 has been "remedied."  But, even if Plaintiff had been able to use the VUP, there

is evidence that it would not have provided a complete or reliable fix.[11]  Since the start of the

VUP, numerous reports of P320 drop fire incidents have continued to come in, indicating that the

offered "upgrades" have not fixed the problem.  ███████████████████████

████████████████████████████████████████████████████

███████████████████████ Ex. 80 (SIG-ORTIZ00007527) (emphasis added).

Similarly, on a recent episode of Nightline, Det. Brittney Hilton of the Bridge City, Texas, Police

Department, described an incident in which her "upgraded" P320 fired without a trigger pull.[12]

Given these facts, the VUP cannot be said to obviate Plaintiff's damages.

Defendant's citations are each distinguishable.  First, Defendant cites *Melvin v. Stevens*,

10 Ariz. App. 357 (1969), for the following quote:  "If by reasonable expenditure goods may be

made to conform to the warranty, the amount of such expenditure may be the measure of such

damages."  MSJ at 18.  But this quote—which actually comes from *Downs v. Shouse*, 18 Ariz.

App. 225, 230 (1972)—does support the proposition that Defendant suggests.  Rather, *Downs*

simply states that the cost of repair "may" be an available measure of damages.  *Id.* (noting that

benefit-of-the-bargain damages under U.C.C. 2-714(2) are "not exclusive" of other remedies).

Next, Defendant cites *Fairway Builders, Inc. v. Malouf Towers Rental Co.*, 124 Ariz.

242, 253 (Ct. App. 1979), for the contention that damages are always the "cost of repair."  But

---

[10] Defendant argues that Plaintiff "has confirmed that the upgrade . . . would provide him with the benefit of the bargain" because he has purchased four "post-upgrade" P320s.  MSJ at 16.  But these purchases do not change the fact that Mr. Ortiz was unable to use the VUP.

[11] Contrary to Defendant's assertions, Plaintiffs Expert William P. Munsell does not offer any opinion on the safety of the "upgraded" P320s.

[12] https://abc.com/shows/nightline/episode-guide/2021-08/24-tuesday-august-24-2021 (last checked Nov. 12, 2021) (last checked Nov. 12, 2021).

that case involved a construction contract and cited a rule from the First Restatement of Contracts (1932) that was specific to construction contracts.  In other words, it has no bearing on this consumer products case.

Defendant then states in bold that "where, as here, there are no repair costs chargeable to plaintiff and plaintiff does not suffer any actual injury, there are no damages for plaintiff to recover."  MSJ at 19.  But the cases it cites in support say no such thing.  Neither *Nataros v. Fine Arts Gallery of Scottsdale, Inc.*, 126 Ariz. 44 (Ct. App. 1980), nor *Gilmore v. Wingate*, 21 Ariz. 542 (1920), involved a repair.  Rather, both cases stand the rule that damages are only available when economic harm is demonstrated.  Here, Plaintiff satisfies that requirement because he presents testimony from two experts demonstrating that his P320 was worth less as a result of the defect.  At minimum, his injury is not moot because SIG did not repair his defective P320.  Nor can Defendant state that Plaintiff failed to mitigate his damages.  Plaintiff made reasonable efforts to use the VUP, but SIG did not provide any "upgrade."

## III. PLAINTIFF'S WARRANTY CLAIMS ARE VALID AS A MATTER OF LAW

### A. Privity Is Not Required Under New Hampshire Law, And Numerous Privity Exceptions Apply Under Arizona Law

Defendant contends that "Plaintiff's warranty-based claims fail due to lack of privity between Plaintiff and SIG Sauer."  MSJ at 27.  That is incorrect.  As described above, New Hampshire law applies to Plaintiff's warranty claims, and there is no privity requirement under New Hampshire law.  *Caldwell v. Atrium Medical Corp.*, 2019 WL 4600382, at *5 (D.N.H. Sept. 23, 2019).

But even if Arizona law applies to Plaintiff's warranty claims, there are several exceptions to privity that apply here.  First, an exception to privity exists when a non-party is the intended beneficiary of the warranty.  *Hayden Bus. Ctr. Condominiums Ass'n v. Pegasus Dev.*

30

*Corp.*, 209 Ariz. 511, 513 (Ct. App. 2005).  Here, when SIG warranted that its pistols were "drop safe," it did so for the benefit of end consumers, such as Mr. Ortiz, not intermediaries like ProForce Law Enforcement.

Second, it is generally recognized that there is "an exception to [the privity] principle where the product in question is a thing of danger."  *See Wade v. Tiffin Motorhomes, Inc.*, 686 F. Supp. 2d 174, 191 (N.D.N.Y. 2007); *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 541 (D. Md. 2011).  This exception plainly applies here, as this case concerns a "drop fire" defect that has resulted in numerous injuries.

Finally, there is a generally accepted exception to privity when a plaintiff demonstrates "reliance on the manufacturer's written representations in labels or advertising materials." *Sanders v. City of Fresno*, 2006 WL 1883394 at *19 (E.D. Cal. July 3, 2006); *Prairie Prod., Inc. v. Agchem Div.-Pennwalt Corp.*, 514 N.E.2d 1299, 1302-03 (Ind. Ct. App. 1987).  Here, Plaintiff Ortiz testified that he "read on . . .  the SIG SAUER website . . . that the P320 was 'drop safe' and that it 'won't fire unless you want it to,'" and he "relied on these representations" at the time of purchase.  8/12/21 Ortiz Decl. (Dkt. 40-2) ¶¶ 5, 9-11.

## B.  Plaintiff's MMWA Claim Is A Stand-Alone Cause Of Action, Independent Of His Common Law Warranty Claims

SIG argues that "[b]ecause Plaintiff's state law warranty claims are not viable, his claim for violation of the MMWA (Count I) must also fail."  MSJ at 27.  That is incorrect.  As discussed in the previous section, Plaintiff's warranty claims should proceed.  But even if they do not, Plaintiff's MMWA claim proceeds anyway.

SIG overlooks an important distinction between the MMWA's standard for written warranty claims, on the one hand, and implied warranty claims, on the other.  MMWA claims concerning implied warranties are dependent on state law, but MMWA claims based on written

31

warranties, such as the claims in this case, are <u>not</u> dependent on state law. *Compare* § 15 U.S.C. § 2301(7) (defining an "implied warranty" as "an implied warranty arising under State law") *with* § 15 U.S.C. 2301(6) (defining the terms of a "written warranty," with no mention of state law). Where an MMWA claim concerns a written warranty, it is independent of state law, and the protections of the MMWA are often broader than state law protections. *See, e.g.*, *Borchardt v. Mako Marine Int'l, Inc.*, 2011 WL 2084177, at *5 (S.D. Fla. May 24, 2011) ("[T]he plaintiffs' MMWA claim does not fail simply because their state law express warranty claims fail.").

### C.  SIG Had Ample Notice Of Plaintiff's Warranty Claims

SIG argues that "Plaintiff's breach of warranty claims must also be dismissed because Plaintiff did not provide notice of any alleged breach to SIG Sauer within a reasonable time after discovery of such breach." MSJ at 29. That is wrong. At most, pre-suit notice "only needs to be sufficient to let the seller know that the transaction [was] still troublesome and [needed to] be watched." *Royal Typewriter Co., Div. of Litton Business Systems, Inc. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1102 (11th Cir. 1982).

Here, Defendant cannot rely on a lack of notice from Plaintiff because it already had actual notice of the defect. *See, e.g.*, *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 638 (Ohio 1989) ("While Chemtrol admits in effect that no formal notice was given, reviewing the Wise and Crowley affidavits a reasonable person could conclude that Midland-Ross had knowledge of the damage sustained by Chemtrol shortly after the damage occurred."). Here, SIG knew since before it even started selling the P320 that it had a drop-fire defect. It was then constantly reminded of that fact when the military, Caracal, and then consumers started informing it about drop-fire defects and incidents.

Defendant was also provided with sufficient notice in the first-filed matter of *Gordon v. SIG Sauer, Inc.*, Case No. 4:19-cv-00585 (S.D. Tex. Feb. 20, 2019). There, the named plaintiff

Danté Gordon sent a pre-suit notice letter to SIG "pursuant to U.C.C. § 2-607(3)(a) concerning breaches of express and implied warranties relating to our client, Danté Gordon, and a class of all similarly situated purchasers of SIG P320 semi-automatic pistols." *Gordon*, ECF No. 1-1. This letter indicated that "due to a defect, SIG P320 pistols can inadvertently discharge a round of ammunition if dropped on the ground," and that SIG "breached express and implied warranties made to our client and the Class." *Id.*

## IV.     SIG DOES NOT CONTEST PLAINTIFF'S UNJUST ENRICHMENT AND FRAUD-BASED CLAIMS

As the moving party, SIG "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But while Defendant requests that the court "enter summary judgment in favor of Defendants on all of Plaintiff's Claims" (MSJ at 31), Defendant does not contest Plaintiff's claims for unjust enrichment, fraudulent omission, or fraud. *See*, *generally*, MSJ. Thus, the Court cannot grant summary judgment with respect to these claims.

## <u>CONCLUSION</u>

For these reasons, the Court should deny summary judgment.

Dated: November 12, 2021                    Respectfully submitted,

                                            **BURSOR & FISHER, P.A.**

                                            By:     */s/ Joseph I. Marchese*
                                                        Joseph I. Marchese

                                            **BURSOR & FISHER, P.A.**
                                            Joseph I. Marchese (*pro hac vice*)
                                            NY State Bar No. 4238317
                                            Joshua D. Arisohn (*pro hac vice*)
                                            NY State Bar No. 4495198
                                            888 Seventh Avenue
                                            New York, NY 10019

Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com
        jarisohn@bursor.com

**BURSOR & FISHER, P.A.**
Neal J. Deckant (*pro hac vice*)
CA State Bar No. 322946
NY State Bar No. 5026208
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com

**DOUGLAS, LEONARD & GARVEY, P.C.**
Charles G. Douglas, III
NH Bar #669
Benjamin T. King
NH Bar #12888
14 South Street, Suite 5
Concord, NH 03301
Telephone: (603) 224-1988
E-Mail:  chuck@nhlawoffice.com
         benjamin@nhlawoffice.com